**No. 25-_____**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

In re DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*,

*Petitioners-Defendants.*

(full caption on inside cover)

On Petition for Writ of Mandamus to the United States District Court
for the Northern District of California

## PETITION FOR WRIT OF MANDAMUS AND
## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR
## STAY PENDING CONSIDERATION OF THE PETITION AND
## IMMEDIATE ADMINISTRATIVE STAY

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

CRAIG H. MISSAKIAN
  *United States Attorney*

COURTNEY L. DIXON
MAXWELL A. BALDI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7513*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

---

In re DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*,

---

DONALD J. TRUMP, *in his official capacity as President of the United States*; OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, *in his official capacity as Director of U.S. Office of Management and Budget*; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT; CHARLES EZELL, *in his official capacity as Acting Director of the U.S. Office of Personnel Management*; UNITED STATES DEPARTMENT OF GOVERNMENT EFFICIENCY; ELON MUSK, *in his official capacity*; AMY GLEASON, *in her official capacity as Acting Administrator of the Department of Government Efficiency*; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, *in her official capacity as Secretary of the U.S. Department of Agriculture*; UNITED STATES DEPARTMENT OF COMMERCE; HOWARD LUTNICK, *in his official capacity as Secretary of the U.S. Department of Commerce*; UNITED STATES DEPARTMENT OF DEFENSE; PETER HEGSETH, *in his official capacity as Secretary of the U.S. Department of Defense*; UNITED STATES DEPARTMENT OF ENERGY; CHRIS WRIGHT, *in his official capacity as Secretary of the U.S. Department of Energy*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, Jr., *in his official capacity as Secretary of the U.S. Department of Health and Human Services*; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, *in her official capacity as Secretary of the U.S. Department of Homeland Security*; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, *in his official capacity as Secretary of the U.S. Department of Housing and Urban Development*; UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, *in her official capacity as Attorney General of the United States*; UNITED STATES DEPARTMENT OF THE INTERIOR; DOUG BURGUM, *in his official capacity as Secretary of the U.S. Department of the Interior*; UNITED STATES DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, *in her official capacity as Secretary of the U.S. Department of Labor*; UNITED STATES DEPARTMENT OF STATE; MARCO RUBIO, *in his official capacity as Secretary of the U.S. Department of State*; UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT, *in his official capacity as Secretary of U.S. Department of Treasury*; UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN DUFFY, *in his official capacity as Secretary for the U.S. Department of Transportation*; UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; DOUG COLLINS, *in his official capacity as Secretary of Veterans Affairs*; AMERICORPS, (a.k.a the Corporation for National and Community Service); JENNIFER BASTRESS TAHMASEBI, *in her official capacity as Interim Agency Head of AmeriCorps*; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, *in his official capacity as Administrator of U.S. Environmental Protection Agency*; UNITED STATES GENERAL SERVICES ADMINISTRATION; STEPHEN EHIKIAN, *in his official capacity as Acting Administrator for U.S. General Services Administration*; NATIONAL LABOR RELATIONS BOARD; MARVIN E. KAPLAN, *in his official capacity as Chairman of the National Labor Relations Board*; WILLIAM COWEN, *in his official capacity as the Acting General Counsel of the National Labor Relations Board*; NATIONAL SCIENCE FOUNDATION; BRIAN STONE, *in his official capacity as Acting Director of the National Science Foundation*; UNITED STATES SMALL BUSINESS ADMINISTRATION; KELLY LOEFFLER, *in her official capacity as Administrator of the U.S. Small Business Administration*; SOCIAL SECURITY ADMINISTRATION; FRANK BISIGNANO, *in his official capacity as Commissioner of Social Security*,

*Petitioners-Defendants*,

v.

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

*Respondent*,

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; AFGE LOCAL 1122; AFGE LOCAL 1236; AFGE LOCAL 2110; AFGE LOCAL 3172; SEIU LOCAL 1000; ALLIANCE FOR RETIRED AMERICANS; AMERICAN GEOPHYSICAL UNION; AMERICAN PUBLIC HEALTH ASSOCIATION; CENTER FOR TAXPAYER RIGHTS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; COMMON DEFENSE CIVIC ENGAGEMENT; MAIN STREET ALLIANCE; NATURAL RESOURCES DEFENSE COUNCIL, INC.; NORTHEAST ORGANIC FARMING ASSOCIATION, INC.; VOTEVETS ACTION FUND INC.; WESTERN WATERSHEDS PROJECT; COUNTY OF SANTA CLARA; CITY OF CHICAGO; COUNTY OF MARTIN LUTHER KING, JR.; COUNTY OF HARRIS; CITY OF BALTIMORE; *and* CITY AND COUNTY OF SAN FRANCISCO,

*Real Parties in Interest-Plaintiffs*.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................... 1

STATEMENT ......................................................................................... 3

    A.    Statutory and Regulatory Background ........................................ 3

    B.    The Executive Order and Memorandum .................................... 4

ARGUMENT ........................................................................................ 10

I.    The Court should exercise its mandamus authority to block the production order. ................................................................................ 10

    A.    The district court clearly erred in compelling production of the Plans. ........................................................................................ 11

    B.    The government will suffer irreparable harm absent mandamus and a post-judgment appeal does not provide an adequate means for relief. ...................................................................................... 20

    C.    The issues presented are important and warrant this Court's immediate intervention. ............................................................. 21

II.    This Court should grant a stay pending review of the petition and an immediate administrative stay ....................................................... 22

CONCLUSION .................................................................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## INTRODUCTION

Pursuant to the All Writs Act, 28 U.S.C. § 1651, and Rule 21 of the Federal Rules of Appellate Procedure, the federal government respectfully asks this Court to issue a writ of mandamus directing the district court to vacate its order of July 18, 2025, which directs the government to produce voluminous privileged documents to plaintiffs' counsel and the district court. As of now, the government is required to produce the documents for *in camera* review and to the plaintiffs' counsel by noon PDT on Wednesday, July 23. The government requested that the district court stay any order compelling production pending final resolution of a mandamus petition or at least to stay any such order for seven days to allow for orderly appellate review. Dkt. 208 at 18. By ordering production without addressing that request, the district court implicitly refused to grant a stay. Therefore, the government also seeks an immediate administrative stay and stay pending consideration of this petition to pause its production obligation until this Court can address the lawfulness of the district court's order.

The district court clearly erred in requiring disclosure of the documents and the government will suffer irreparable harm absent mandamus. On July 8, with only one noted dissent, the Supreme Court stayed a preliminary injunction issued by the district court in this case, concluding that plaintiffs were unlikely to succeed on the merits of their challenges to an Executive Order and an associated guidance memorandum, which call for agencies to prepare to reorganize themselves and to undertake

reductions in force (RIFs) consistent with applicable law. *See Trump v. AFGE*, No. 24A1174, 2025 WL 1873449, at *1 (U.S. July 8, 2025). Yet just ten days later, the district court issued an order compelling production of privileged documents concerning agency plans for those potential reorganizations and RIFs. And it did so despite plaintiffs' failure to identify any viable legal theory for which the documents they seek could make a material difference.

The documents the district court ordered the government to produce are plainly covered by the deliberative-process privilege. They are pre-decisional planning tools requested by the President and submitted to a component of the Executive Office of the President to memorialize agencies' thinking at one stage of an interagency dialogue about plans for potential RIFs and reorganizations. A court may authorize discovery into such Executive Branch deliberations only as a last resort. But here, the district court reflexively ordered production, ignoring many other viable alternatives—including first resolving the government's forthcoming motion to dismiss. In similar circumstances, the Supreme Court recently summarily reversed the D.C. Circuit's denial of mandamus relief to the government. *See U.S DOGE Service v. Center for Responsibility & Ethics in Wash.,* 145 S. Ct. 1981, 1982 (2025).

The prospect of production will have a chilling effect on internal Executive Branch deliberations and a prejudicial effect on the government in litigating challenges to the agency actions that were the subject of the deliberations. That the district court restricted dissemination to the government's litigation adversaries does not alleviate

those harms.  And once confidential information is disclosed, that disclosure cannot be undone.  Mandamus and an immediate stay are warranted.

## STATEMENT

### A.     Statutory and Regulatory Background

**1**.  The Office of Personnel Management (OPM) is an independent establishment in the Executive Branch that assists the President in overseeing the federal workforce.  *See* 5 U.S.C. §§ 1101-1104.  The Office of Management and Budget (OMB) is a component of the Executive Office of the President (EOP) that assists the President in preparing the budget and overseeing agencies.  *See* 31 U.S.C. §§ 501-503.  The U.S. DOGE Service (USDS) is an entity in EOP created to help advise and consult on the President's agenda of "modernizing federal technology and software to maximize governmental efficiency and productivity."  Executive Order 14158, 90 Fed. Reg. 8441, 8441 (Jan. 29, 2025).

**2**.  Federal law expressly recognizes that the government may conduct RIFs, an "administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions."  *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002); *see* 5 U.S.C. § 3502.  OPM has promulgated regulations specifying requirements for RIFs, under which "OPM may examine an agency's preparations for [RIFs] at any stage."  5 C.F.R. § 351.205.

Agencies' authority to conduct RIFs predates the modern civil service.  *See* Act of Aug. 15, 1876, 19 Stat. 143, 169; *see generally Hilton v. Sullivan*, 334 U.S. 323, 336-39

3

(1948). Courts have recognized the government's broad discretion to decide which employees to retain or separate. *See, e.g.*, *Keim v. United States*, 177 U.S. 290, 295 (1900). And the President has often set priorities for federal agencies resulting in RIFs. *See, e.g.*, Executive Order 12839, 58 Fed. Reg. 8515, 8515 (Feb. 10, 1993) (directing 4% reduction in civilian workforce to be implemented through "detailed instructions" from OMB).

### B.    The Executive Order and Memorandum

In February, the President issued an executive order, directing "Agency Heads [to] promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law." Add.158-60 (Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025)). The order sets priorities for how agencies carry out RIFs and categorically exempts from RIFs "functions related to public safety, immigration enforcement, or law enforcement." Add.159.

The Executive Order further provides that, by March 13, 2025, "Agency Heads shall submit to" OMB "a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities," and which "discuss[es] whether the agency or any of its subcomponents should be eliminated or consolidated." Add.159. The Executive Order again emphasizes that agency heads need not consider reductions for "any position they deem necessary to meet national security, homeland security, or public safety responsibilities," Add.159, and that the

order "shall be implemented consistent with applicable law and subject to the availability of appropriations." Add.160.

Two weeks later, OPM and OMB jointly issued a guidance Memorandum to agencies. Add.162-68 (*Guidance on Agency RIF and Reorganization Plans Requested by Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 26, 2025)). The Memorandum explained that agencies should submit Agency RIF and Reorganization Plans that "seek to achieve" (1) "[b]etter service for the American people"; (2) "[i]ncreased productivity; (3) "[a] significant reduction in the number of full-time … positions by eliminating positions that are not required"; (4) "[a] reduced real property footprint; and (5) "[r]educed budget topline." Add.162-63. OPM and OMB cautioned agencies, in formulating the Plans, to review "their statutory authority and ensure that their plans and actions are consistent with such authority." Add.163.

The Memorandum explains that agencies should submit Plans in two phases. The initial Plans were to be submitted by March 13, 2025, and "focus[ed] on initial agency cuts and reductions." Add.164. The second-phase Plans, to be submitted by April 14, 2025, "outline[d] a positive vision for more productive, efficient agency operations going forward" to be implanted by the end of the fiscal year. Add.165. The Plans were to be submitted to OMB and OPM "for review and approval." Add.164-65.

The Plans do not themselves implement any RIFs.  Rather, the Plans describe RIFs that an agency may undertake.  Add.165-66.  Agencies must then follow an established process to actually reduce their workforce, including providing 30- or 60-days' notice, *id.* at 7.  *See* 5 U.S.C. § 3502; 5 C.F.R. Part 351 Subpart H.

## C.  Prior Proceedings

Plaintiffs are unions, advocacy organizations, and local governments.  Add.51-59.  Eleven weeks after the President issued the Executive Order, they sued the President, OPM, OMB, USDS, and twenty-one federal agencies—including every Cabinet-level agency except the Department of Education.  Add.59-64.  Plaintiffs principally alleged that the President transgressed the separation of powers by directing agencies to prepare for RIFs and that OMB and OPM usurped other agencies' statutory authority by providing related guidance as the President directed. *See, e.g.*, Add.49.

**1.**  The district court entered a putative temporary restraining order on May 9, 2025, and further ordered the government to produce, by May 13, 2025, four categories of documents: (1) "the versions of all defendant agency [Plans] submitted to OMB and OPM," (2) "the versions of all" Plans "approved by OMB and OPM," (3) "any agency applications for waivers of statutorily-mandated RIF notice periods," and (4) "any responses by OMB or OPM to such waiver requests."  Dkt. 85 at 40.  In ordering the production of those documents, the court explained only that "good

cause [for disclosure] ha[d] been shown pursuant to Federal Rule of Civil Procedure 26(d)." *Id.*

The government moved for reconsideration and a protective order to prevent disclosure of the Plans, Add.173-83, and the plaintiffs agreed not to oppose an order pausing the government's production obligation until the court ruled on the motion for reconsideration, Add.171-72.  In light of the deadline to disclose the documents, the government filed a mandamus petition in this Court.  *See In re Trump*, No. 25-3034 (9th Cir.).

The district court subsequently stayed its discovery order pending further consideration of the government's motion.  Add.169.  The district court then entered an order directing the government to file additional declarations to enable the district court to "assess whether the [deliberative process] privilege applies" to the agency Plans it had previously ordered the government to produce.  Add.29.  In light of that order, the government withdrew its mandamus petition while reserving the right to seek relief again if the court ordered disclosure of privileged materials. *See* Mot. to Withdraw Mandamus Pet., *In re Trump*, No. 25-3034 (9th Cir. May 30, 2025).

**2.**  The district court entered a preliminary injunction on May 22, 2025.  On the merits, the court held that absent express authorization, the President cannot direct agencies to engage in large-scale RIFs and that OMB, OPM, and USDS are unlawfully usurping agencies' authority to make RIF determinations.  Dkt. 124.  The court prospectively enjoined about 20 agencies, OMB, OPM, and USDS, as well as "any

7

other individuals acting under their authority or the authority of the President," from "taking any actions to implement or enforce sections 3(c) and 3(e)" of the Executive Order or the Memorandum.  *Id.* at 47-48.

The government appealed and sought a stay pending appeal.  A divided motions panel of this Court denied the stay motion.  *See AFGE v. Trump*, 2025 WL 1541714 (9th Cir. May 30, 2025).

**3.**  The government thereafter applied to the Supreme Court for a stay of the preliminary injunction, which the Court granted on July 8, 2025.  The Court noted that the government is "likely to succeed on its argument that the Executive Order and Memorandum are lawful," and that the "other factors bearing on whether to grant a stay are satisfied."  2025 WL 1541714, at *1.  The Court explained that it "express[ed] no view on the legality of any Agency RIF and Reorganization Plan," noting that the district court "enjoined further implementation or approval of the plans based on its view about the illegality of the Executive Order and Memorandum, not on any assessment of the plans themselves," which were not before the Court.  *Id.*

Justice Sotomayor concurred in the grant of a stay, noting that "the relevant Executive Order directs agencies to plan reorganizations and reductions in force 'consistent with applicable law,'" as the Memorandum reiterated, and that "[t]he plans themselves are not before this Court."  2025 WL 1541714, at *1 (Sotomayor, J., concurring).  Only Justice Jackson filed a dissent.

**4.** Following the Supreme Court's stay decision, plaintiffs filed in district court an "urgent request" that the district court confirm its prior discovery order and deny the government's request for reconsideration and a protective order. Add.12-26.

The district court granted plaintiffs' motion in part on July 18, 2025, ordering the government to produce to the court and plaintiffs' counsel, by Wednesday, July 23, at noon PST, "the versions of [Plans] submitted to OMB and OPM" and "the versions of [Plans] approved by OMB and/or OPM." Add.10.

Addressing the deliberative process privilege, the district court assumed that "at least some [Plans] may include pre-decisional and deliberative materials," but concluded that plaintiffs' need for the Plans outweighed the government's interest in non-disclosure. Add.7. The district court concluded that the Plans were relevant to plaintiffs' claim under the Administrative Procedure Act alleging that defendants' "implementation of [the Plans] are arbitrary and capricious." Add.6. The court rejected the government's arguments that, to the extent plaintiffs alleged any APA claim challenging the agency's implementation of RIFs that remained viable following the Supreme Court's stay decision, any such claim would have to be "adjudicated based on the administrative record," which has not yet been compiled, and the Plans would not be part of the administrative record. Add.6. The court explained that there are "exceptions to the general rule that courts" are limited to the administrative record and speculated that such an exception might apply here. Add.6. The court dismissed as "specious" the government's assertions that disclosure of the Plans

would harm the government, noting that any harm to the government is "self-inflicted" by the government's decision to engage in RIFs.  Add.6.

In ordering disclosure, the court granted the government's motion for a protective order limiting dissemination of the Plans to plaintiffs' counsel, at least "at this still-early stage of the case."  Add.9.  The district court also permitted the government to redact, in the material provided to plaintiffs' counsel "any material addressing union negotiating strategy."  Add.9.

## ARGUMENT

**I.    The Court should exercise its mandamus authority to block the production order.**

Mandamus relief is appropriate where a petitioner has "no other adequate means to attain the relief desired," where "the right to the writ is clear and indisputable," and where "the writ is appropriate under the circumstances."  *Karnoski v. Trump*, 926 F.3d 1180, 1203 (9th Cir. 2019) (per curiam) (quoting *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380-81 (2004)).  This Court considers:

> (1) whether the petitioner has no other means, such as a direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in any way not correctable on appeal; (3) whether the district court's order is clearly erroneous as a matter of law; (4) whether the district court's order is an oft repeated error or manifests a persistent disregard of the federal rules; and (5) whether the district court's order raises new and important problems or issues of first impression.

*Id.* (citing *Bauman v. U.S. Dist. Court*, 557 F.2d 650, 654-55 (9th Cir. 1977)).  These factors "serve as guidelines," and "[n]ot every factor need be present at once" or even

10

"point in the same direction" for a writ of mandamus to issue.  *Hernandez v. Tanninen*, 604 F.3d 1095, 1099 (9th Cir. 2010) (quotation marks omitted).

### A.  The district court clearly erred in compelling production of the Plans.

The deliberative process privilege is a subset of executive privilege and protects deliberations by shielding from disclosure documents "reflecting advisory opinions, recommendations and comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975). "[I]t would be impossible to have any frank discussions of legal or policy matters in writing if all such writings were to be subjected to public scrutiny." *EPA v. Mink*, 410 U.S. 73, 87 (1973).

The privilege may be overcome if a litigant's "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *FTC v. Warner Communc'ns*, 742 F.2d 1156, 1161 (9th Cir. 1984) (per curiam).  In assessing a claim under the privilege, a court must consider "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.*

**1.**  The district court assumed without deciding that the Plans may contain material covered by the privilege.  *See* Add.6.  That assumption was plainly warranted. The Plans are predecisional.  "A predecisional document is one prepared in order to

11

assist an agency decisionmaker in arriving at his decision." *Assembly of State of Cal. v. U.S. Dep't of Com.*, 968 F.2d 916, 920 (9th Cir. 1992) (quotation marks omitted). That is satisfied here. The final decision an agency will reach is whether or not to conduct a RIF or otherwise to reorganize itself. That is true regardless of whether OPM or OMB opines on a Plan because the final authority to proceed with a RIF rests with the employing agency. The Plans do not embody any final decisions on RIFs or reorganizations; rather, they are "subject to change at any moment as the agency's needs, missions, and staffing evolve or as new leadership joins an agency." Add.185. A Plan is never final and may change drastically as the agency's priorities and thinking changes. "Indeed, the non-final and frequently changing nature of [Plans] is one of the reasons OMB and OPM requested that the agencies submit monthly progress reports in May, June, and July." Add.185. Nothing in any Plan irrevocably commits an agency to taking any specific step. Add.185. The Plans are also deliberative. "A predecisional document is a part of the deliberative process, if the disclosure of the materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Carter*, 307 F.3d at 1089. As the Memorandum and the Billy Declaration both make clear, the Plans contain a significant amount of information concerning the agencies' future plans and strategies, not all of which will actually be acted upon.

**2.** The relevant question is therefore whether the privilege can be overcome. The district court clearly erred in concluding that it could.

Foremost, the Plans are not relevant to any viable claim plaintiffs could assert. Plaintiffs' core theory in this lawsuit is that the Executive Order and Memorandum are unlawful because Congress must affirmatively authorize the President to direct agencies to conduct "large-scale" RIFs and OPM, OMB, and USDS lack authority to review and approve agencies' Plans. *See, e.g.*, Add.49, 140, 142, 144-46. As the Supreme Court's stay order confirms, plaintiffs are "likely" to fail on that theory. *See Trump v. AFGE*, No. 24A1174, 2025 WL 1873449, at *1 (U.S. July 8, 2025) (holding that "the Government is likely to succeed on its argument that the Executive Order and Memorandum are lawful"). And more importantly for present purposes, the validity of that theory cannot possibly turn on the content of any particular Plan. The President's authority to issue an Executive Order, and OMB and OPM's authority to issue guidance on implementing that order, does not depend on Plans that agencies issue in response to the Executive Order and Memorandum. Indeed, it is blackletter administrative law that challenges may not rest on post-decision records. *See Southwestern Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). Nor could the content of the Plans inform whether the Executive Order or Memorandum are themselves legal where, as Justice Sotomayor emphasized in her concurrence, the Executive Order and Memorandum direct agencies to proceed "consistent with applicable law." *Trump v. AFGE*. 2025 WL 1541714, at *1

(Sotomayor, J., concurring) (citation omitted).  To the extent a particular Plan developed by an agency was unreasonable or recommended a course of action that was not consistent with applicable law, that would be a defect in the Plan—it would not demonstrate that the Executive Order and Memorandum were themselves unlawful.

The district court understood one claim in plaintiffs' complaint to arguably allege an APA arbitrary-and-capricious challenge to agencies' "implementation of [the Plans]."  Add.5.  A challenge to unspecified future agency action is not a cognizable APA claim to begin with.  But even assuming plaintiffs may bring an APA claim in district court to agencies' implementation of a specific RIF, plaintiffs here do not challenge the specifics of any final agency action implementing any particular RIF.  Rather, plaintiffs allege wholesale that agencies are violating the APA by "implementing the President's" Executive Order and acting pursuant to the Memorandum.  *E.g.*, Add.149.  That claim, like plaintiffs' other claims, turns on plaintiffs' arguments about the Executive Order and the Memorandum.  As with plaintiffs' other claims, the Supreme Court's stay order confirms that argument is not viable, and the content of any particular Plan is not relevant to addressing it.  Now that the Court has concluded plaintiffs are likely to fail on their core theory, plaintiffs cannot turn this suit into a vehicle for challenging particular agency RIFs that have not been finalized.  Nor could plaintiffs plausibly seek to challenge the Plans themselves, given that those Plans are—by their nature—deliberative documents that

14

do not mark the consummation of an agencies' thinking on RIFs and reorganizations and carry no legal consequences. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The district court clearly erred in requiring the government to disclose agency Plans for RIFs that have not yet occurred and that are not properly before the court in this lawsuit.

Moreover, even assuming plaintiffs could somehow pursue in this case an APA claim challenging as arbitrary-and-capricious the specifics of any particular future agency RIF, the district court's disclosure order would still be manifestly improper. Any such APA claim would need to be adjudicated based on the administrative record, of which the Plans would not be a part. An agency's action can be held arbitrary or capricious if the agency's decision is not "founded on a reasoned evaluation of the relevant factors." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (citation omitted); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Because a court "assess[es] the lawfulness of agency action based on the reasons offered by the agency[,] [d]eliberative documents, which are prepared to aid the decision-maker in arriving at a decision, are ordinarily not relevant to that analysis." *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 445 (9th Cir. 2024) (citation omitted). Agencies' plans, which, as discussed above, are deliberative and pre-decisional, would not be part of the administrative record for the agency's final action and would not be relevant to plaintiffs' purported arbitrary-and-capricious claim. An agency is not

15

required to defend every potential option it considered and committed to paper; it would simply have to defend its final decision on the basis of the record it assembles and its own contemporaneous explanation.

The district court did not purport to dispute that the agencies' Plans would not be part of any administrative record. Add.6. Rather, in ordering the Plans' disclosure to plaintiffs, the district court emphasized that there are "'exceptions' to the "general rule" that an APA claim must proceed only on the administrative record, and the court speculated that such an exception might possibly apply here. *See* Add.6. That gets the burden for justifying discovery in an APA case precisely backwards: the burden would be on the plaintiffs, at the appropriate time, to establish that any certified administrative record is inadequate and that extra-record discovery is appropriate. *See San Luis*, 776 F.3d at 993. The burden is not on the government to preemptively negate that any exception might be possible—let alone before any administrative record has even been compiled and certified, in part because many of the potential RIFs discussed in the Plans have not even been finalized. That is particularly true when the plaintiffs have not made any sort of showing of agency bad faith or agency reliance on extra-record materials. *See San Luis*, 776 F.3d at 992. Indeed, the government has not yet responded to plaintiffs' complaint, and it advised the district court that it intended to soon move to dismiss, a motion that it will file today. Doc. 208, at 8; *see In re Musk*, No. 25-5072, 2025 WL 926608, at *1 (D.C. Cir. Mar. 26, 2025) (granting stay pending mandamus because "petitioners have shown a

16

likelihood of success on their argument that the district court was required to decide their motion to dismiss before allowing discovery").  A party should not be able to engage in intrusive discovery to prove up a complaint that suffers from fatal defects. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) ("[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court.") (cleaned up)); *see also In re United States*, 583 U.S. 29, 32 (2017) (per curiam) (vacating and remanding to the district court with instructions to rule on the government's threshold arguments regarding jurisdiction and reviewability under the APA which "likely would eliminate the need for the District Court to examine a complete administrative record.").  That is especially so where the Supreme Court has already held that plaintiffs' claims are likely to fail on purely legal grounds that do not depend on factual development—namely, that the President has lawful authority, with the assistance of OPM and OMB, to direct and guide agencies in implementing RIFs, and that any defects in those future RIFs do not negate the validity of the Executive Order and Memo pursuant to which they were adopted.

The district court's reflexive discovery order is particularly erroneous given the nature of the documents at issue.  The Supreme Court has repeatedly held that "[t]he high respect that is owed to the office of the Chief Executive … is a matter that should inform the conduct of the entire proceeding, including the timing and scope of

discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997). That office's "unique position in the constitutional scheme" "counsel[s] judicial deference and restraint." *Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982). "[S]pecial considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Cheney*, 542 U.S. at 385. And because discovery against the White House raises the prospect of a "'constitutional confrontation'" between the Executive and Judicial Branches, the Supreme Court has made clear that it is reserved for exceptional circumstances and that such confrontations "should be avoided whenever possible." *Id.* at 389-90 (quoting *United States v. Nixon*, 418 U.S. 683, 692 (1974)); *see, e.g., U.S DOGE Service v. Center for Responsibility & Ethics in Wash.,* 145 S. Ct. 1981, 1982 (2025) (summarily vacating denial of mandamus petition because court of appeals gave insufficient consideration to the "separation of powers concerns [that] counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications").

The Supreme Court's decision in *Cheney* illustrates the proper application of these principles. There, President George W. Bush had established a "National Energy Policy Development Group" within the White House to help develop national energy policy over the course of five months. 542 U.S. at 373. A district court authorized extensive discovery into the energy task force as part of litigation to determine whether the task force was subject to the Federal Advisory Committees

Act. *Id.* at 375. After the D.C. Circuit denied the government's petition for a writ of mandamus, the Supreme Court reversed. *Id.* at 376, 392. The Court emphasized that the case did not present "a routine discovery dispute" and that the courts had failed to take adequate account of the "special considerations" that "control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Cheney*, 542 U.S. at 385. Given the separation-of-powers concerns present in those circumstances, the Court made clear that discovery into the actions of the President and his close advisors should be permitted only as a last resort, that district courts must "explore other avenues" to avoid it, and that courts must ensure that any permitted discovery is "precisely identified" and no broader than necessary to serve its purpose. *Id.* at 387, 390.

Here, the district court ordered production of deliberative documents prepared at the request of the President and that the President's Executive Order directed be sent to OMB, a component of the Executive Office of the President. *See* Add.159. These documents speak to how agencies plan to implement core presidential priorities; to be effective, they must candidly convey the agencies' assessments of their staffing needs and programmatic priorities. *See* Add.163-67. It would plainly hamper agencies' ability to communicate effectively with the President and those components charged with coordinating his agenda if agencies had to be concerned about the deliberative documents' use in future litigation. The district court paid no heed to the

19

nature of these documents in hastily ordering their disclosure, without considering alternatives that could obviate any need for discovery—namely, waiting to rule on the need for disclosure until after the district court adjudicated the government's forthcoming motion to dismiss and an administrative record for any properly challenged RIFs are certified and deemed inadequate.

### B. The government will suffer irreparable harm absent mandamus and a post-judgment appeal does not provide an adequate means for relief.

Disclosure of confidential information is irreversible. "[O]nce a secret is revealed, there is nothing for [a court order] to protect." *Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, 306 F. App'x 727, 732 (3d Cir. 2009). As a party is likely to suffer irreparable harm if required to disclose privileged materials, courts recognize that mandamus is appropriate to review such disclosure orders. *See, e.g., In re von Bulow*, 828 F.2d 94, 98 (2d Cir. 1987) (recognizing that "appeal after judgment" is "inadequate at best" to address compelled disclosure of privileged material). The need for interlocutory review is heighted here given "[t]he unique features of the … deliberative process privilege." *Karnoski*, 926 F.3d at 1203.

Here, disclosure "would seriously undermine agency operations" across the Executive Branch. Add.185. As an OMB declarant explains, the Plans contain "highly sensitive information," which may include nascent regulatory plans, and intended approaches for engaging with Congress. Add.185. The protective order the district court issued does not ameliorate the discovery order's unwarranted intrusion

into the government's privileged deliberations.  It cannot eliminate the chilling effect created by disclosures of deliberative materials, nor justify disregarding the government's interest in maintaining the documents' confidentiality.  *Cf. Perry v. Schwarzenegger*, 591 F.3d 1147, 1163-64 (9th Cir. 2009) (granting defendants' mandamus petition and overruling a district court's order compelling the defendants to produce documents whose disclosure threatened to "inhibi[t] internal campaign communications that are essential to effective association and expression," while emphasizing that "[a] protective order limiting dissemination of this information will ameliorate but cannot eliminate these threatened harms").  Moreover, disclosing to litigation adversaries deliberative plans concerning future agency actions that will be subject to litigation causes the very type of harm to the government that the deliberative process privilege is meant to prevent.

### C.  The issues presented are important and warrant this Court's immediate intervention.

The deliberative process privilege exists because disclosure of deliberative documents chills the willingness of government officials to engage in "open, frank discussion[s]" about difficult policy choices.  *Mink*, 410 U.S. at 87.  Here, where the discission involves top-level officials making long-term policy judgments at the President's request, the government's interest in confidentiality is at its apex.  The government cannot function if officials are worried that in writing down their strategies for future staffing needs or for budget talks with congressional

21

appropriators or for any number of other sensitive decisions, those deliberations may be shared on a whim. The stakes of disclosure justify this Court's exercise of its mandamus jurisdiction.

## II. This Court should grant a stay pending review of the petition and an immediate administrative stay.

This Court should also stay the district court's order pending its consideration of this petition and grant an administrative stay pending its consideration of the stay motion. This Court commonly grants stays pending disposition of a writ of mandamus, including in cases involving challenges to discovery orders. *See, e.g.*, Order, *In re United States of America*, No. 17-72917 (Oct. 24, 2017) (staying discovery and record supplementation); *Barton v. U.S. Dist. Court*, 410 F.3d 1104, 1106 (9th Cir. 2005). A stay is equally appropriate here.

Once the government has been required to turn over the Plans, the intrusion upon the prerogatives and autonomy of the Executive Branch and the confidentiality of its communications will have occurred and cannot be remedied. Conversely, plaintiffs will not be harmed if it is prevented from obtaining (improper and irrelevant) discovery during the short time it will take this Court to decide the government's mandamus petition. Given the significant separation-of-powers concerns that the district court's order raises and the absence of any clear, immediate need for intrusive discovery, the equities and public interest plainly favor a stay.

## CONCLUSION

For the foregoing reasons, this Court should grant an immediate administrative stay and grant a stay pending resolution of the petition for mandamus.  Additionally, this Court should issue a writ of mandamus compelling the district court to vacate its July 18 production order.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

CRAIG H. MISSAKIAN
   *United States Attorney*

COURTNEY L. DIXON

   */s/ Maxwell A. Baldi*
MAXWELL A. BALDI
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7513*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-1754*

July 2025

## CERTIFICATE OF COMPLIANCE

This petition complies with the type-volume limit of Federal Rule of Appellate Procedure 21(d)(2) and Circuit Rule 32-3 because it contains 5,486 words. This petition also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

/s/ Maxwell A. Baldi
Maxwell A. Baldi

# CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, I electronically filed the foregoing

petition with the Clerk of the Court for the United States Court of Appeals for the

Ninth Circuit by using the appellate CM/ECF system.  Service has been accomplished

via e-mail to the following counsel:

*Counsel for Real Party in Interest-Plaintiffs:*
Molly J. Alarcon (molly.alarcon@sfcityatty.org)
Tiffany Bingham (tiffany.bingham@harriscountytx.gov)
Matthew Stark Blumin (mblumin@afscme.org)
Barbara Jane Chisholm (bchisholm@altber.com)
Bethany Dwyer (bethany.dwyer@harriscountytx.gov)
Norman L. Eisen (Norman@statedemocracydefenders.org)
Sara Jennifer Eisenberg (sara.eisenberg@sfcityatty.org)
Jonathan G.C. Fombonne (jonathan.fombonne@harriscountytx.gov)
Hannah Mae Godbey (hannah.godbey@cco.sccgov.org)
Elena Goldstein (egoldstein@democracyforward.org)
Sara Gross (sara.gross@baltimorecity.gov)
David J Hackett (david.hackett@kingcounty.gov)
Rebecca A. Hirsch (Rebecca.Hirsch2@cityofchicago.org)
Alison Chinn Holcomb (aholcomb@kingcounty.gov)
Alexander Justin Holtzman (alexander.holtzman@sfcityatty.org)
Tsuki Hoshijima (thoshijima@democracyforward.org)
Corinne F Johnson (cjohnson@altber.com)
Meredith Anne Johnson (meredith.johnson@cco.sccgov.org)
Stephen J. Kane (Stephen.kane@cityofchicago.org)
Alex Keiser (alex.keiser@harriscountytx.gov)
Erin King-Clancy (erin.king-clancy@kingcounty.gov)
Spencer W. Klein (Spencer@statedemocracydefenders.org)
Jacob Kovacs-Goodman (Jacob@statedemocracydefenders.org)
Mollie M Lee (mollie.lee@sfcityatty.org)
Danielle Evelyn Leonard (dleonard@altshulerberzon.com)
Stacey M. Leyton (sleyton@altshulerberzon.com)
Anthony J LoPresti (tony.lopresti@cco.sccgov.org)
Yvonne Rosil Mere (yvonne.mere@sfcityatty.org)
Sharanya Mohan (sai@publicrightsproject.org)
Kavita Kandala Narayan (Kavita.Narayan@cco.sccgov.org)

Erica Newland (erica.newland@protectdemocracy.org)
Teague Paterson (TPaterson@afscme.org)
Skye L. Perryman (sperryman@democracyforward.org)
Lucy Prather (lucy.prather@cityofchicago.org)
Jacek Pruski (jacek.pruski@protectdemocracy.org)
Raphael N. Rajendra (raphael.rajendra@cco.sccgov.org)
Rushab Sanghvi (sanghr@afge.org)
Aaron Schaffer-Neitz (aschafferneitz@altshulerberzon.com)
Robin Starr Tholin (rtholin@altshulerberzon.com)
Julia Torti (jules.torti@protectdemocracy.org)
Robert Chan Tysor, Jr (chan.tysor@harriscountytx.gov)
Steven K. Ury (steven.ury@seiu.org)
Sarah Utley (sarah.utley@harriscountytx.gov)
Alice X Wang (awang@altshulerberzon.com)

The district court has been provided with a copy of this petition.

*/s/ Maxwell A. Baldi*
Maxwell A. Baldi

**ADDENDUM**

# TABLE OF CONTENTS

**Page**

Order Granting in Part and Denying in Part Motion for Protective Order or Reconsideration and Requiring Production of Agency RIF And Reorganization Plans, Dkt. 214 (Jul. 18, 2025) ............................................................Add.1

Plaintiffs' Urgent Request for Ruling Confirming Prior Expedited Discovery Order, Denial of Defendants' Motion for Reconsideration and Protective Order, and Request for Modification, Dkt. 176 (Jul. 9, 2025) ................................Add.12

Order Re: Production of Certain Discovery Documents, Dkt. 139 (May 29, 2025) ....................................................................................................................Add. 27

Order Directing In Camera Production, Dkt. 109 (May 15, 2025) ........................Add.30

Amended Complaint, Dkt. 100 (May 14, 2025)........................................................Add.35

Exhibit A to Amended Complaint, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative" Executive Order  14210, 90 Fed. Reg. 9669 (Feb. 11, 2025), Dkt. 100-1 (May 14, 2025) ...................................................................................................................Add.157

Exhibit B to Amended Complaint, Memorandum from Russell T. Vought, Director, Office of Management and Budget and Charles Ezell, Acting Director, Office of Personnel Management, to Heads of Executive Departments and Agencies (Feb. 26 2025), Dkt. 100-2 (May 14, 2025) .............Add.161

Order Postponing Production Deadline, Dkt. 92 (May 12, 2025) .......................Add.169

Notice re Motion for Protective Order, Dkt. 89 (May 11, 2025) .........................Add.171

Motion for Protective Order, Dkt. 88 (May 11, 2025) ..........................................Add.173

Exhibit A to Motion for Protective Order, Declaration of Stephen M. Billy, Dkt. 88-1 (May 11, 2025)......................................................................................Add.184

i

United States District Court<br>Northern District of California

1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

7 AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO,
8 et al.,

9                Plaintiffs,

10       v.

11 DONALD J. TRUMP, et al.,

12                Defendants.

Case No. 25-cv-03698-SI

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
PROTECTIVE ORDER OR
RECONSIDERATION AND
REQUIRING PRODUCTION OF
AGENCY RIF AND
REORGANIZATION PLANS**

Re: Dkt. Nos. 88, 165

13

14

15      On May 9, 2025, the Court ordered defendants to disclose their Agency RIF[1] and

16 Reorganization Plans (ARRPs). Dkt. No. 85 at 40. Defendants moved for a protective order or for

17 reconsideration. Dkt. No. 88. The Court partly granted defendants' motion by staying the

18 production deadline pending further briefing. Dkt. No. 92. For the reasons explained below, the

19 Court now GRANTS in part and DENIES in part defendants' motion.

20

21                              **BACKGROUND**

22      Pursuant to the President's Executive Order 14210 and a February 26, 2025 joint

23 memorandum, the Office of Management and Budget (OMB) and the Office of Personnel

24 Management (OPM) required the heads of federal departments and agencies to submit "Phase 1"

25 and "Phase 2" ARRPs for review and approval by March 13 and April 14. Dkt. No. 37-1, Exs. A,

26 B. On May 1, 2025, plaintiffs in this action moved for a temporary restraining order and requested,

27

28             [1] A "RIF" is a reduction in force.

1    among other relief, "that the Court order that OMB and OPM immediately provide to the Court and

2    to Plaintiffs the Federal Defendant Agency ARRPs, which Defendants have to date kept secret."

3    Dkt. No. 37 at 50.  In its May 9, 2025 order granting a temporary restraining order, the Court ordered

4    defendants to provide to the Court and to plaintiffs the following categories of documents: "(1) the

5    versions of all defendant agency ARRPs submitted to OMB and OPM, (2) the versions of all

6    defendant agency ARRPs approved by OMB and OPM, (3) any agency applications for waivers of

7    statutorily-mandated RIF notice periods, and (4) any responses by OMB or OPM to such waiver

8    requests[.]" Dkt. No. 85 at 40.  The Court ordered the production by May 13, 2025. *Id.*

9         On May 11, 2025, defendants moved for a protective order or in the alternative for

10   reconsideration and requested an immediate stay of the Court's discovery order.  Dkt. No. 88.  The

11   May 11 motion for reconsideration was the first time defendants expressly invoked the deliberative

12   process privilege.  The Court set a briefing schedule and stayed the May 13 production deadline

13   pending resolution of defendants' motion.  Dkt. No. 92.  Plaintiffs submitted an opposition, Dkt.

14   No. 96, and defendants replied, Dkt. No. 103.  "To assess whether the deliberative process privilege

15   applies to the ARRPs of the federal agency defendants in this case," the Court ordered defendants

16   to produce ARRPs from a sampling of four agency defendants to the Court for *in camera* review

17   and to plaintiffs' counsel for counsel's eyes only.  Dkt. No. 109 at 4-5.  Defendants timely provided

18   the documents for review along with a declaration from Stephen Billy, a Senior Advisor at OMB.

19   Dkt. No. 88-1.  Upon a finding that the Billy declaration was insufficient to support the deliberative

20   process privilege, the Court further ordered defendants to provide more detailed declarations from

21   agency decisionmakers supporting application of the privilege.  Dkt. No. 139.  Defendants produced

22   those declarations under seal.[2]  Dkt. No. 165.  At this point, therefore, the Court has reviewed *in*

23   *camera* the ARRPs of four of the federal agency defendants as well as the declarations submitted to

24   support the privilege assertion.

25        On May 22, 2025, the Court issued a preliminary injunction but did not rule on the question

26   of whether the ARRPs should be disclosed.  *See* Dkt. No. 124.  After the Supreme Court stayed this

27

28        [2] The Court GRANTS defendants' administrative motion to file these declarations under
     seal.  *See* Dkt. No. 165.

1  Court's preliminary injunction, *Trump v. Am. Fed. of Gov't Emps.*, No. 24A1174, 2025 WL

2  1873449, 606 U.S. ____ (July 8, 2025), plaintiffs filed an "urgent request" for a final ruling on

3  defendants' motion to reconsider the Court's May 9 order.  Dkt. No. 176.  The Court ordered

4  defendants to submit a response by July 14.  Dkt. No. 177.  Defendants responded, Dkt. No. 208,

5  and plaintiffs replied, Dkt. No. 213.  The matter is now ripe for review.

**LEGAL STANDARD**

**I.    Discovery**

"'[A] district court has wide discretion in controlling discovery.'"  *Jeff D. v. Otter*, 643 F.3d

278, 289 (9th Cir. 2011) (quoting *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988)).

**II.    Deliberative Process Privilege**

Defendants invoke the deliberative process privilege to argue that they should not be

compelled to produce the ARRPs.  As the Ninth Circuit has explained,

> This privilege permits the government to withhold documents that
> reflect advisory opinions, recommendations and deliberations
> comprising part of a process by which government decisions and
> policies are formulated. *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132,
> 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975). It was developed to
> promote frank and independent discussion among those responsible
> for making governmental decisions, *Environmental Protection
> Agency v. Mink,* 410 U.S. 73, 87, 93 S.Ct. 827, 836, 35 L.Ed.2d 119
> (1973), and also to protect against premature disclosure of proposed
> agency policies or decisions. *Coastal States Gas Corp. v. Department
> of Energy,* 617 F.2d 854, 866 (D.C. Cir. 1980). The ultimate purpose
> of the privilege is to protect the quality of agency decisions. *Sears,*
> 421 U.S. at 151, 95 S.Ct. at 1517.

*F.T.C. v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984).  Factual material is not

protected unless it cannot be severed from deliberative material.  *Id.*

The deliberative process privilege is qualified, not absolute.  *Id.*  "A litigant may obtain

deliberative materials if his or her need for the materials and the need for accurate fact-finding

override the government's interest in non-disclosure."  *Id.* (citations omitted).

# DISCUSSION

## I.      Deliberative Process Privilege

To resolve whether the government may assert the deliberative process privilege to avoid production of submitted ARRPs and approved ARRPs involves asking several questions. First, are the documents relevant to the litigation? If so, are the documents of the nature to be covered by the privilege—that is, are they pre-decisional and deliberative? Even if so, should the privilege be qualified and overridden by other considerations? Finally, if the documents are ordered produced, should their disclosure be limited by a protective order?

### A.      Relevance

Defendants' recent filing argues repeatedly that the Supreme Court's order staying the preliminary injunction "effectively ends this case[.]" *See* Dkt. No. 208 at 1. This Court disagrees with defendants' reading. In granting the preliminary injunction, this Court did not reach several of the claims in the amended complaint. The Supreme Court's stay of the injunction therefore did not have any bearing on those claims.

Moreover, the high Court's terse order to stay an injunction—and its statement that "the Government is likely to succeed on its argument that the Executive Order and Memorandum are lawful"—are inherently preliminary.[3] *See Trump*, 2025 WL 1873449, at *1. The Court of Appeals still must determine whether the preliminary injunction is appropriate, a question defendants raised to that court and a question that may ultimately return to the Supreme Court. Meanwhile, here below, these preliminary decisions do not foreclose claims or otherwise halt proceedings on the merits on any claim in this case.

Further, in granting the stay, the Supreme Court stated,

> We express no view on the legality of any Agency RIF and Reorganization Plan produced or approved pursuant to the Executive Order and Memorandum. The District Court enjoined further

---

[3] Since the Supreme Court included no explanation of its conclusion, this Court cannot say whether the Supreme Court determined the claims underlying the preliminary injunction fail as a matter of law or if the evidentiary record has not yet sufficiently developed to support the claims.

United States District Court
Northern District of California

1
2

> implementation or approval of the plans based on its view about the
> illegality of the Executive Order and Memorandum, not on any
> assessment of the plans themselves. Those plans are not before this
> Court.

3  *Id.* In a concurrence, Justice Sotomayor noted that the Supreme Court's decision allows the district

4  court to consider the legality of the ARRPs "in the first instance." *Id.* (Sotomayor, J., conc.). As

5  this Court has since observed, the content of the ARRPs thus remains squarely at issue in this case.

6  *See* Dkt. No. 177 at 2.

7  Litigants in a civil case "may obtain discovery regarding any nonprivileged matter that is

8  relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ.

9  P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be

10  discoverable." *Id.* "Relevant information for purposes of discovery is information reasonably

11  calculated to lead to the discovery of admissible evidence. . . . District courts have broad discretion

12  in determining relevancy for discovery purposes." *Surfvivor Media, Inc. v. Survivor Prods.*, 406

13  F.3d 625, 635 (9th Cir. 2005) (internal quotation marks and citations omitted).

14  Here, the ARRPs are relevant to the claims in the amended complaint. To argue otherwise

15  is to ignore the allegations of the operative complaint. The Court will take just one clear-cut

16  example: Claim VII, the Administrative Procedure Act (APA) claim alleging arbitrary and

17  capricious action by the federal agency defendants, remains at issue. The Court reserved ruling on

18  this claim (along with two other APA claims) at the preliminary injunction stage, explaining that "a

19  full review of the ARRPs will significantly aid the Court's review of the merits of these APA

20  claims." Dkt. No. 124 at 44. Count VII alleges, among other things, that the "implementation of

21  ARRPs by RIFing federal employees, closing offices, functions, and programs, and otherwise

22  reorganizing agency functions are all final agency action under the APA" and that the "actions of

23  the Federal Agency Defendants . . . violate the APA because they are arbitrary and capricious" for

24  numerous alleged reasons, including that the agencies "conduct the process for the creation and

25  approval of plans to radically transform the entire federal government in secret." Dkt. No. 100

26  ¶¶ 429, 431. To prove this claim, plaintiffs will need to show that an agency has failed to consider

27  an important aspect of a problem, that the agency offers an explanation for a decision that is contrary

28  to the evidence, that the agency's decision is so implausible that it could not be ascribed to a

5

United States District Court
Northern District of California

1    difference in view or be the product of agency expertise, or that the agency's decision is contrary to

2    governing law. *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citations omitted).

3    In the context of this case, the ARRPs *are* the documents in which OMB and OPM directed the

4    federal agency defendants to outline their initial agency cuts and reductions and the agencies'

5    "positive vision for more productive, efficient agency operations going forward." Dkt. No. 37-1,

6    Ex. B at 3-4. These plans are highly relevant to plaintiffs' Claim VII.

7    Confusingly, defendants state in their brief that "Plaintiffs do not challenge any ARRP as

8    unlawful by arguing that an ARRP's plan is arbitrary and capricious . . . ." Dkt. No. 208 at 6.

9    Perhaps by this statement defendants intend to say that plaintiffs cannot challenge the plans because

10   those plans have not been made public. Numerous times, defendants argue essentially that plaintiffs

11   cannot prove their case because plaintiffs do not have the ARRPs because the ARRPs have not been

12   made public. *See id.* at 1, 6. By this logic, any defendant could withhold relevant discovery on the

13   grounds that the plaintiff had not yet proven his or her case. The Court will not countenance such

14   reasoning.

15   Additionally, the Court rejects defendants' argument that the ARRPs could not be disclosed

16   pursuant to an APA claim because, in their view, "APA claims, even if cognizable in district court

17   at all, must be adjudicated based on the administrative record" and the ARRPs would not be part of

18   the administrative record. Dkt. No. 208 at 1-2. The Ninth Circuit has recognized "narrow

19   exceptions" to the general rule that courts reviewing an agency decision are limited to the

20   administrative record. *Lands Council*, 395 F.3d at 1030. The district court may admit extra-record

21   evidence, for instance, in limited circumstances "if admission is necessary to determine whether the

22   agency has considered all relevant factors and has explained its decision" or "when plaintiffs make

23   a showing of agency bad faith." *Id.* (internal quotation marks and citation omitted). It is premature

24   for the government to assert that such exceptions would never apply here.

25   To summarize, the ARRPs are plainly relevant. The Court therefore turns to defendants'

26   argument that the ARRPs should nevertheless be protected from disclosure because of the

27   deliberative process privilege.

28

### B.     Pre-decisional and Deliberative

"To fall within the deliberative process privilege, a document must be both 'predecisional' and 'deliberative.'" *Carter v. U.S. Dep't of Com.*, 307 F.3d 1084, 1089 (9th Cir. 2002) (citation omitted).  Predecisional documents are "prepared in order to assist an agency decisionmaker in arriving at his decision." *Id.* (internal quotation marks and citation omitted).  "A predecisional document is a part of the deliberative process, if the disclosure of the materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Id.* (internal quotation marks, brackets, and citation omitted).

The Court has now reviewed *in camera* four agencies' ARRPs, the contents of which vary widely.  The Court has also reviewed declarations from officials in those four agencies asserting the privilege.  The Court questions whether ARRPs that have been approved by OMB and OPM in any fashion remain "predecisional," though defendants assert that "[a]n ARRP is never final and may change drastically as the agency's priorities and thinking changes."  *See* Dkt. No. 88 at 4.  Nonetheless, at this stage, the Court assumes without deciding that at least some ARRPs may include pre-decisional and deliberative materials.

### C.     Qualified Privilege

The Court therefore proceeds to the next inquiry—whether a party's "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *Warner*, 742 F.2d at 1161.  Courts consider the following factors when evaluating this question: "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.*  Considering these factors, the Court holds that the need for accurate fact-finding in this litigation overrides any interest in non-disclosure.

First, the relevance of the evidence has already been discussed above.  In short, the ARRPs remain relevant to the current proceedings.

Second, plaintiffs cannot seek the relevant information in the ARRPs elsewhere.  U.S.

1    Senators have requested much of the same information from OMB and OPM, but at this Court's

2    hearing on May 9, 2025, counsel for the government could not say whether the information had

3    been provided. Dkt. No. 85 at 41 n.22. Nor have Freedom of Information Act requests resulted in

4    release of the plans. *See Democracy Forward Found. v. Off. of Mgmt. & Budget*, No. CV 25-858

5    (SLS), 2025 WL 1078778, at *3 (D.D.C. Apr. 9, 2025). The government has developed and begun

6    to implement elements of ARRPs without transparency to the general public or the affected federal

7    employees. Defendants may not attack plaintiffs' case for failing to "challenge the content of

8    particular ARRPs" while simultaneously withholding those same ARRPs. *See* Dkt. No. 208 at 1.

9        The third factor also favors plaintiffs, as "the government—the Executive—is a party to and

10    the focus of the litigation." *See Karnoski v. Trump*, 926 F.3d 1180, 1206 (9th Cir. 2019).

11        Finally, considering the limited information it has access to, the Court does not find that a

12    protected disclosure of the ARRPs as outlined below would chill future frank and independent

13    discussions within agencies. As plaintiffs persuasively argue, defendants' contention that release

14    of the ARRPs could hurt employee recruitment and retention or harm agencies' positions at the

15    bargaining table are specious when defendants are attempting to make large-scale reductions in force

16    and, separately, to eliminate collective bargaining rights of federal employees. *See* Dkt. No. 96 at

17    13-14. The damage to the federal government's employee recruitment, retention, and labor relations

18    has already been done, and the wounds are self-inflicted. Revealing these plans to the Court and to

19    plaintiffs' counsel only under the terms of the protective order discussed below would not chill

20    future lawful deliberations by defendants.

21        As plaintiffs have noted, defendants are moving forward with RIFs in the wake of the

22    Supreme Court's ruling. Dkt. No. 213 at 2 n.1. The issues in this case remain of significant public

23    importance. The Court concludes that, even assuming at least some material within ARRPs may be

24    predecisional and deliberative, the need for accurate fact-finding overrides the government's

25    interests in non-disclosure.

26

27        **D.    Protective Order**

28        At this stage, however, the Court will grant defendants' request for a protective order.

1    Defendants request that, if the Court ultimately orders disclosure of ARRPs, that the documents be

2    filed under seal and plaintiffs' counsel prohibited from disclosing their contents to anybody else,

3    including their clients. Dkt. No. 88 at 10. Rule 26 of the Federal Rules of Civil Procedure allows a

4    court to impose a protective order on discovery material for "good cause." Fed. R. Civ. P. 26(c)(1).

5       "The presumption of access is based on the need for federal courts, although independent—

6    indeed, particularly because they are independent—to have a measure of accountability and for the

7    public to have confidence in the administration of justice." *Ctr. for Auto Safety v. Chrysler Grp.,*

8    *LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) (internal quotation marks and citation omitted). When

9    matters involve government actors and issues of public concern, a higher showing of harm is

10   necessary to avoid disclosure. *In re Roman Cath. Archbishop of Portland in Oregon*, 661 F.3d 417,

11   424 n.5 (9th Cir. 2011) (citing *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995)

12   (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787-91 (3d Cir. 1994))).

13      Notwithstanding the Court's finding that the information at issue is of grave public concern,

14   at this still-early stage of the case, the Court will grant defendants' request for a protective order

15   that limits distribution of the ARRPs to plaintiffs' counsel and the Court only. *See* Dkt. No. 88 at

16   10. All federal agency defendants' ARRPs must be produced.

17      For the versions provided to plaintiffs' counsel, the Court will also allow defendants to redact

18   any material addressing union negotiating strategy. The versions provided to the Court must

19   highlight any redacted material. This Court has afforded defendants several opportunities to propose

20   redactions to the ARRPs, Dkt. Nos. 139 at 3, 177 at 2, but defendants have come back only with

21   near-total redactions. The Court cautions defendants not to abuse this allowance by redacting

22   material unrelated to union negotiation strategies.

23

24   **II.**     **The "40 RIFs in 17 Agencies"**

25      In defendants' application for a stay to the Supreme Court, the U.S. Solicitor General

26   represented that "about 40 RIFs in 17 agencies were in progress and are currently enjoined."

27   Application for Stay at 32-33, *Trump v. Am. Fed. of Gov't Emps., AFL-CIO*, No. 24A1174 (U.S.

28   June 2, 2025). Defendants made this assertion to the Supreme Court to highlight the urgency of

1  their stay request and the extent of irreparable injury facing the government. Yet defendants now

2  back-track, telling this Court that, actually, "those RIFs have not been finalized, many were in an

3  early stage, and some are not now going forward." Dkt. No. 208 at 12. Defendants have submitted

4  a declaration from Noah Peters, a senior advisor in OPM, stating that the numbers given to the

5  Supreme Court "reflect[] results from an early, initial step in RIF planning" and "did not derive from

6  how many RIFs were mentioned in any Agency RIF and Reorganization Plans (ARRPs)." Dkt. No.

7  208-1 ¶¶ 11-12. But if RIFs do not flow from ARRPs, Executive Order 14210, or the OMB/OPM

8  Memo at issue in this case, they would not have been enjoined by the Court's preliminary injunction.

9  The government's shifting positions degrade the Executive's credibility and further underscore the

10  need for an examination of the documents themselves. The Court repeats a query that it previously

11  posed: if the ARRPs are non-final planning documents that do not commit an agency to take any

12  specific action, pursuant to *what*, then, are the agencies implementing their large-scale

13  reorganizations and RIFs?

14      Further, in its order on July 9, 2025, the Court directed defendants to "provide a list of the

15  'about 40 RIFs in 17 agencies' that defendants referenced in their Supreme Court stay application."

16  Dkt. No. 177 at 2. Defendants provided a list of agencies, not a list of the RIFs. *See* Dkt. No. 208-

17  1 ¶ 14. Defendants must file with the Court, not under seal, a list of the RIFs referenced in the

18  Supreme Court stay application. Defendants may note which RIFs, if any, agencies have decided

19  not to move forward, or provide any other details they wish.

20

21                                      **CONCLUSION**

22      Defendants' motion for a protective order or reconsideration is GRANTED in part and

23  DENIED in part, as described above. By Wednesday, July 23, 2025 at 12:00 p.m. (PDT), defendants

24  shall submit to the Court for *in camera* review paper copies of the following documents for the

25  federal agency defendants in this case: (1) the versions of ARRPs submitted to OMB and OPM and

26  (2) the versions of ARRPs approved by OMB and/or OPM. The federal agency defendants in this

27  case consist of the departments of Agriculture, Commerce, Defense, Energy, Health and Human

28  Services, Homeland Security, Housing and Urban Development, Justice, Interior, Labor, State,

United States District Court
Northern District of California

Add. 10 <sup>10</sup>

1    Treasury, Transportation, and Veterans Affairs; AmeriCorps; the Peace Corps; the General Services

2    Administration; the National Labor Relations Board; the National Science Foundation; the Small

3    Business Administration; the Social Security Administration; and the Environmental Protection

4    Agency.  Documents for *in camera* review may be mailed or hand-delivered to the Clerk's Office,

5    clearly stamped "DO NOT FILE—IN CAMERA REVIEW."

6           By Wednesday, July 23, 2025 at 12:00 p.m. (PDT), defendants shall provide the same

7    material to plaintiffs' counsel, but plaintiffs' counsel may not share the plans or their contents with

8    their clients or any third parties unless or until the Court orders otherwise.  The Court will not order

9    broader disclosure without prior notice to defendants' counsel.

10          By Wednesday, July 23, 2025 at 12:00 p.m. (PDT), defendants shall also publicly file a list

11   of the RIFs referenced in its application for a stay before the Supreme Court, as explained above.

12

13          **IT IS SO ORDERED**.

14   Dated: July 18, 2025

15                                                                    _____

16                                                                    SUSAN ILLSTON
                                                                      United States District Judge
17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
Fax: (415) 362-8064
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*

[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> Defendants. | Case No. 3:25-cv-03698-SI <br><br> **URGENT ACTION REQUESTED** <br><br> **PLAINTIFFS' URGENT REQUEST FOR RULING CONFIRMING PRIOR EXPEDITED DISCOVERY ORDER, DENIAL OF DEFENDANTS' MOTION FOR RECONSIDERATION AND PROTECTIVE ORDER, AND REQUEST FOR MODIFICATION** |

Add.12

**INTRODUCTION**

Plaintiffs return to this Court with this urgent request to (1) confirm this Court's prior order granting expedited discovery with respect to the Agency RIF and Reorganization Plans ("ARRPs") at issue in this litigation and deny Defendants' request for reconsideration and protective order; and (2) modify that order to require identification of the seventeen federal agencies that, according to Defendants, had RIFs in progress when the Court ordered the now-stayed injunctive relief.

This Court's May 22 preliminary injunction was granted based on Plaintiffs' likelihood of success on facial challenges to the President's Workforce Optimization Executive Order and the Office of Management and Budget ("OMB") and the Office of Personnel Management ("OPM")'s February 26 implementing Memorandum. Yesterday's Supreme Court order staying that injunction "express[ed] no view" on the lawfulness of "any Agency RIF and Reorganization Plan produced or approved pursuant to the Executive Order and Memorandum," and emphasized, "Those plans are not before this Court." *Trump v. AFGE*, Case No. 24A1174 (Jul. 8, 2025) ("S. Ct. Order") at 1-2. Plaintiffs' other claims in this litigation, on which this Court reserved prior analysis, challenge the lawfulness of the ARRPs as approved by OMB/OPM and implemented by the Federal Agency Defendants, including, as Justice Sotomayor explained in concurrence, "whether they can and will be carried out consistent with the constraints of law." *Id.* at 2.

Plaintiffs understand (and the prior record before this Court shows) that Defendants intend to implement these ARRPs imminently following the Supreme Court's stay of this Court's preliminary injunction, including through actions that have already been approved by OMB/OPM to proceed. Those actions include, according to Defendants, at least 40 RIFs that were in progress at seventeen federal agencies. Further relief, in the form of an injunction and/or interim stay pursuant to the Administrative Procedure Act ("APA") section 705, is not foreclosed by the Supreme Court's stay decision, and Plaintiffs intend to seek such further relief as is warranted by the facts and circumstances of these ARRPs and OMB/OPM approvals. As this Court previously explained, and as further confirmed by the Supreme Court's ruling, review of these documents will facilitate this Court's consideration of the unlawfulness of these agency actions. Continued confidentiality is neither required by law nor appropriate in light of Plaintiffs' pending claims. In

PLAINTIFFS' REQUEST FOR RULING ON EXPEDITED DISCOVERY, No. 3:25-cv-03698-SI

1    light of the imminent implementation of what Plaintiffs contend are unlawful actions, Plaintiffs

2    request this Court urgently confirm the prior order, deny Defendants' subsequent request for

3    reconsideration and protective order, and require production of the ARRPs and related documents

4    previously ordered.  In addition, given the imminence of agency implementation of these *already*

5    *approved* ARRPs, Plaintiffs also ask the Court to modify the prior expedited discovery order to

6    require the immediate disclosure of the timing and scope of the 40 RIFs at seventeen agencies

7    identified by Defendants as "in progress" (as of May 16, when Defendants filed their initial stay

8    application in the Supreme Court).

9        As further detailed below, the Supreme Court's order highlights the relevance of the

10    ARRPs and related communications to key issues before this Court, including but not limited to

11    Plaintiffs' arbitrary-and-capricious and other APA claims on which this Court previously reserved

12    analysis.  Defendants' assertion of deliberative process privilege does not shield them from the

13    required production.  Deliberative process is a *qualified* privilege, so even if it were held to apply

14    here, the privilege would be overcome based on the direct relevance of the contents of the ARRPs

15    to the legality of the actions taken to implement Executive Order No. 14210 and the OMB/OPM

16    Memorandum.  This Court should act expeditiously to order their production.

17        Defendants have informed Plaintiffs that they oppose this request and intend to file a

18    response.

19                              **BACKGROUND**

20        This Court granted a TRO (Dkt. No. 85) and then a preliminary injunction (Dkt. No. 124)

21    based on Plaintiffs' ultra vires claims challenging the Executive Order and Memorandum as

22    unlawful and exceeding any constitutional or statutory authority, as well as the parallel exceeds-

23    authority (and procedural) APA claims against OMB and OPM.  The Court did not reach, and

24    specifically reserved, resolution of Plaintiffs' arbitrary-and-capricious APA claims against OMB,

25    OPM, and DOGE, as well as Plaintiffs' APA claims against the Federal Agency Defendants.  Dkt.

26    No. 124 at 44.

27        Plaintiffs' TRO motion had requested expedited production of the ARRPs and related

28    documents, in light of factual disputes regarding the OMB/OPM approvals and decision-making

PLAINTIFFS' REQUEST FOR RULING ON EXPEDITED DISCOVERY, No. 3:25-cv-03698-SI

1    and imminence of agency action under plans that the government continued to refuse to reveal to

2    its employees, their representatives, or the public.  This Court initially ordered production of four

3    categories of documents including all versions of ARRPs submitted to OMB and OPM and/or

4    approved by OMB and OPM, based on the Court's conclusion that they would "significantly aid

5    the Court's review of the merits of these APA claims."  Dkt. No. 85 at 37, 39-40; *see also* Dkt. No.

6    124 at 44.  After Defendants invoked the deliberative process privilege and moved for a protective

7    order and/or for reconsideration (Dkt. No. 88), this Court postponed Defendants' production

8    deadline (Dkt. No. 92).  The Court later decided that it would partially reconsider its order and

9    determined that, "To assess whether the deliberative process privilege applies to the ARRPs of the

10    federal agency defendants in this case, the Court would benefit from a better understanding of their

11    contents."  Dkt. No. 109 at 4.  The Court therefore directed Defendants to submit for *in camera*

12    review ARRPs from four agencies  *Id*.  The parties disputed the completeness of Defendants'

13    submission.  The Court subsequently ordered Defendants to submit declarations from each of those

14    agencies setting forth which versions of the ARRPs have been approved and which parts they

15    contend are protected by the privilege and why.  Dkt. No. 139.  Defendants subsequently submitted

16    those declarations *in camera* for this Court's review.

## DISCUSSION

### I. This Court Should Confirm the Prior Order and Require Immediate Production of the ARRPs and Related Documents

#### A. Application of the balancing test favors disclosure, as the Supreme Court order underscores.

As Plaintiffs have previously explained—in reasoning that is bolstered by the Supreme

Court's order—even if it were assumed that the deliberative process privilege does apply to any of

the ARRPs previously submitted to OMB/OPM, the application of the balancing test for that

qualified privilege would require production of the ARRPs and related documents previously

ordered by this Court.

The Supreme Court's order underscores Plaintiffs' argument.  That order stayed this

Court's preliminary injunction (Dkt. No. 124) based on the Supreme Court's conclusion that

1    Defendants are likely to succeed in defending the facial legality of the Executive Order and the

2    OMB/OPM Memorandum.  However, the Supreme Court was explicit that it was "express[ing] no

3    view on the legality of any Agency RIF and Reorganization Plan produced or approved pursuant to

4    the Executive Order and Memorandum." S. Ct. Order at 1.  The concurring opinion of Justice

5    Sotomayor further noted that the agencies' "plans themselves are not before the Court, at this stage,

6    and we thus have no occasion to consider whether they can and will be carried out consistent with

7    the constraints of law." *Id.* at 2.  Instead, Justice Sotomayor noted, the Supreme Court's stay order

8    "leaves the District Court to consider those questions in the first instance." *Id.*  The Supreme

9    Court's order thus contemplates, and certainly does not interfere with, this Court's consideration of

10   these important issues, including whether the approval and implementation of any of the ARRPs

11   violates the law.  On that, the Supreme Court majority reached no conclusions, and on those issues

12   this Court can and should proceed.

13        Defendants' prior objection to production of the ordered documents was grounded in the

14   deliberative process privilege.  It is uncontested that the deliberative process is a qualified privilege

15   that can be overridden if the litigant's "need for the materials and the need for accurate fact-finding

16   override the government's interest in nondisclosure." *FTC v. Warner Commc'ns*, 742 F.2d 1156,

17   1161 (9th Cir. 1984); Dkt. No. 88 at 4 n.4; Dkt. No. 96 at 12.  In deciding whether to override the

18   privilege, courts consider "1) the relevance of the evidence; 2) the availability of other evidence; 3)

19   the government's role in the litigation; and 4) the extent to which disclosure would hinder frank

20   and independent discussion regarding contemplated policies and decisions." *Id.*  Even if the

21   privilege were to apply, application of these factors require disclosure of the ARRPs and related

22   documents. *See also* Dkt. No. 96 at 12-14.

23        First, the ARRPs and related documents are highly relevant to the issue that the Supreme

24   Court's order expressly leaves open: the "legality of any Agency RIF and Reorganization Plan

25   produced or approved pursuant to the Executive Order and Memorandum." S. Ct. Order at 1-2.

26   The ARRPs and related documents will shed light on the scope and nature of actions implementing

27   these orders, and, in particular, whether Defendants are "engag[ing] in reasoned decisionmaking,"

28   *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (cleaned up), which

PLAINTIFFS' REQUEST FOR RULING ON EXPEDITED DISCOVERY, No. 3:25-cv-03698-SI

1   means that the agency actions must be both "reasonable and reasonably explained," *FCC v.*

2   *Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  Without those ARRPs and related

3   documents, this Court will be hampered from evaluating the issue that the Supreme Court has

4   specifically directed that it may now consider. *See also* Dkt. No. 85 at 37 (finding that "the release

5   of the ARRPs will significantly aid the Court's review of the merits of these APA claims").

6   Moreover, as this Court previously noted, notwithstanding Defendants' failure to produce any

7   evidence, Defendants continue to contest significant facts relevant to Plaintiffs' claims of unlawful

8   action, including whether Defendants have approved these plans at all, and what, if any, approved

9   actions are imminent.  Dkt. No. 109.  The disclosure of Defendants' plans is necessary for this

10  Court to resolve these fact disputes that Defendants have put at issue.

11      "[T]he second and third criteria [also] favor Plaintiffs. The evidence sought is …

12  exclusively[] under Defendants' control, and the government—the Executive—is a party to and the

13  focus of the litigation."  *Karnoski v. Trump*, 926 F.3d 1180, 1206 (9th Cir. 2019).  As this Court is

14  well aware, Defendants have refused to reveal ARRPs to federal employees, their labor

15  representatives, the public, or even in response to requests by Congress, notwithstanding imminent

16  implementation. May 9, 2025 Hearing Transcript at 20:20–21:13.  Therefore, this expedited

17  discovery is required for Plaintiffs and this Court to fully assess the legality of Agency plans.

18      Finally, as to the fourth prong, Defendants have never made a specific showing of harm

19  from disclosure, either in this Court or in Defendants' later-withdrawn mandamus petition to the

20  Ninth Circuit.  "To test whether disclosure of a document is likely to adversely affect the purposes

21  of the privilege, courts ask themselves whether the document is so candid or personal in nature that

22  public disclosure is likely in the future to stifle honest and frank communication within the

23  agency." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

24  Defendants have made no showing that disclosure of ARRPs would have such a chilling effect on

25  internal agency communications.  Their assertion of privilege rests on boilerplate statements that

26  ARRPs contain "highly sensitive information," Dkt. No. 88-1 ¶4, without specific factual

27  explanation of the basis for that claim or how much of the information in ARRPs can be

28  characterized as such, or any factually grounded reason to believe that the declarant's boilerplate

PLAINTIFFS' REQUEST FOR RULING ON EXPEDITED DISCOVERY, No. 3:25-cv-03698-SI

1    assertion is true for all ARRPs for the dozen-plus agencies at issue in this case.  *See Reps. Comm.*

2    *for Freedom of the Press v. FBI*, 3 F.4th 350, 370 (D.C. Cir. 2021) ("A perfunctory statement that

3    disclosure of all the withheld information—regardless of category or substance—would jeopardize

4    the free exchange of information … will not suffice.") (cleaned up); *see also In re Roman Cath.*

5    *Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011).  And as this Court

6    previously acknowledged, the claims of chill, when compared to the contents of the documents,

7    were overstated and unsupported.  Dkt. No. 109 at 4.  Indeed, the NEH ARRP publicly filed in this

8    case, *see* Soriano Supp. Decl. & Ex. 1, simply reveals the extent of Defendants' unlawful plans to

9    transform the government.  *Id.*  Nor do the ARRPs and declarations subsequently filed *in camera*

10   support the government's invocation of privilege with the required specificity.

11        As Plaintiffs explained in opposing Defendants' request for reconsideration, the

12   government's other asserted interests likewise fail to support the deliberative process privilege.

13   *See* Dkt. No. 96 at 18.  Defendants' claim that disclosure "might seriously hurt agency recruitment

14   and retention if released," Dkt. No. 88 at 6 (citing Dkt. No. 88-1 ¶4), cannot be squared with the

15   government's public statements that it plans to radically dismantle the federal workforce through

16   "40 RIFs in 17 agencies" previously enjoined in this case.  Stay Application at 32–33, *Trump v.*

17   *Am. Fed. of Gov't Emps., AFL-CIO*, No. 24A1174 (U.S. June 2, 2025) (hereinafter "S. Ct. Stay

18   App.").  And "agencies must concretely explain how disclosure 'would'—not 'could'—adversely

19   impair *internal deliberations*." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369–70

20   (emphasis added).  Defendants have not done so here.[1]

**B. The deliberative process does not even apply to most of what Defendants seek to
    shield.**

To qualify for the deliberative process privilege, a document must be both

(1) predecisional, having been "generated before the adoption of an agency's policy or decision,"

and (2) deliberative in nature, "containing opinions, recommendations, or advice about agency

policies." *Warner Commc'ns*, 742 F.2d at 1161; *see also* Dkt. No. 109 at 3–4.

---

[1] If this Court is concerned that Defendants should be able to shield any statements in ARRPs
regarding strategies for agency negotiations with unions, the Court could authorize redaction of those
portions of the ARRPs.

PLAINTIFFS' REQUEST FOR RULING ON EXPEDITED DISCOVERY, No. 3:25-cv-03698-SI

1    At a minimum, ARRPs are not predecisional once agencies have begun implementing them.

2    Defendants represented to the Supreme Court that about 40 RIFs in 17 agencies "were in progress"

3    before they were enjoined by this Court's preliminary injunction order.  S. Ct. Stay App. at 32–33.[2]

4    Those agencies' ARRPs and these implementing actions have necessarily already been approved.

5    As the Court is aware, by the terms of the OMB/OPM Memorandum, agencies could not begin

6    implementation of ARRPs until they were approved by OMB and OPM.  Dkt. No. 100-2 at 3–4;

7    *see also id.* at 6 (prohibiting implementation of ARRPs for agencies that provide direct services

8    until specific OMB and OPM certification). As this Court found, OMB/OPM approval is a

9    "necessary triggering step" in agencies' RIF and reorganization processes, and the factual record

10   shows that OMB and OPM rejected ARRPs that did not include enough cuts.  Dkt. No. 124 at 36.

11   A plan that has been approved is being implemented is not predecisional.[3]  The government

12   declarant's bare (and entirely unsupported) assertion that no ARRP is ever final, Dkt. No. 88-1 at 2,

13   cannot shield the ARRPs from production.  If the mere possibility of future revision were enough

14   to support the deliberative process privilege, then no decision would ever be final and the

15   government could operate in perpetual secrecy.  Dkt. No. 96 at 13.  In any case, that assertion

16   contradicts the record, which shows that OMB and OPM imposed specific deadlines for ARRP

17   submission, and that implementation by at least seventeen agencies was "in progress."

18   Also, at a minimum, the factual material within ARRPs (approved or not) is not

19   deliberative.  The deliberative process privilege does not protect facts unless they are interwoven

20   with deliberative material and not segregable.  *Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143,

21   1148 (9th Cir. 2008); *Assembly of State of Cal. v. U.S. Dep't of Com.*, 968 F.2d 916, 921 (9th Cir.

22   1992).  The OMB/OPM Memorandum dictates the contents of ARRPs, and many of the required

23

24   [2] If the Court wishes to limit the required disclosure at this time to those ARRPs that are being
25   implemented and so have necessarily been approved, it could order disclosure of the ARRPs of the
     seventeen Federal Agency Defendants that, according to Defendants' stay applications in the Ninth
26   Circuit and Supreme Court, had planned to implement RIFs but were blocked by this Court's
     preliminary injunction (and, if not included in that number, the nine agencies that had already noticed
27   RIFs before this Court's TRO, *see infra*).

28   [3] One federal agency disclosed both its Phase 1 and 2 ARRPs to its employees' union, presumably
     because they were approved and so no longer predecisional.  Dkt. No. 96-1 at 2, 16–23.  This
     disclosure also belies the assertion that disclosure would cause harm.

PLAINTIFFS' REQUEST FOR RULING ON EXPEDITED DISCOVERY, No. 3:25-cv-03698-SI

1   elements call for factual submissions.  Dkt. No. 100-2.  The ARRPs disclosed by the government in

2   camera and under protective order, Dkt. No. 109, confirm that ARRPs contain segregable factual

3   material.  Defendants' sweeping invocation of the deliberative process privilege belies the non-

4   deliberative nature of significant portions of the ARRPs.

5        Ultimately, the purpose of the deliberative process privilege is to promote good government

6   by protecting the quality of agency decisions.  Dkt. No. 109 at 3 (quoting *Warner Commc'ns Inc.*,

7   742 F.2d at 1161).  The government serves the people, and withholding agencies' plans from the

8   public as the agencies begin implementing them does not serve the purposes of the deliberative

9   process privilege.

10       **C.    The Court should rule expeditiously.**

11       The parties have extensively briefed the deliberative process issue as relates to the ARRPs.

12  *See* Dkt. No. 96.  If this Court requires any further briefing, it should take place expeditiously.

13  Plaintiffs documented the issuance of RIF notices to employees of at least nine Federal Defendant

14  Agencies before this Court granted a TRO.  Dkt. No. 101-1 at 8.[4]  Further, in their stay applications

15  to the Ninth Circuit and Supreme Court, Defendants represented that "[d]ozens of RIF actions

16  affecting thousands of federal employees," or "about 40 RIFs in 17 agencies," were in process and

17  enjoined by this Court's orders.  9th Cir. Case No. 25-330, Dkt. No. 35-1, at 23; S. Ct. Stay App. at

18  32.[5]  The ARRPs and related documents will shed light on whether these imminent RIF and

19  reorganization actions are unlawful, including whether they are arbitrary and capricious.  Given the

20  imminence of further implementation of the ARRPs and OMB/OPM approval thereof, this Court

21  should order disclosure of the ARRPs and previously-ordered documents as soon as practicable.

22

23

---

24  [4] *See, e.g.*, Dkt. No. 37-12 ¶¶14, 20-22, Ex. D (AmeriCorps); Dkt. No. 37-14 ¶¶12-15, Exs. D, F, K

25  (GSA); Dkt. No. 37-18 ¶¶8-9, 13, Exs. B, D, G (SBA); Dkt. No. 37-19 ¶¶12-14, Ex. D (EPA); Dkt.
    No. 37-20 ¶12 (State); Dkt. No. 37-21 ¶¶9-12, 18, Exs. A, D (HHS); Dkt. No. 41-1 ¶¶13-17 Exs. C,

26  D (HUD); Dkt. No. 41-4 ¶¶18-22, Ex. F (HHS); Dkt. No. ¶17, Ex. K (HHS); Dkt. No. 70-2 ¶¶4-6,
    Ex. B (DOL); Dkt. No. 96-1 ¶¶15-19, Exs. 2-3 (NSF).

27  [5] *See also*, *e.g.*, *Agencies ready to move quickly on RIFs if court block falls*, Government Executive
    (June 6, 2025), available at: https://www.govexec.com/workforce/2025/06/agencies-ready-move-

28  quickly-rifs-if-court-block-falls/405895/ (discussing imminent post-injunction plans to implement
    RIFs and reorganizations by at least the Interior, Agriculture and State).

PLAINTIFFS' REQUEST FOR RULING ON EXPEDITED DISCOVERY, No. 3:25-cv-03698-SI

**II.     The Court Should Modify the Existing Order to Grant Further Limited Expedited Discovery**

As discussed, Defendants have repeatedly represented that this Court's injunction halted seventeen agencies from implementing roughly 40 RIFs that were in progress at the time of the TRO on May 9.  Plaintiffs understand that such implementation is imminent.  There is no justification for maintaining secrecy as to such actions by Defendants.  Plaintiffs request Defendants be ordered to immediately disclose the scope and timing of those 40 RIFs at seventeen agencies.

## CONCLUSION

The Court should grant Plaintiffs' request to confirm the prior order granting expedited discovery seeking production of all ARRPs that the Federal Defendant Agencies had submitted to OMB and/or OPM and related documents, deny Defendants' motion for protective order, and modify that order to require the further production of relevant information regarding imminent RIFs.

DATED: July 9, 2025                    Respectfully submitted,

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Corinne F. Johnson
Alice X. Wang
Robin S. Tholin
Aaron Schaffer-Neitz
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
dleonard@altshulerberzon.com

By: */s/ Danielle Leonard*
_____

*Attorneys for All Union and Non-Profit Organization Plaintiffs*

Elena Goldstein (pro hac vice)

1

2    Skye Perryman (pro hac vice)
     Tsuki Hoshijima (pro hac vice)
3    DEMOCRACY FORWARD FOUNDATION
     P.O. Box 34553
4    Washington, D.C. 20043
     Tel: (202) 448-9090
5    Fax: (202) 796-4426
     egoldstein@democracyforward.org
6    sperryman@democracyforward.org
     thoshijima@democracyforward.org

7    By: /s/ Tsuki Hoshijima

8
     *Attorneys for All Union and Non-Profit Organization*
9    *Plaintiffs (except NRDC) and for Plaintiffs City of*
     *Chicago, IL; Martin Luther King, Jr. County, WA;*
10   *Harris County, TX; and City of Baltimore, MD*

11
     Jules Torti (pro hac vice)
12   PROTECT DEMOCRACY PROJECT
     82 Nassau St., #601
13   New York, NY 10038

14
     Erica J. Newland (pro hac vice)
15   Jacek Pruski (pro hac vice)
     PROTECT DEMOCRACY PROJECT
16   2020 Pennsylvania Ave., N.W., Suite 163
     Washington, D.C. 20006
17   Tel: 202-579-4582
     jules.torti@protectdemocracy.org
18   erica.newland@protectdemocracy.org
     jacek.pruski@protectdemocracy.org
19
     By: /s/ Jacek Pruski
20

21   *Attorneys for All Union and Non-Profit Organization*
     *Plaintiffs (except NRDC)*
22

23   Norman L. Eisen (pro hac vice)
     Spencer W. Klein (pro hac vice)
24   STATE DEMOCRACY DEFENDERS FUND
     600 Pennsylvania Avenue SE #15180
25   Washington, D.C. 20003
     Tel: (202) 594-9958
26   Norman@statedemocracydefenders.org
     Spencer@statedemocracydefenders.org
27

28

PLAINTIFFS' REQUEST FOR RULING ON EXPEDITED DISCOVERY, No. 3:25-cv-03698-SI

1 By: /s/ Norman L. Eisen

2 *Attorneys for All Union and Non-Profit Organization*
*Plaintiffs (except NRDC)*

3

4 Rushab Sanghvi (SBN 302809)
AMERICAN FEDERATION OF GOVERNMENT

5 EMPLOYEES, AFL-CIO
80 F Street, NW

6 Washington, D.C. 20001
Tel: (202) 639-6426

7 Sanghr@afge.org

8

9 By: /s/ Rushab Sanghvi

10 *Attorneys for Plaintiffs American Federation of*
*Government Employees, AFL-CIO (AFGE) and AFGE*

11 *locals*

12 Teague Paterson (SBN 226659)
Matthew Blumin (pro hac vice)

13 AMERICAN FEDERATION OF STATE, COUNTY,
AND MUNICIPAL EMPLOYEES, AFL-CIO

14 1625 L Street, N.W.
Washington, D.C. 20036

15 Tel: (202) 775-5900
TPaterson@afscme.org

16 MBlumin@afscme.org

17

18 By: /s/ Teague Paterson

19 *Attorneys for Plaintiff American Federation of State*
*County and Municipal Employees, AFL-CIO*

20 *(AFSCME)*

21 Steven K. Ury (SBN 199499)
SERVICE EMPLOYEES INTERNATIONAL

22 UNION, AFL-CIO
1800 Massachusetts Ave., N.W.

23 Washington, D.C. 20036
Tel: (202) 730-7428

24 steven.ury@seiu.org

25

26 By: /s/ Steven K. Ury

27 *Attorneys for Plaintiff Service Employees*
*International Union, AFL-CIO (SEIU)*

28

1
2
3
4
5
6
7
8
9
10

David Chiu (SBN 189542)
City Attorney
Yvonne R. Meré (SBN 175394)
Chief Deputy City Attorney
Mollie M. Lee (SBN 251404)
Chief of Strategic Advocacy
Sara J. Eisenberg (SBN 269303)
Chief of Complex and Affirmative Litigation
Molly J. Alarcon (SBN 315244)
Alexander J. Holtzman (SBN 311813)
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY FOR THE
CITY AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
San Francisco, CA 94102
molly.alarcon@sfcityatty.org
alexander.holtzman@sfcityatty.org

11
12
13

By: /s/ Alexander Holtzman

*Attorneys for Plaintiff City and County of San Francisco*

14
15
16
17
18
19
20
21
22

Tony LoPresti (SBN 289269)
COUNTY COUNSEL
Kavita Narayan (SBN 264191)
Meredith A. Johnson (SBN 291018)
Raphael N. Rajendra (SBN 255096)
Hannah M. Godbey (SBN 334475)
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, 9th Floor
San José, CA 95110
Tel: (408) 299-5900
Kavita.Narayan@cco.sccgov.org
Meredith.Johnson@cco.sccgov.org
Raphael.Rajendra@cco.sccgov.org
Hannah.Godbey@cco.sccgov.org

23
24
25

By: /s/ Tony LoPresti

*Attorneys for Plaintiff County of Santa Clara, Calif.*

26
27
28

David J. Hackett (pro hac vice)
General Counsel to King County Executive & Special
Deputy Prosecutor
Alison Holcomb (pro hac vice)
Deputy General Counsel to King County Executive &
Special Deputy Prosecutor

PLAINTIFFS' REQUEST FOR RULING ON EXPEDITED DISCOVERY, No. 3:25-cv-03698-SI

Add.24

Erin King-Clancy (pro hac vice app. forthcoming)
Senior Deputy Prosecuting Attorney
OFFICE OF KING COUNTY PROSECUTING
ATTORNEY LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov
aclancy@kingcounty.gov

By: */s/ David J. Hackett*

*Attorneys for Plaintiff Martin Luther King, Jr. County*

Sharanya Mohan (CABN 350675)
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
sai@publicrightsproject.org

By: */s/ Sharanya Mohan*

*Attorney for Plaintiffs Baltimore, MD, Chicago, IL,
Harris County, TX, and King County, WA*

Christian D. Menefee
Harris County Attorney
Jonathan G.C. Fombonne (pro hac vice)
Deputy County Attorney and First Assistant
Tiffany Bingham (pro hac vice app. forthcoming)
Managing Counsel
Sarah Utley (pro hac vice app. forthcoming)
Division Director – Environmental Division
Bethany Dwyer (pro hac vice app. forthcoming)
Deputy Division Director - Environmental Division
R. Chan Tysor (pro hac vice app. forthcoming)
Senior Assistant County Attorney
Alexandra "Alex" Keiser (pro hac vice)
Assistant County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002
Tel: (713) 274-5102
Fax: (713) 437-4211
jonathan.fombonne@harriscountytx.gov
tiffany.bingham@harriscountytx.gov
sarah.utley@harriscountytx.gov
bethany.dwyer@harriscoupntytx.gov
chan.tysor@harriscountytx.gov

1    alex.keiser@harriscountytx.gov

2    By: /s/ Jonathan G.C. Fombonne

3        *Attorneys for Plaintiff Harris County, Texas*

4
     Mary B. Richardson-Lowry,
5    Corporation Counsel of the City of Chicago
     Stephen J. Kane (IL ARDC 6272490) (pro hac vice
6    app. forthcoming)
     Rebecca A. Hirsch (IL ARDC 6279592) (pro hac
7    vice)
     Lucy Prather (IL ARDC 6337780) (pro hac vice)
8    City of Chicago Department of Law,
     Affirmative Litigation Division
9    121 N LaSalle Street, Suite 600
     Chicago, Illinois 60602
10   Tel: (312) 744-6934
     Stephen.kane@cityofchicago.org
11   Rebecca.Hirsch2@cityofchicago.org
     Lucy.Prather@cityofchicago.org
12

13   By: /s/ Stephen J. Kane

14
         *Attorneys for Plaintiff City of Chicago*
15

16   Ebony M. Thompson
     Baltimore City Solicitor
17   Sara Gross (pro hac vice app. forthcoming)
     Chief of Affirmative Litigation
18   Baltimore City Department of Law
     100 N. Holliday Street
19   Baltimore, Maryland 21202
     Tel: (410) 396-3947
20   sara.gross@baltimorecity.gov

21   By: /s/ Sara Gross

22       *Attorneys for Plaintiff City of Baltimore*

23

24

25

26

27

28

1

2

3

4                                   UNITED STATES DISTRICT COURT

5                                 NORTHERN DISTRICT OF CALIFORNIA

6

7    AMERICAN FEDERATION OF                        Case No.  25-cv-03698-SI
     GOVERNMENT EMPLOYEES, AFL-CIO,
8    et al.,
                                                   **ORDER RE: PRODUCTION OF**
9                      Plaintiffs,                 **CERTAIN DISCOVERY DOCUMENTS**

10           v.                                    Re: Dkt. No. 88

11   DONALD J. TRUMP, et al.,

12                     Defendants.

13

14          This order considers next steps in the Court's assessment of defendants' assertion of the

15   deliberative process privilege for Agency RIF[1] and Reorganization Plans (ARRPs).

16

17                                           **BACKGROUND**

18          Pursuant to the President's Executive Order 14210 and a February 26, 2025 joint

19   memorandum, the Office of Management and Budget (OMB) and the Office of Personnel

20   Management (OPM) required the heads of federal departments and agencies to submit "Phase 1"

21   and "Phase 2" ARRPs for review and approval by March 13 and April 14.  Dkt. No. 37-1, Exs. A,

22   B.  In its May 9, 2025 order, the Court ordered defendants to provide to the Court and to plaintiffs

23   the following categories of documents: "(1) the versions of all defendant agency ARRPs submitted

24   to OMB and OPM, (2) the versions of all defendant agency ARRPs approved by OMB and OPM,

25   (3) any agency applications for waivers of statutorily-mandated RIF notice periods, and (4) any

26   responses by OMB or OPM to such waiver requests[.]"  Dkt. No. 85 at 40.

27

28   _____
            [1] A "RIF" is a reduction in force.

     **Add. 27**

*United States District Court*
*Northern District of California*

1    On May 11, 2025, defendants moved for a protective order or in the alternative for

2    reconsideration and request for an immediate administrative stay of the Court's discovery order.

3    Dkt. No. 88 ("Mot.").  Although plaintiffs had requested disclosure of the ARRPs in their May 1

4    emergency motion for a temporary restraining order, the May 11 motion for reconsideration was the

5    first time defendants expressly invoked the deliberative process privilege.  Defendants supported

6    their arguments with a declaration from Stephen Billy, a Senior Advisor in the Office of

7    Management and Budget.  Dkt. No. 88-1 ("Decl. Billy").  The Court then ordered defendants to

8    produce ARRPs from a sampling of four agency defendants to the Court for *in camera* review and

9    to plaintiffs' counsel for counsel's eyes only.  Dkt. No. 109.  Defendants timely provided the

10   documents for review.[2]

12                                       **DISCUSSION**

13   Defendants invoke the deliberative process privilege to argue that they should not be

14   compelled to release the ARRPs.  As the Ninth Circuit has explained,

> This privilege permits the government to withhold documents that reflect advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975). It was developed to promote frank and independent discussion among those responsible for making governmental decisions, *Environmental Protection Agency v. Mink*, 410 U.S. 73, 87, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973), and also to protect against premature disclosure of proposed agency policies or decisions. *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 866 (D.C. Cir.1980). The ultimate purpose of the privilege is to protect the quality of agency decisions. *Sears,* 421 U.S. at 151, 95 S.Ct. at 1517.

*F.T.C. v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984).  Factual material is not

protected unless it cannot be severed from deliberative material.  *Id.*

To assert the deliberative process privilege, the government must "provide sufficient detail

'to insure that the privilege remains a narrow privilege which is not indiscriminately invoked.'"

*Scalia v. Int'l Longshore & Warehouse Union*, 336 F.R.D. 603, 611 n.4 (N.D. Cal. 2020) (quoting

United States District Court
Northern District of California

---

[2] The parties continue to dispute whether the ARRPs defendants provided are the versions "approved" by OMB and OPM.  *See* Dkt. No. 119.

1    *United States v. Rozet*, 183 F.R.D. 662, 665 (N.D. Cal. 1998)).  The privilege must be asserted by

2    someone with significant responsibility within the agency that produced the documents.  *In re*

3    *McKesson Governmental Entities Average Wholesale Price Litig.*, 264 F.R.D. 595, 601 (N.D. Cal.

4    2009) (citing *Rozet*, 183 F.R.D. at 665 (citing *Coastal Corp. v. Duncan*, 86 F.R.D. 514, 516-17 (D.

5    Del. 1980))).  Defendants' provided declaration from OMB Senior Advisor Stephen Billy is

6    currently insufficient to meet this standard.

7         Accordingly, as the Court continues to assess whether the privilege applies to the ARRPs in

8    whole or in part, the Court ORDERS defendants to provide declarations to the Court from

9    appropriate individuals within the four agencies for which defendants have already provided ARRPs

10    to the Court for *in camera* review.  The declarations should provide sufficient detail as to which

11    parts of the ARRPs for that agency may be protected by the privilege and why.  The declarations

12    should indicate whether any versions of the submitted ARRPs have been approved formally or

13    informally by OMB or OPM.  Defendants should likewise identify any proposed redactions to the

14    portions of the submitted ARRPs for which they assert the privilege.

15         The Court orders defendants to file the above material, under seal where appropriate, by

16    Friday, June 13, 2025.  Defendants shall refer to the Court's standing orders and the civil local rules

17    of the Northern District of California regarding filing material under seal.

18

19         **IT IS SO ORDERED**.

20    Dated: May 29, 2025

21

22                      SUSAN ILLSTON

                         United States District Judge

23

24

25

26

27

28

United States District Court
Northern District of California

1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    AMERICAN FEDERATION OF              Case No.  25-cv-03698-SI
     GOVERNMENT EMPLOYEES, AFL-CIO,
8    et al.,
                                         ORDER RE: PRODUCTION OF
9              Plaintiffs,               CERTAIN DISCOVERY DOCUMENTS

10        v.                             Re: Dkt. No. 88

11   DONALD J. TRUMP, et al.,

12             Defendants.

13

14         This order addresses the government's request to reconsider, rescind, and/or otherwise

15   modify the Court's order that the government must produce Agency RIF[1] and Reorganization Plans

16   (ARRPs) on an expedited basis.  Pursuant to the President's Executive Order 14210 and a February

17   26, 2025 joint memorandum, the Office of Management and Budget (OMB) and the Office of

18   Personnel Management (OPM) required the heads of federal departments and agencies to submit

19   "Phase 1" and "Phase 2" ARRPs by March 13 and April 14. Dkt. No. 37-1, Exs. A, B.  In its May

20   9, 2025 order granting a temporary restraining order, the Court ordered the ARRPs of the federal

21   agency defendants produced (both the ARRPs the agencies submitted and the versions that OMB

22   and OPM approved).  Dkt. No. 85 at 40.

23         The government now argues that these plans "are simply irrelevant to future proceedings in

24   this Court," that the plans are covered by the deliberative process privilege, and that "[n]othing in

25   an ARRP irrevocably commits an agency to taking any specific step." Dkt. No. 88 ("Mot.") at 3, 4

26   & n.4.  Meanwhile, heads of defendant agencies have announced their intent to lay off large swathes

27   _____

28         [1] A "RIF" is a reduction in force.

United States District Court
Northern District of California

1  of their agencies, and employees are receiving RIF notices.[2]  Based on the positions the parties have

2  staked out thus far, it is clear this case is headed toward a factual dispute: did President Trump,

3  OPM, OMB, and DOGE simply instruct agencies *to begin planning* for RIFs in the future and

4  *provide guidance* on how to make those plans?  Or are these defendants *directing* agencies to make

5  "large-scale" RIFs and to make them now?  If the government's position is to be believed—that the

6  ARRPs are non-final planning documents that do not commit an agency to take any specific action—

7  that begs another question: pursuant to *what*, then, are the agencies implementing their large-scale

8  RIFs?

9      On May 9, 2025, this Court issued a temporary restraining order putting in place a two-week

10  pause on implementation of RIFs at the defendant agencies, in order to preserve the status quo while

11  this case can be more fully litigated.  At that point, the Court had received more than 1,000 pages

12  of declarations in support of plaintiffs' position and no evidence to support the government's

13  contentions.  The temporary restraining order is set to expire on May 23, 2025, and the Court set a

14  preliminary injunction hearing for May 22 at 10:30 a.m.

15      Given the gravity of what defendants assert is at issue, and in the interest of transparency,

16  the Court now reconsiders the question of whether defendants must provide copies of ARRPs to

17  plaintiffs and the Court.

18

19                **BACKGROUND**

20      In its May 9, 2025 order, the Court ordered defendants to provide to the Court and to

21  plaintiffs the following categories of documents: "(1) the versions of all defendant agency ARRPs

22  submitted to OMB and OPM, (2) the versions of all defendant agency ARRPs approved by OMB

23  and OPM, (3) any agency applications for waivers of statutorily-mandated RIF notice periods, and

24

25      [2] *See, e.g.*, Am. Compl. ¶ 20 & n.11 (March 27 press release that the Department of Health
26  and Human Services plans to RIF 10,000 employees), ¶ 20 n. 13 (Environmental Protection Agency
    RIF notices sent to certain staff, and agency head targeting 65% budget cut), ¶ 213 & n.63 (March
27  21 Small Business Administration announcement of plan to reduce workforce by 43%, pursuant to
    Executive Order 14210), ¶¶ 251-252 (National Science Foundation's 37 divisions are being
28  abolished and RIF notices to some staff went out on May 9).

United States District Court
Northern District of California

1   (4) any responses by OMB or OPM to such waiver requests[.]"[3]  Dkt. No. 85 at 40.  The Court

2   ordered this production because it "requires more information to evaluate the individual ARRPs and

3   what roles OMB, OPM, and DOGE have played in shaping them."  *Id.* at 39.  The Court set a

4   production deadline of 4:00 p.m. (PDT) on May 13, 2025.  *Id.*

5        On May 11, 2025, defendants moved for a protective order or in the alternative for

6   reconsideration and request for an immediate administrative stay of the Court's discovery order.

7   Dkt. No. 88 ("Mot.").  Defendants support their arguments with a declaration from Stephen Billy, a

8   Senior Advisor in the Office of Management and Budget.  Dkt. No. 88-1 ("Decl. Billy").

9        The Court set a briefing schedule on defendants' motion and stayed the deadline for the

10  government to produce the materials until after the Court ruled on the motion.  Dkt. No. 92.

11  Plaintiffs have filed an opposition and the government has filed a reply.  Dkt. Nos. 96, 103.

12

13                              **DISCUSSION**

14       Defendants invoke the deliberative process privilege to argue that they should not be

15  compelled to release the ARRPs.  As the Ninth Circuit has explained,

16       This privilege permits the government to withhold documents that reflect advisory
         opinions, recommendations and deliberations comprising part of a process by which
17       government decisions and policies are formulated. *NLRB v. Sears, Roebuck & Co.,*
         421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975). It was developed to
18       promote frank and independent discussion among those responsible for making
         governmental decisions, *Environmental Protection Agency v. Mink,* 410 U.S. 73, 87,
19       93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973), and also to protect against premature
         disclosure of proposed agency policies or decisions. *Coastal States Gas Corp. v.*
20       *Department of Energy,* 617 F.2d 854, 866 (D.C. Cir.1980). The ultimate purpose of
         the privilege is to protect the quality of agency decisions. *Sears,* 421 U.S. at 151, 95
21       S.Ct. at 1517.

22  *F.T.C. v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984).

23       To resolve whether the government may assert the deliberative process privilege to avoid

24  production of ARRPs involves asking several questions.  First, are the documents relevant to the

25  litigation?  If so, are the documents of the nature to be covered by the privilege—that is, are they

26

27       _____
              [3] Plaintiffs had asked for disclosure of "current versions" of ARRPs.  The Court provided
28  greater specificity in its order to assist in evaluating one of the core factual disputes between the
     parties: the extent of OMB/OPM/DOGE's involvement in directing the content of the ARRPs.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  pre-decisional and deliberative? Even if so, should the privilege be overridden by other

2  considerations?[4] Finally, if the documents are ordered produced, should their disclosure be limited

3  by a protective order?

4      The challenge facing the Court is that the parties characterize the contents of the ARRPs in

5  starkly different terms. According to the government's declaration, "Nothing in an ARRP, or its

6  review or approval by OPM or OMB, binds the agency to any particular course of action." Decl.

7  Billy ¶ 5. Moreover, "[a]n ARRP is never final and may change drastically as the agency's priorities

8  and thinking changes." Mot. at 4 (citing Decl. Billy ¶ 6). The government further asserts that

9  ARRPs "include highly sensitive information that would seriously undermine agency operations if

10  they were released," including labor negotiation strategy, reorganization plans that might hurt

11  agency recruitment and retention, and plans for regulatory changes or future appropriations requests.

12  Decl. Billy ¶ 4. On the other hand, the evidence presented by plaintiffs so far in this litigation

13  suggest the plans are final agency decisions that have led to quick, tangible actions with widespread

14  effects. Plaintiffs have received one ARRP from a non-defendant federal agency (the National

15  Endowment for the Humanities) and the contents of that plan do not neatly align with the

16  government's characterization of ARRPs in general. *See* Dkt. No. 96-1, Ex. 1, Attachs. C, D. The

17  Court sees no "highly sensitive information [that] would seriously undermine agency operations if

18  they were released," *see* Decl. Billy ¶ 4, though the Court acknowledges the government's position

19  that this ARRP is not representative of ARRPs in general and that plaintiffs attached only the Phase

20  2 cover sheet, not the full Phase 2 ARRP.

21      To assess whether the deliberative process privilege applies to the ARRPs of the federal

22  agency defendants in this case, the Court would benefit from a better understanding of their contents.

23  The Court therefore ORDERS as follows:

24      By Monday, May 19, 2025 at 12:00 p.m. (PDT), defendants shall submit to the Court for *in*

25

26

27  [4] The deliberative process privilege is qualified, not absolute. *See Warner Commc'ns*, 742
F.2d at 1161. "A litigant may obtain deliberative materials if his or her need for the materials and

28  the need for accurate fact-finding override the government's interest in non-disclosure." *Id.*
(citations omitted).

*camera* review the following documents for *four federal agency defendants*:[5] (1) the versions of ARRPs submitted to OMB and OPM and (2) the versions of ARRPs approved by OMB and/or OPM. Plaintiffs shall designate two of the agencies for which the ARRPs are to be produced and shall provide those agency names to defendants by 10:00 a.m. (PDT) on Friday, May 16, 2025. Defendants may designate the other two agencies for which it will provide ARRPs.

By Monday, May 19, 2025 at 12:00 p.m. (PDT), defendants will also provide the same ARRPs to plaintiffs' counsel, but plaintiffs' counsel may not share the plans or their contents with their clients or any third parties unless or until the Court orders otherwise.

The parties should be prepared to argue the merits of applying the deliberative process privilege to the ARRPs at the May 22, 2025 hearing.

**IT IS SO ORDERED**.

Dated:  May 15, 2025

_____

SUSAN ILLSTON
United States District Judge

---

[5] Documents for *in camera* review may be mailed or hand-delivered to the Clerk's Office, clearly stamped "DO NOT FILE—IN CAMERA REVIEW."

Add. 34   5

Stacey M. Leyton (SBN 203827)
Barbara J. Chisholm (SBN 224656)
Danielle Leonard (SBN 218201)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
sleyton@altber.com
bchisholm@altber.com
dleonard@altber.com

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel.: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

*Attorneys for Plaintiffs*
[Additional counsel and affiliations listed on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO; AMERICAN FEDERATION OF STATE COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO; SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO; AFGE LOCAL 1122; AFGE LOCAL 1236; AFGE LOCAL 2110; AFGE LOCAL 3172; SEIU LOCAL 521; SEIU LOCAL 1000; SEIU LOCAL 1021; ALLIANCE FOR RETIRED AMERICANS; AMERICAN GEOPHYSICAL UNION; AMERICAN PUBLIC HEALTH ASSOCIATION; CENTER FOR TAXPAYER RIGHTS; COALITION TO PROTECT AMERICA'S NATIONAL PARKS; COMMON DEFENSE CIVIC ENGAGEMENT; MAIN STREET | Case No. 3:25-cv-03698-SI **AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

ALLIANCE; NATURAL RESOURCES
DEFENSE COUNCIL, INC.; NORTHEAST
ORGANIC FARMING ASSOCIATION,
INC.; VOTEVETS ACTION FUND INC.;
WESTERN WATERSHEDS PROJECT;
COUNTY OF SANTA CLARA,
CALIFORNIA; CITY OF CHICAGO,
ILLINOIS; MARTIN LUTHER KING, JR.
COUNTY, WASHINGTON; HARRIS
COUNTY, TEXAS; CITY OF BALTIMORE,
MARYLAND; and CITY AND COUNTY OF
SAN FRANCISCO, CALIFORNIA

      Plaintiffs,

  v.

DONALD J. TRUMP, in his official capacity
as President of the United States;
UNITED STATES OFFICE OF
MANAGEMENT AND BUDGET;
RUSSELL VOUGHT, in his official capacity
as Director of U.S. Office of Management and
Budget;
UNITED STATES OFFICE OF PERSONNEL
MANAGEMENT;
CHARLES EZELL, in his official capacity as
Acting Director of the U.S. Office of Personnel
Management;
DEPARTMENT OF GOVERNMENT
EFFICIENCY;
ELON MUSK, in his official capacity as the
actual head of the Department of Government
Efficiency;
AMY GLEASON, in her official capacity as
the titular Acting Administrator of the
Department of Government Efficiency;
UNITED STATES DEPARTMENT OF
AGRICULTURE;
BROOKE ROLLINS, in her official capacity
as Secretary of the U.S. Department of
Agriculture;
UNITED STATES DEPARTMENT OF
COMMERCE;
HOWARD LUTNICK, in his official capacity
as Secretary of the U.S. Department of
Commerce;
UNITED STATES DEPARTMENT OF

AMENDED COMPLAINT, No. 3:25-cv-03698-SI

**Add. 36**

DEFENSE;
PETE HEGSETH, in his official capacity as
Secretary of the U.S. Department of Defense;
UNITED STATES DEPARTMENT OF
ENERGY;
CHRIS WRIGHT, in his official capacity as
Secretary of the U.S. Department of Energy;
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
ROBERT F. KENNEDY JR., in his official
capacity as Secretary of the U.S. Department
of Health and Human Services;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY;
KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of Homeland
Security;
UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT;
SCOTT TURNER, in his official capacity as
Secretary of the U.S. Department of Housing
and Urban Development;
UNITED STATES DEPARTMENT OF
JUSTICE;
PAM BONDI, in her official capacity as
Attorney General of the U.S. Department of
Justice;
UNITED STATES DEPARTMENT OF THE
INTERIOR;
DOUG BURGUM, in his official capacity as
Secretary of the U.S. Department of the
Interior;
UNITED STATES DEPARTMENT OF
LABOR;
LORI CHAVEZ-DEREMER, in her official
capacity as Secretary of the U.S. Department
of Labor;
UNITED STATES DEPARTMENT OF
STATE;
MARCO RUBIO, in his official capacity as
Secretary of the U.S. Department of State;
UNITED STATES DEPARTMENT OF
TREASURY;
SCOTT BESSENT, in his official capacity as
Secretary of U.S. Department of Treasury;
UNITED STATES DEPARTMENT OF
TRANSPORTATION;
SEAN DUFFY, in his official capacity as

Secretary for the U.S. Department of
Transportation;
UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS;
DOUG COLLINS, in his official capacity as
Secretary of Veterans Affairs;
AMERICORPS (a.k.a. the CORPORATION
FOR NATIONAL AND COMMUNITY
SERVICE);
JENNIFER BASTRESS TAHMASEBI, in her
official capacity as Interim Agency Head of
AmeriCorps;
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY;
LEE ZELDIN, in his official capacity as
Administrator of U.S. Environmental
Protection Agency;
UNITED STATES GENERAL SERVICES
ADMINISTRATION;
STEPHEN EHIKIAN, in his official capacity
as Acting Administrator for U.S. General
Services Administration;
NATIONAL LABOR RELATIONS BOARD;
MARVIN KAPLAN, in his official capacity as
Chairman of the National Labor Relations
Board;
WILLIAM COWEN, in his official capacity as
the Acting General Counsel of the National
Labor Relations Board;
NATIONAL SCIENCE FOUNDATION;
BRIAN STONE, in his official capacity as
Acting Director of the National Science
Foundation;
PEACE CORPS;
ALLISON GREENE, in her official capacity
as Chief Executive Officer of the Peace Corps;
UNITED STATES SMALL BUSINESS
ADMINISTRATION;
KELLY LOEFFLER, in her official capacity
as Administrator of the U.S. Small Business
Administration;
UNITED STATES SOCIAL SECURITY
ADMINISTRATION; and
LELAND DUDEK, in his official capacity as
Acting Commissioner of the U.S. Social
Security Administration,

        Defendants.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI

**Add. 38**

# INTRODUCTION

Plaintiffs are a coalition of labor organizations, non-profit groups, and local governments that file this amended complaint to hold unlawful and stop the unconstitutional dismantling of the federal government by the President of the United States on a scale unprecedented in this country's history and in clear excess of his authority.  Plaintiffs are the American Federation of Government Employees, AFL-CIO ("AFGE"); American Federation of State County and Municipal Employees, AFL-CIO ("AFSCME"); Service Employees International Union, AFL-CIO ("SEIU"); AFGE Local 1122; AFGE Local 1236; AFGE Local 2110; AFGE Local 3172; SEIU Local 521; SEIU Local 1000; SEIU Local 1021; Alliance for Retired Americans; American Public Health Association; American Geophysical Union; Center for Taxpayer Rights; Coalition to Protect America's National Parks; Common Defense Civic Engagement; Main Street Alliance; Natural Resources Defense Council, Inc.; Northeast Organic Farming Association Inc.; VoteVets Action Fund Inc.; Western Watersheds Project; the County of Santa Clara, California; Martin Luther King, Jr. County, Washington; the City of Baltimore, Maryland; Harris County, Texas; the City of Chicago, Illinois; and the City and County of San Francisco, California (collectively, "Plaintiffs").

By way of Executive Order, President Donald J. Trump has ordered agencies across the entire federal government to engage in a "critical transformation of the Federal bureaucracy" for the purported purpose of "eliminating waste, bloat, and insularity," including by conducting "large-scale" Reductions in Force ("RIFs") to further the reorganization of the federal agencies—all without *any* Congressional authorization.  *See* Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (Implementing the President's ''Department of Government Efficiency'' Workforce Optimization Initiative).  Executive Order 14210, and the actions taken by the Administration to implement the President's order, usurp Congress's exclusive Article I legislative authority, exceed the President's Article II Executive or statutory authority, and therefore violate the Constitution's fundamental separation of powers principles.  Plaintiffs seek to declare these acts of the President unconstitutional, unlawful, and otherwise in excess of any constitutional or statutory authority; to hold unlawful and set aside the acts of agency defendants implementing his orders as unlawful and in violation of the

Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C) and (D); and to enjoin this unconstitutional

reorganization of the federal government without legislative authority. Plaintiffs therefore hereby

plead as follows:

1. The President does not possess authority to reorganize, downsize, or otherwise

transform the agencies of the federal government, unless and until Congress authorizes such action.

Federal agencies are "creatures of statute." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595

U.S. 109, 117 (2022). Since the founding of the nation, federal courts have recognized that the

federal agencies are not created by the President: "To Congress under its legislative power is given

the establishment of offices … [and] the determination of their functions and jurisdiction." *Myers v.*

*United States*, 272 U.S. 52, 129 (1926).

2. When the President takes for himself the legislative power of Congress to recreate

federal agencies in the manner *he* sees fit, he violates the Constitution. *Youngstown Sheet & Tube Co.*

*v. Sawyer*, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to

see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.… And the

Constitution is neither silent nor equivocal about who shall make laws which the President is to

execute."). And when the President does so across *every* federal agency, he threatens the very

constitutional foundation of this nation: "There can be no liberty where the legislative and executive

powers are united in the same person." *Bowsher v. Synar*, 478 U.S. 714, 721–22 (1986) (quoting

James Madison in The Federalist No. 47, p. 325 (J. Cooke ed. 1961)). Thus, for nearly 100 years,

when Presidents have wanted to restructure the government by reorganizing both between and within

federal agencies, they have obtained Congressional authorization to do so. *See* Cong. Rsch. Serv.,

RL31446, *Reorganizing the Executive Branch in the 20th Century: Landmark Commissions* (June 10,

2002).

3. President Trump contends he was elected with a mandate to radically transform the

size and organization of the entire federal government. Ignoring applicable constitutional law, he has

engaged in a campaign unprecedented in American history: to eliminate entire federal agencies;

drastically reduce the number of employees, functions, programs, and offices at others; terminate

1    leases for government property; terminate government contracts; and sell off government property, all

2    without Congressional authorization.  President Trump has called his plan to downsize and transform

3    the federal government as he desires "The 'Manhattan Project' of our time."[1]

4         4.     As soon as President Trump took office, he immediately began his "large scale

5    structural reform" project. *Id.*

6         5.     First, on January 20, 2025, he created the "Department of Government Efficiency" or

7    "DOGE" out of a former information technology office and charged it with enacting an "18-month

8    DOGE agenda" (which the Administration has never made public) and embedding a "DOGE Team"

9    at every federal agency.  Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025).  He also

10   immediately ordered DOGE, along with the Office of Management and Budget ("OMB") and the

11   Office of Personnel Management ("OPM"), to create "a plan to reduce the size of the Federal

12   Government's workforce."  The White House, *Presidential Actions: Hiring Freeze* (Jan. 20, 2025).

13        6.     The President then proceeded to dismantle several government agencies, either

14   eliminating their functions or transferring and subsuming them within other agencies.  Exec. Order

15   No. 14242, 90 Fed. Reg. 13679 (Mar. 20, 2025) (Education); Exec. Order No. 14238, 90 Fed. Reg

16   13043 (Mar. 14, 2025) (seven agencies); Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025)

17   (four agencies); *see also* Exec. Order No. 14169, 90 Fed. Reg. 8619 (Foreign Aid) and Press Release,

18   U.S. Dep't of State, *Prioritizing America's National Interests One Dollar at A Time* (Jan. 29, 2025)

19   (USAID); *Nat'l Treasury Emps. Union v. Vought*, __ F. Supp. 3d __, No. 25-0381, 2025 WL 942772

20   (D.D.C. Mar. 28, 2025) (CFPB).

21        7.     On February 11, 2025, President Trump issued the Executive Order 14210 that is the

22   subject of this lawsuit.  Executive Order 14210 (hereinafter "Workforce Executive Order" or

23   _____

24        [1] Statement by President-elect Donald J. Trump announcing Department of Government
     Efficiency, The American Presidency Project (Nov. 12, 2024):

25        To drive this kind of drastic change, the Department of Government Efficiency ["DOGE"]
          will provide advice and guidance from outside of Government, and will partner with the
26        White House and Office of Management & Budget to drive **large scale structural reform**,
          and create an entrepreneurial approach to Government never seen before.

27   Available at: https://www.presidency.ucsb.edu/documents/statement-president-elect-donald-j-trump-
     announcing-that-elon-musk-and-vivek-ramaswamy (emphasis added).

28   AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    3

"Executive Order 14210") ordered all federal agencies to "commence[]" a **critical transformation of the Federal bureaucracy**" for the purported purpose of "eliminating waste, bloat, and insularity." Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) (emphasis added), attached hereto as Exhibit A.

8.    This Workforce Executive Order, in pertinent part, requires all federal agencies to effectuate President Trump's vision for the radical transformation and downsizing of the federal government by:  1) freezing agency hiring and allowing OMB and DOGE to control future hiring government-wide; 2) commencing "large-scale reductions in force" ("RIFs") that serve the purpose of stripping away agency functions, eliminating the offices and functions that the President chooses to eliminate, and dramatically reducing staffing levels throughout the government; and 3) creating corresponding "reorganization" plans reflecting these RIFs that also address whether the "agency or any of its subcomponents should be eliminated or consolidated." *Id*.

9.    The Workforce Executive Order does not simply suggest or encourage agencies to exercise their own statutory authority to effectuate a government-wide reorganization: it orders them to act according to the President's vision, *regardless* of that statutory authority.  The Workforce Executive Order imposes the following requirements:

a.    Agencies are *required* to commence large-scale RIFs (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions, obligations, and appropriations);

b.    Agencies are *required* to prioritize in RIFs any "agency initiatives, components, or operations that my Administration suspends or closes" (irrespective of statutory requirements, obligations, or authority delegated to the agencies);

c.    Agencies are *required* to prioritize in RIFs levels of staffing equivalent to  government emergency shutdown levels (which have nothing to do with the staffing needed to properly run fully appropriated agencies);

d.    Agencies are *required* to consider their own abolition, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements, obligations, or authority delegated to the agencies);

e.    And finally, agencies are required to reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions.

As the President made plain in the White House "Fact Sheet" that accompanied the Executive Order,

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                    4

Add. 42

the Executive Order furthers the President's goals of "reforming the federal workforce" and "reducing the unnecessary footprint of government."[2]

10.    Again and again, the President has explained his plan to reorganize and reform the *entire federal government*: "I got elected on the basis of making our government stronger and smaller, because we have millions of people that — obviously, they're paying millions of people that shouldn't be paid."  The White House, *Remarks by President Trump after Executive Order Signing* (Feb. 18, 2025); *see also* The White House, *Remarks by President Donald J. Trump in Joint Address to Congress* (Mar. 4, 2025) ("Americans have given us a mandate for bold and profound change.  For nearly 100 years, the federal bureaucracy has grown until it has crushed our freedoms, ballooned our deficits, and held back America's potential in every possible way.  The nation founded by pioneers and risk-takers now drowns under millions and millions of pages of regulations and debt. … My administration will reclaim power from this unaccountable bureaucracy, and we will restore true democracy to America again."); The White House, *Fact Sheet: President Donald J. Trump Continues the Reduction of the Federal Bureaucracy* (Mar. 14, 2025) ("President Trump has made reforming the federal workforce a key priority for his second term.").

11.    At no point has Congress authorized President Trump's actions with respect to the federal agencies that Congress created in an exercise of its Article I legislative authority, which the Constitution grants to Congress, not to the President.  Unlike President Trump, nine Presidents on 16 occasions, across the political spectrum, have been granted authority by Congress to propose fast-tracked legislation before reorganizing federal agencies:  Presidents Herbert Hoover, Franklin D. Roosevelt, Harry S. Truman, Dwight D. Eisenhower, John F. Kennedy, Lyndon B. Johnson, Richard Nixon, Jimmy Carter, and Ronald Reagan.  *See* Cong. Rsch. Serv., RL31446, *Reorganizing the Executive Branch in the 20th Century: Landmark Commissions* (June 10, 2002); *see also* Paul Larkin, Jr. & John-Michael Seibler, *The President's Reorganization Authority*, Heritage Foundation Legal Memorandum No. 210 (July 12, 2017).  Congress has given no such authority to President Trump.

---

[2] The White House, *Fact Sheet:  President Donald J. Trump Works to Remake America's Federal Workforce* (Feb. 11, 2025).

Add. 43

12. President Trump should well understand the constitutional limits on his authority to reorganize the federal government, because he tried and failed to obtain that authorization during his first term in office. *See* Exec. Order No. 13781, 82 Fed. Reg. 13959 (Mar. 13, 2017) (Comprehensive Plan for Reorganizing the Executive Branch) (ordering OMB to engage in public and agency processes to create a report with recommendations regarding reorganization); Off. of Mgmt. and Budget, *Delivering Government Solutions in the Twenty-First Century: Reform Plan and Reorganization Recommendations* (June 2018).[3] As the first-term OMB reorganization report expressly acknowledged, the plans "establish a vision for the Executive Branch that will require further exploration and partnership with the Congress." *Id.* at 4. Congress did not re-enact reorganization authority for this first-term plan. President Trump determined that in his second term he would proceed without Congress.

13. To serve his goals of radical transformation, the President has also enlisted three centralized agencies with government-wide reach. OMB, OPM, and DOGE are implementing the President's unconstitutional and unlawful orders to federal agencies by way of requiring all those other agencies to present "Agency RIF and Reorganization Plans" ("ARRPs") for *approval*, according to parameters and requirements imposed on those agencies. *See* Memorandum from Russel Vought, OMB Director, and Charles Ezell, OPM Acting Director, to Heads of Executive Departments and Agencies re: Guidance on Agency RIF and Reorganization Plans Requested by *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 26, 2025) (attached hereto as Exhibit B). DOGE, for its part, has been dictating to each agency the required cuts to staffing and programs, in the name of "fraud and waste": "We are

---

[3] Available at: https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-Reorg-Plan.pdf. In 2017, President Trump ordered notice and public comment on the creation of these reorganization recommendations: "The Director shall publish a notice in the *Federal Register* inviting the public to suggest improvements in the organization and functioning of the executive branch and shall consider the suggestions when formulating the proposed plan described in subsection (c) of this section." Exec. Order No. 13781, Sec. 2(b).

1   cutting the waste and fraud in real time. Every day like that passes, our goal is to reduce the waste

2   and fraud by $4 billion a day every day, seven days a week. And so far, we are succeeding."[4]

3     14. Through these agents, President Trump's orders, effectuated by OMB, OPM, and

4   DOGE, require federal agencies within weeks to create plans to reorganize themselves through

5   massive layoffs, for the purpose of President Trump's desire for "large scale structural reform" and

6   "reducing the size and scope of the federal government."  These orders require agencies to disregard

7   individual authorizing statutes, regulations, and terms that govern each agency, and the requirements

8   of reasoned decision-making.  To be clear, the agencies that are directed to submit ARRPs are *not* the

9   decision-makers here:  even if they are quickly creating and submitting these plans, they are required

10  to submit plans that follow the President's mandate, according to the President's designs, and that are

11  only effectuated by OMB and OPM (and DOGE) approval.

12    15. Three months into this Administration, there can be no real doubt that impacted

13  federal agencies are acting according to the direction being given by President Trump through

14  DOGE, OMB, and OPM.  Courts throughout the country have rejected this Administration's attempts

15  to blame agencies for action that this Administration required them to take.  *See New York v. Trump*,

16  133 F.4th 51, 65 (1st Cir. 2025) (affirming District of Rhode Island's conclusion that "any

17  'suggest[ion] that the challenged federal funding freezes were purely the result of independent agency

18  decisions' was 'disingenuous.'"); *Am. Fed'n of Gov. Emps., AFL-CIO v. Off. of Pers. Mgmt.*, No. 25-

19  cv-01780-WHA (N.D. Cal.), ECF Nos. 44, 45, 120, 132 (holding that OPM, not federal agencies,

20  unlawfully ordered the terminations of probationary employees government-wide); *Does v. Musk*, __

21  F. Supp. 3d __, No. 25-0462, 2025 WL 840574 (D. Md. Mar. 18, 2025) (holding DOGE is directing

22  agency action); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, __ F. Supp. 3d __, No. 25-cv-

23  239, 2025 WL 597959, at *7 (D.D.C. Feb. 25, 2025) (rejecting contention that "countless federal

24  agencies ... suddenly began exercising their own discretion to suspend funding across the board at the

25

26

27    [4] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics* (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.  Transcript available at: https://www.rev.com/transcripts/musk-and-doge-on-brett-baier.

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI       7

exact same time" because it requires "unfathomable" "coincidental assumptions" and "contradicts the record").

16. Moreover, President Trump himself has touted his ability to control agencies through DOGE, stating that, "after he signs an executive order, it gets 'passed on to [Musk] and his group' and 'they're all getting done.'" *Does v. Musk*, 2025 WL 840574 at *2 (quoting The White House, *Interview of President Trump and Elon Musk by Sean Hannity*, *"the Sean Hannity Show"*, (Feb. 18, 2025)).[5]  The President explained further:

> [H]e would take that executive order that I'd signed, and he would have those people to whatever agency it was – "when are you doing it?  Get it done.  Get it done."  And some guy that maybe didn't want to do it, all of a sudden, he's signing – he just doesn't want to be bothered.

*Id.*; *see also* The White House, *Remarks by President Trump Before Cabinet Meeting*, (Feb. 26, 2025) (President Trump:  "We're cutting down government.  We're cutting down the size of government.  We have to.  We're bloated.  We're sloppy.  We have a lot of people that aren't doing their job").[6]

17. Those who work for President Trump confirm that the President is controlling federal agencies according to his vision:

- The President's National Economic Council Director Kevin Hassett, White House Press Briefing (Feb. 20, 2025):
  > I'm saying that *we're studying every agency and deciding who to let go and why*, and we're doing so very rationally with a lot of support from analysis. (Emphasis added.)[7]

- Elon Musk, who according to the President, is head of DOGE, told reporters on February 11, 2025 that "the people voted for major government reform and that's what

---

[5] Available at: https://www.whitehouse.gov/remarks/2025/02/interview-of-president-trump-and-elon-musk-by-sean-hannity-the-sean-hannity-show/.

[6] Available at: https://www.whitehouse.gov/remarks/2025/02/remarks-by-president-trump-before-cabinet-meeting/.

[7] The White House, *Press Briefing by Press Secretary Karoline Leavitt, Deputy Chief of Staff Stephen Miller, National Economic Council Director Kevin Hassett, and National Security Advisor Mike Waltz* (Feb. 20, 20250, available at: https://www.whitehouse.gov/remarks/2025/02/press-briefing-by-press-secretary-karoline-leavitt-deputy-chief-of-staff-stephen-miller-national-economic-council-director-kevin-hassett-and-national-security-advisor-mike-waltz/.

people are going to get."[8]  Musk, again on March 27, 2025:  "Well, this is a revolution, and I think it might be the biggest revolution in government since the original revolution."[9]

18.    The Administration has largely not revealed the transformation and downsizing plans to the press, to the public (even in response to FOIA requests), in response to union information requests, or to Congress.  OMB and OPM required all federal agencies to submit the ARRPs in a two-stage approval process, by deadlines of March 13 and April 14, 2025.  The Administration has refused to make either the March 13 or April 14 version of the ARRPs public, claiming they are "pre-decisional" because they have not been approved by OMB, and that employees and the public will learn what these plans are only when the reorganization occurs and RIF notices come out:

> It's no secret the Trump Administration is dedicated to downsizing the federal bureaucracy and cutting waste, fraud, and abuse. This document is a pre-deliberative draft and does not accurately reflect final reduction in force plans…. When President Trump's Cabinet Secretaries are ready to announce reduction in force plans, they will make those announcements to their respective workforces at the appropriate time.

Email from White House Principal Deputy Press Secretary Harrison Fields, as reported by the Washington Post.[10]

19.    What information Plaintiffs have painstakingly collected is gleaned from RIF notices that have been issued to date, press coverage of agency sources and leaked government documents, and statements by the President and agency heads describing general plans.  That information reveals that the Administration is actively implementing this unprecedented reorganization now.  The American people have a right to know what the President is doing to dismantle their federal government.

---

[8] Gov't Exec., *Trump orders agencies to plan for widespread layoffs and attrition-based hiring*, (Feb. 11, 2025), available at: https://www.govexec.com/workforce/2025/02/trump-orders-agencies-plan-widespread-layoffs-and-attrition-based-hiring/402938/.

[9] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics*  (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112.  Transcript available at: https://www.rev.com/transcripts/musk-and-doge-on-brett-baier.

[10] Washington Post, *Internal White House document details layoff plans across U.S. agencies* (March 27, 2025), available at: https://www.washingtonpost.com/politics/2025/03/27/federal-worker-layoffs-government-agencies/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          9

20.     Details are emerging: in late March, pursuant to the mandate of Executive Order 14210, the Department of Health and Human Services ("HHS") began eliminating more than 10,000 positions throughout the Center for Disease Control ("CDC"), Food and Drug Administration ("FDA"), the National Institutes of Health ("NIH"), among other programs, throwing the medical, public health, and scientific community into utter chaos.[11] As of April 15, 2025, the IRS was slated to commence RIFs ultimately totaling 40% of its workforce, including over 50% of the tax enforcement staff (the very staff that *brings in revenue to the government*).[12] On April 22, 2025, the EPA began sending RIF notices to employees across its headquarters and regional offices.[13] Other agencies are right behind (*see infra* ¶¶189–256):

- The Department of Agriculture will eliminate at least 9,000 positions and entire regional offices and Research Stations within the Forest Service, taking staff down to at least 2019 levels;

- The Department of Energy will terminate 43% of its staff, eliminating offices and functions (including more than 500 positions at the Nuclear National Security Administration and eliminating the Office of Clean Energy Demonstrations entirely);

- The U.S. Environmental Protection Agency will reportedly lose 65% of its staff and effectively the entire Office of Research and Development (over 1,000 chemists, biologists, toxicologists and other scientists), among others;

- The Department of Housing and Urban Development is looking to cut approximately 51% of staff, eliminating and consolidating offices and functions;

- The Department of the Interior is going to engage in large-scale RIFs of positions and programs that are deemed not "critical to public safety" or not "linked to highest priority programs";

---

[11] *See* March 27, 2025 Press Release: HHS Announces Transformation to Make America Healthy Again, available at: https://www.hhs.gov/press-room/hhs-restructuring-doge.html.

[12] Fed. News Network, *IRS outlines plan to cut up to 40% of workforce, as tax filing season ends*, (Apr. 15, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-outlines-plan-to-cut-up-to-40-of-workforce-as-tax-filing-season-ends/. The IRS began RIFs with one office in March. Gov't Exec., *IRS sends RIF notices as it begins widespread layoffs* (Apr. 4, 2025), available at: https://www.govexec.com/workforce/2025/04/irs-sends-rif-notices-it-begins-widespread-layoffs/404317/. On April 23, 2025, the IRS confirmed the RIFs are ongoing. Fed. News Network, *IRS layoff notices to employees delayed by 'glitches,'* (Apr. 23, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-layoff-notices-to-employees-delayed-by-glitches/.

[13] Reuters, *EPA begins layoffs of environmental justice staff* (Apr. 22, 2025), available at: https://www.reuters.com/business/world-at-work/epa-begins-layoffs-environmental-justice-staff-2025-04-22/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                          10

- The Department of Labor will eliminate the entire Office of Federal Contract Compliance Programs, among other cuts;

- The Small Business Administration will lay off 43% of staff;

- The Social Security Administration will engage in "agency-wide organizational restructuring that will include significant workforce reductions" that the agency describes as "massive reorganizations" eliminating over 5,000 positions and potentially closing up to 47 field offices; and

- The Department of Veterans' Affairs looks to roll back to at least 2019 staffing levels by cutting *over 83,000 jobs across the country*, in critical veterans' service roles.

The list goes on, because the President has directed nearly every agency to make massive cuts to its workforce in furtherance of a reorganization of the entire federal government. These are no minor reforms or policy judgments: this is an express attempt to "transform" the country's federal administrative structure.

21. By ordering and enacting the radical transformation President Trump contends he was elected to enact, President Trump has exceeded any constitutional authority granted to him in Article II or statutorily delegated by Congress and has thereby usurped Congress's Article I authority. President Trump's Executive Order 14210 requiring agencies to engage in these large-scale RIF and reorganization plans is therefore *ultra vires* and unconstitutional.

22. Moreover, neither OMB, OPM, nor DOGE have their own authority to order federal agencies to engage in large-scale RIFs or take any other action in service of government reorganization. The statutory authority defined by Congress does not give OMB or OPM any authority to *require* agencies to RIF employees, or to do so according to specific parameters, including because the President has decided to eliminate programs, functions, or positions, or take agencies down to shutdown levels of staff, or for either OMB or OPM to assert decision-making authority over the agencies. Nor does DOGE have any authority to require agencies to meet targets imposed by DOGE for reductions of staff and/or spending. By implementing the President's orders, OMB, OPM, and DOGE therefore are each exceeding their authority, engaging in arbitrary and capricious action, and ignoring proper procedure, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), and (D).

AMENDED COMPLAINT, No. 3:25-cv-03698-SI

11

**Add. 49**

23.     Finally, the impacted agencies themselves do not have the authority to do the President's unconstitutional bidding, under the terms set by the President rather than by Congress. Over and over, newly appointed agency heads have explained that they are reorganizing, eliminating programs, and cutting thousands upon thousands of jobs, because the President directed them to and because DOGE told them how much and what to cut. As Veterans Affairs Secretary Doug Collins stated on the "Fox & Friends" program in early March 2025, the VA's plan to cut 80,000 jobs pursuant to the President's Executive Order was not his idea: "No, that is a goal that was put out … [as] President Trump and [the Office of Personnel Management] have said let's look at a reduction in force across government,…And that is a goal, that is our target."[14] *See also, e.g.*, U.S. Dep't of Health & Hum. Servs., *Fact Sheet: HHS Transformation to Make America Healthy Again* (Mar. 27, 2025) ("The restructuring of HHS is proceeding in accordance with President Trump's Executive Order").[15]  By implementing the President's unconstitutional orders, effectuated by DOGE's, OMB's, and OPM's requirements, these agencies have acted and are acting not in accordance with law and are engaged in arbitrary and capricious action in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) and (C).

24.     The President's insistence on implementing this politically driven "mandate" comes at a nearly immeasurable cost to federal agencies, millions of public employees, state and local governments, and all those who depend on the services the agencies provide every day.  Plaintiffs stand together to name these harms at their source, pursue their right to judicial review, and stop actions that threaten the very foundations of our constitutional democracy.

25.     And so it falls upon this Court to play its Article III role in restraining the President's unconstitutional acts and the unlawful actions of the agencies that implement those directives. *Marbury v Madison*, 5 U.S. 137 (1803).  None of the actions at issue here are dedicated by the Constitution to the President and out of this Court's reach.  Plaintiffs call upon this Court to hold unlawful President Trump's unconstitutional reorganization and dismantling of the federal

---

[14] The Hill, *VA Secretary: Cutting 80,000 is "our target,"* (Mar. 10, 2025), available at: https://www.yahoo.com/news/va-secretary-cutting-80-000-170115439.html.
[15] Available at: https://www.hhs.gov/press-room/hhs-restructuring-doge-fact-sheet.html.

**Add. 50**

1    government by and through Executive Order 14210, and to enjoin the actions of the agencies

2    implementing that unconstitutional presidential order.

**JURISDICTION AND VENUE**

4    26.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

5    27.    Venue is appropriate in this district under 28 U.S.C. § 1391(e).  Plaintiffs AFGE,

6    AFGE Local 1122, AFGE Local 1236, AFGE Local 2110, AFGE Local 3172, AFSCME, SEIU, SEIU

7    Local 521, SEIU Local 1000, and SEIU Local 1021 represent federal, state, and/or local government

8    employees whose place of employment is within the Northern District of California, and Plaintiffs the

9    City and County of San Francisco and the County of Santa Clara are located within the Northern

10   District of California.

11   28.    Intradistrict assignment is appropriate in the San Francisco/Oakland division of this

12   Court.

**PARTIES**

14   29.    Plaintiff AFGE is a labor organization and unincorporated association headquartered at

15   80 F Street N.W., Washington, D.C. 20001.  AFGE, the largest union of federal employees, represents

16   approximately 800,000 federal civilian employees through its affiliated councils and locals at 192

17   Departments, agencies and sub-agencies of the federal government, and in every state in the United

18   States.

19   30.    Plaintiff AFSCME is a labor organization and unincorporated association

20   headquartered at 1625 L Street, N.W., Washington, D.C. 20036.  AFSCME is the largest trade union

21   of public employees in the United States, with 1.4 million members organized into approximately

22   3,400 local unions, 58 councils and affiliates in 46 states, the District of Columbia, and Puerto Rico.

23   AFSCME members include nurses, corrections officers, child care providers, emergency medical

24   technicians, sanitation workers, school bus drivers, civil engineers, policy analysts, and more, all with

25   one thing in common:  a dedication to making our communities stronger, healthier, and safer.

26   AFSCME represents federal civilian employees in numerous agencies and departments across the

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    13

**Add. 51**

1  federal government, and state and local government employees who rely on the services of the

2  federal government every day.

3         31.     Plaintiff SEIU is a labor organization of approximately two million working people

4  united by the belief in the dignity and worth of workers and the services they provide. SEIU's

5  members work in healthcare, the public sector, and property services. SEIU has more than 150

6  affiliates across the United States, Canada, and Puerto Rico, and is headquartered at 1800

7  Massachusetts Ave., N.W., Washington, D.C. 20036. SEIU members include physicians, technicians,

8  long-term care workers, janitors, security officers, airport workers, librarians, childcare workers,

9  educators, fast food workers, employees who work for city, county, and federal governments, and

10  many more. SEIU, together with its local affiliates, represent approximately 80,000 federal sector

11  employees in the United States, including nurses, doctors, other healthcare workers, police officers,

12  firefighters, first responders, office workers, scientists, engineers, analysts, maintenance workers, and

13  more. SEIU federal sector members provide a broad swath of services and bring a substantial amount

14  of expertise to numerous agencies across the federal government. SEIU also represents about

15  785,000 care providers and over 700,000 non-federal public sector employees employed by states,

16  counties, cities, and school boards across the country, which rely on federal agencies in order to

17  continue providing essential services to their communities. SEIU's members also include

18  approximately 6,000 workers employed by contractors to provide cleaning, security, maintenance,

19  and other services at federally owned and federally leased sites run by numerous federal agencies.

20         32.     Plaintiff AFGE Local 1122 is a labor organization and unincorporated association

21  headquartered in Richmond, California. AFGE Local 1122 represents approximately 600 employees

22  at a Social Security Administration Western Program Service Center in Richmond, California, in

23  addition to other units within SSA's San Francisco region. Those employees work in positions

24  including Claims Specialists, Benefits Authorizers, and other clerical staff.

25         33.     Plaintiff AFGE Local 1236 is a labor organization and unincorporated association

26  headquartered in San Francisco, California. AFGE Local 1236 represents approximately 74 attorney-

27

28

**Add. 52**

1    advisors at Environmental Protection Agency Region 9 Headquarters in San Francisco, California,

2    and EPA's National Center for Radiation Field Operations in Las Vegas, Nevada.

3          34.    Plaintiff AFGE Local 2110 is a labor organization and unincorporated association

4    headquartered in Palo Alto, California.  AFGE Local 2110 represents approximately 4,000 employees

5    at the Department of Veterans' Affairs Palo Alto Health Care System, including its Menlo Park and

6    Livermore Divisions, and at several Community-Based Outpatient Clinics in Fremont, San José,

7    Monterey, and Capitola.  Those employees work as doctors, nurses, emergency medical services

8    personnel, food service workers, custodial staff, and administrative staff.

9          35.    Plaintiff AFGE Local 3172 is a labor organization and unincorporated association

10    headquartered in Pacifica, California.  AFGE Local 3172 represents approximately 1,600 employees

11    at SSA field offices in California and Nevada.  Those employees work in positions including Claims

12    Services Representatives, Claims Specialists, Technical Experts, and other administrative and

13    facilities staff.

14          36.    Plaintiff SEIU Local 521 is a labor organization and unincorporated association

15    headquartered in San José, California.  SEIU Local 521 represents over 72,000 members who work

16    for cities, counties, public schools, public offices of education, public hospital districts, transit

17    authorities, federally qualified healthcare clinics, private non-profits, and Head Start child care

18    agencies in the state of California, and who operate family childcare provider services.  SEIU Local

19    521's members live and work throughout the state, including in the counties of San Mateo, Santa

20    Clara, Santa Cruz, Monterey, and San Benito.  The members represented by SEIU Local 521 work in

21    nearly most classifications in county and public district hospitals, social services agencies, and in

22    Head Start agencies and family provider childcare settings.

23          37.    Plaintiff SEIU Local 1000 is a labor organization and unincorporated association

24    headquartered in Sacramento and has a Coastal & Central Representation office located at 436 14th

25    Street, Suite 200, in Oakland, California.  SEIU Local 1000 represents approximately 96,000

26    employees who work in the California state government.  Those employees live and work throughout

27    the State, including in San Francisco, Oakland, and Sacramento.  The employees represented by

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                  15

**Add. 53**

1    SEIU Local 1000 work in a wide range of positions across the state government, including as office

2    assistants, secretaries, data entry staff, technical assistants, information technology analysts,

3    accounting officers, auditors, and departmental analysts.

4          38.    Plaintiff SEIU Local 1021 is a labor organization and unincorporated association

5    headquartered in Oakland, California. SEIU Local 1021 represents approximately 70,000 members

6    who work for cities, counties, public schools, public hospital districts, transit authorities, federally

7    qualified healthcare clinics, private non-profits, private higher education institutions, and Head Start

8    child care agencies in the state of California. SEIU Local 1021's members live and work throughout

9    the state, including in the counties of Alameda, Contra Costa, Del Norte, Humboldt, Marin,

10    Mendocino, Napa, San Francisco, and Sonoma. The members represented by SEIU Local 1021 work

11    in most classifications in county and public district hospitals, social services agencies, and in Head

12    Start agencies.

13          39.    Plaintiff Alliance for Retired Americans ("ARA" or the "Alliance") is a grassroots

14    organization with 4.4 million retiree members. Founded by the AFL-CIO Executive Council in 2001,

15    the Alliance has 40 state alliances and members in every state, including 950,000 members—nearly

16    300,000 of whom are retirees—in California. The Alliance's retiree members are from all walks of

17    life. They are former teachers, industrial workers, state and federal government workers,

18    construction workers, and community leaders united in the belief that every American deserves a

19    secure and dignified retirement after a lifetime of hard work.

20          40.    Plaintiff American Geophysical Union ("AGU") is a 501(c)(3) membership

21    association for Earth and space scientists. The organization, founded in 1919, pursues a mission "to

22    support and inspire a global community of individuals and organizations interested in advancing

23    discovery in Earth and space sciences and its benefit for humanity and the environment." AGU has

24    more than 42,000 members worldwide, with 29,000 residing in the U.S., of whom more than 4,000

25    are in California; approximately 8,400 of those members work in the federal government, 28,000 are

26    university researchers, and 2,000 are scientists at nonprofit organizations. In addition to traditional

27    career support provided by an association, AGU publishes a portfolio of 24 high-impact scholarly

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI           16

1    journals and convenes regular scientific meetings, including its Annual Meeting, which had more

2    than 30,000 attendees in 2024.

3         41.     Plaintiff the American Public Health Association ("APHA") is a non-partisan, non-

4    profit organization that champions the health of all people and all communities; strengthens the

5    profession of public health; shares the latest research and information; promotes best practices; and

6    advocates for public health issues and policies grounded in scientific research.  APHA represents

7    more than 23,000 individual members who reside in all 50 states, including 2,100 individual

8    members in California, and also has 52 state and regional affiliates.  APHA's membership also

9    includes organizational members, including groups interested in health, state and local health

10   departments, and health-related businesses.  APHA is the only organization that combines a 150-year

11   perspective, a broad-based member community, and the ability to influence federal policy to improve

12   the public's health.  APHA's membership additionally includes more than 250 California students in

13   university public health schools or related programs, and over 50 California agency or organizational

14   members, including the California Department of Public Health, Contra Costa County Public Health,

15   Marin County Public Health, and the Los Angeles Trust for Children's Health.

16        42.     Plaintiff Center for Taxpayer Rights is a nonpartisan nonprofit organization dedicated

17   to furthering taxpayers' awareness of and access to taxpayer rights.  The Center accomplishes its

18   mission, in part, by educating the public and government officials about the role taxpayer rights play

19   in promoting compliance and trust in systems of taxation.  The Center provides technical support for

20   the establishment and expansion of taxpayer advocate and ombuds offices as independent voices of

21   taxpayer rights and systemic change.  The Center develops materials to educate the public about the

22   function of taxes and taxpayer rights in civil society.  The organization also develops training

23   programs for tax administration officials as a component of leadership training.  Through the Center's

24   Low Income Taxpayer Clinic ("LITC"), the organization provides free representation to low-income

25   taxpayers in disputes with the IRS and in the federal courts.  All of the clients of the Center's LITC

26   are low-income taxpayers.  The Center also operates LITC Connect, a nationwide network of Low-

27   Income Taxpayer Clinics and volunteer attorneys, certified public accountants, and enrolled

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    17

1    agents that matches LITCs with tax professionals who can provide pro bono representation to low-

2    income taxpayers and support for specific issues.  The Center, through LITC Connect, provides

3    training when needed to LITC staff and tax professionals supporting LITCs in serving low-income

4    taxpayers and hosts weekly calls with LITCs who are LITC Connect members.  In 2023, LITCs, most

5    of whom are members of LITC Connect and the weekly calls, represented nearly 20,000 taxpayers

6    nationwide, educated over 140,000 taxpayers and service providers about their rights and

7    responsibilities before the IRS, secured over $10 million in tax refunds, and decreased or corrected

8    over $41 million in tax liabilities.

9        43.    Plaintiff Coalition to Protect America's National Parks ("Parks Coalition") is a non-

10    profit organization made up of over 4,000 members, all of whom are current, former, and retired

11    employees and volunteers of the National Park Service.  Together, they have accumulated over

12    50,000 years of experience caring for America's most valuable natural and cultural resources.  The

13    Coalition's goal is to support the preservation and protection of the National Park System and the

14    mission-related programs of the National Park Service ("NPS") to ensure the survival of the park

15    system for generations to come.  The Coalition's members are regular and avid users of the National

16    Park System and NPS programs, as well as the national forests and other public lands, for recreation

17    and conservation activities.

18        44.    Plaintiff Common Defense Civic Engagement ("Common Defense") is a grassroots

19    membership organization of progressive veterans, military families, and civilian supporters standing

20    up for our communities against the rising tide of racism, hate, and violence.  Common Defense

21    invests in the leadership of its members through training and deployment in campaigns that connect

22    directly to their history of service, including voting rights, climate justice, and anti-militarism.

23    Approximately 33,187 of Common Defense's members live in California, including approximately

24    2,000 veterans.

25        45.    Plaintiff Main Street Alliance ("MSA") is a national network of small businesses, with

26    approximately 30,000 members throughout the United States.  MSA helps small business owners

27    realize their full potential as leaders for a just future that prioritizes good jobs, equity, and community

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                                18

**Add. 56**

through organizing, research, and policy advocacy. MSA also seeks to amplify the voices of its small business membership by sharing their experiences with the aim of creating an economy where all small business owners have an equal opportunity to succeed. MSA is nonpartisan and is a Section 501(c)(3) organization. MSA has approximately 1,410 small business members in California, including more than 70 small businesses in Alameda, Santa Clara, San Francisco, Sonoma, and Contra Costa Counties.

46.    Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a not-for-profit environmental and public health membership organization that works to ensure the rights of all people to clean air, clean water, and healthy communities. NRDC has many hundreds of thousands of members throughout the United States. NRDC engages in research, policy analysis, advocacy, public education, and litigation to protect public health and the environment. As part of its work, NRDC petitions federal agencies for rulemaking and other actions to protect the environment and human health, comments on proposed regulations issued by federal agencies, researches and informs its members about important environmental and public health issues, and publishes scientific papers and advocacy briefs to inform the scientific community, policymakers, and the public.

47.    Plaintiff Northeast Organic Farming Association Inc. ("NOFA") is a non-profit organization of over 5,000 farmers, farmworkers, gardeners, landscape professionals, and consumers working to promote healthy food, organic farming practices, and a cleaner environment. NOFA is comprised of seven state-chapters: Connecticut, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island, and Vermont. Each of these organizations offers educational conferences, workshops, farm tours, and printed materials to educate farmers, gardeners, consumers, and land care professionals on organic farming. NOFA also publishes a quarterly newspaper, *The Natural Farmer*, that provides features on organic farming techniques, certification issues, organic market conditions, and environmental developments that may impact farmers and growers; administers the Organic Land Care program, which trains landscape professionals and others on the principles and practices of organic land care, as laid out by the *NOFA Standards for Organic Land Care*; runs a professional accreditation program; provides advice, support and cross-credentialing to partner institutions

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                           19

1    engaged in sustainable landscape education; and educates the public about the importance of using

2    standards-based organic landscaping services.

3        48.    Plaintiff VoteVets Action Fund Inc. ("VoteVets") is a non-partisan, non-profit

4    organization incorporated under the laws of the District of Columbia.  Its purpose is to lift up the

5    voices of veterans on matters of national security, veterans' care, and everyday issues that affect the

6    lives of those who served as well as their families including foreign policy, veterans' unemployment,

7    robust investment in care for veterans, energy security, protecting the rights of those who serve, and

8    upholding the Constitution and democracy that every military member swore to uphold and protect.

9    VoteVets has nearly two million supporters across the country, in all fifty states, with whom it

10   regularly communicates about issues affecting veterans, including the operations, programs, and

11   services available through the VA.  Approximately 417,000 of VoteVets' supporters live in California,

12   including 131,000 in Northern California.

13       49.    Plaintiff Western Watersheds Project ("WWP") is a non-profit environmental

14   conservation group that works to influence and improve public lands management throughout the

15   western United States to protect native species and conserve and restore the habitats they depend

16   on.  WWP's primary focus is on the negative impacts of livestock grazing, including harm to

17   ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless

18   areas, Wilderness Study Areas, and designated Wilderness.  WWP was founded in 1993 and has more

19   than 14,000 members and supporters and field offices in Colorado, Utah, Idaho, Montana, Wyoming,

20   Arizona, Nevada, and Oregon.  WWP covers over 250 million acres of public land spanning all of the

21   western states.

22       50.    The Plaintiffs identified in the preceding paragraphs are all proceeding on their own

23   behalf as an organization, including based on injury to their mission and organizational activities, as

24   well as on a representative or associational basis, based on injury to their members.

25       51.    Plaintiff County of Santa Clara, California ("Santa Clara") is a charter county and

26   political subdivision of the State of California.

27

28
     AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                              20

52.     Plaintiff Martin Luther King, Jr. County ("King County") is a home rule charter county organized and existing under and by virtue of the constitution and laws of the State of Washington.

53.     Plaintiff the Mayor and City Council of Baltimore ("Baltimore") is the corporate identity of the Plaintiff City of Baltimore, Maryland, a home-rule jurisdiction created by the Baltimore City Charter as an entity that may sue and be sued.

54.     Plaintiff Harris County, Texas ("Harris County") is a local government entity in the state of Texas.

55.     Plaintiff the City of Chicago, Illinois ("Chicago") is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

56.     Plaintiff the City and County of San Francisco ("San Francisco") is a municipal corporation organized and existing under and by virtue of the laws of the State of California and is a charter city and county.

57.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

58.     Defendant Office of Management and Budget ("OMB") is a federal agency headquartered in Washington, D.C.  OMB is a federal agency within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1).

59.     Defendant Russell Vought is the Director of OMB and is sued in his official capacity.

60.     Office of Personnel Management ("OPM") is a federal agency headquartered in Washington, D.C.  OPM is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

61.     Defendant Charles Ezell has been the Acting Director of OPM since January 20, 2025. He is sued in his official capacity.

62.     Defendant Department of Government Efficiency ("DOGE") is a federal agency headquartered in Washington, D.C.  DOGE is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

63.     Defendant Elon Musk is the actual head of DOGE and is sued in his official capacity.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    21

**Add. 59**

64.     Defendant Amy Gleason is the titular Acting Administrator of DOGE and is sued in her official capacity.

65.     The following federal departments and agencies, including their agency heads, may be referred to collectively herein as "Federal Agency Defendants."  For purposes of this Amended Complaint, the Federal Agency Defendants do not include OMB, OPM, or DOGE, which will be specifically identified.  The Federal Agency Defendants are sued for their own unlawful conduct in Claims Six and Seven below, and also pursuant to Rule 19 for purposes of effectuating complete relief as to Claims One through Five against the President, OMB, OPM, DOGE and their agency heads.

66.     Defendant United States Department of Agriculture ("USDA" or "Agriculture") is a federal agency headquartered in Washington, D.C.  USDA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

67.     Defendant Brooke Rollins is the Secretary of Agriculture and is sued in her official capacity.

68.     Defendant United States Department of Commerce ("Commerce") is a federal agency headquartered in Washington, D.C.  Commerce is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

69.     Defendant Howard Lutnick is the Secretary of Commerce and is sued in his official capacity.

70.     Defendant United States Department of Defense ("DoD" or "Defense") is a federal agency headquartered in Washington, D.C.  Defense is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

71.     Defendant Pete Hegseth is the Secretary of Defense and is sued in his official capacity.

72.     Defendant United States Department of Energy ("Energy") is a federal agency headquartered in Washington, D.C.  Energy is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

73.     Defendant Chris Wright is the Secretary of Energy and is sued in his official capacity.

Add. 60

74. Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C. HHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

75. Defendant Robert F. Kennedy Jr. is the Secretary of HHS and is sued in his official capacity.

76. Defendant United States Department of Homeland Security ("DHS") is a federal agency headquartered in Washington, D.C. DHS is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

77. Defendant Kristi Noem is the Secretary of DHS and is sued in her official capacity.

78. Defendant United States Department of Housing and Urban Development ("HUD") is a federal agency headquartered in Washington, D.C. HUD is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

79. Defendant Scott Turner is the Secretary of HUD and is sued in his official capacity.

80. Defendant United States Department of Justice ("DOJ") is a federal agency headquartered in Washington, D.C. DOJ is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

81. Defendant Pam Bondi is the Attorney General and is sued in her official capacity.

82. Defendant United States Department of the Interior ("DoI" or "Interior") is a federal agency headquartered in Washington, D.C. Interior is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

83. Defendant Doug Burgum is the Secretary of the Interior and is sued in his official capacity.

84. Defendant United States Department of Labor ("DOL") is a federal agency headquartered in Washington, D.C. DOL is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

85. Defendant Lori Chavez-DeRemer is the Secretary of Labor and is sued in her official capacity.

Add. 61

86. Defendant United States Department of State ("State") is a federal agency headquartered in Washington, D.C.  State is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

87. Defendant Marco Rubio is the Secretary of State and is sued in his official capacity.

88. Defendant United States Department of Treasury ("Treasury") is a federal agency headquartered in Washington, D.C.  Treasury is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

89. Defendant Scott Bessent is the Secretary of Treasury and is sued in his official capacity.

90. Defendant United States Department of Transportation ("DOT") is a federal agency headquartered in Washington, D.C.  DOT is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

91. Defendant Sean Duffy is the Secretary of Transportation and is sued in his official capacity.

92. Defendant United States Department of Veterans Affairs ("the VA") is a federal agency headquartered in Washington, D.C.  The VA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

93. Defendant Doug Collins is the Secretary of Veterans Affairs and is sued in his official capacity.

94. Defendant AmeriCorps (a.k.a. the Corporation for National and Community Service) is a federal agency headquartered in Washington, D.C.  AmeriCorps is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

95. Defendant Jennifer Bastress Tahmasebi is the Interim Agency Head of AmeriCorps and is sued in her official capacity.

96. Defendant United States Environmental Protection Agency ("EPA") is a federal agency headquartered in Washington, D.C.  EPA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

Add. 62

1      97.     Defendant Lee Zeldin is the EPA Administrator and is sued in his official capacity.

2      98.     Defendant United States General Services Administration ("GSA") is a federal agency

3   headquartered in Washington, D.C.  GSA is a federal agency within the meaning of the APA, 5

4   U.S.C. § 551(1).

5      99.     Defendant Stephen Ehikian is the GSA Acting Administrator and is sued in his official

6   capacity.

7      100.    Defendant National Labor Relations Board ("NLRB") is a federal agency

8   headquartered in Washington, D.C.  NLRB is a federal agency within the meaning of the APA, 5

9   U.S.C. § 551(1).

10     101.    Defendant Marvin Kaplan is the Chairman of the NLRB and is sued in his official

11  capacity.

12     102.    Defendant William Cowen is the Acting General Counsel of the NLRB and is sued in

13  his official capacity.

14     103.    Defendant National Science Foundation ("NSF") is a federal agency headquartered in

15  Alexandria, Virginia.  NSF is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

16     104.    Defendant Brian Stone is the Acting Director of the NSF and is sued in his official

17  capacity.

18     105.    Defendant Peace Corps is a federal agency headquartered in Washington, D.C.  Peace

19  Corps is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

20     106.    Defendant Allison Greene is the Chief Executive Officer of the Peace Corps and is

21  sued in her official capacity.

22     107.    Defendant United States Small Business Administration ("SBA") is a federal agency

23  headquartered in Washington, D.C.  SBA is a federal agency within the meaning of the APA, 5 U.S.C.

24  § 551(1).

25     108.    Defendant Kelly Loeffler is the Administrator of the SBA and is sued in her official

26  capacity.

27

28

109.     Defendant United States Social Security Administration ("SSA") is a federal agency headquartered in Baltimore, Maryland.  SSA is a federal agency within the meaning of the APA, 5 U.S.C. § 551(1).

110.     Defendant Leland Dudek is the Acting Commissioner of the SSA and is sued in his official capacity.

## FACTUAL ALLEGATIONS

**I.     The Constitution's Distribution of Legislative and Executive Authority With Respect to the Agencies of the Federal Government**

111.     Article I vests in Congress the legislative power to create the departments, agencies, and offices within the executive branch; to define their duties; and to fund their activities.  U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."); *INS v. Chadha*, 462 U.S. 919 (1983).  Thus, "[t]o Congress under its legislative power is given the establishment of offices … [and] the determination of their functions and jurisdiction."  *Myers v. United States*, 272 U.S. 52, 129 (1926); U.S. Const. art I, § 8, cl. 18 ("The Congress shall have Power To…make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.").  Congress thus "control[s]" the very "existence of executive offices."  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 500 (2010); *see also Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022) ("Administrative agencies are creatures of statute.").

112.     Among Congress's very first acts were "establishing executive departments and staffs."  David Engdahl, Necessary and Proper Clause, *The Heritage Guide to the Constitution*, The Heritage Foundation.[16]  When the First Congress created the Treasury Department, for example, it established therein "distinct offices—Secretary, Comptroller, Auditor, Treasurer and Register—and their duties."  Harvey C. Mansfield, *Reorganizing the Federal Executive Branch: The Limits of Institutionalization*, 35 L. & Contemporary Problems 462, 463 (1970).

---

[16] Available at: http://www.heritage.org/constitution/#!/articles/1/essays/59/necessary-and-proper-clause.

Add. 64

1       113.    Those executive agencies of the federal government are identified in various statutes,

2   including 5 U.S.C. §§ 101 (listing Cabinet-level departments), 104 (independent establishments), and

3   105 (defining "agency" to include, inter alia, Cabinet departments and independent establishments).

4   Each agency has its own authorizing statutes that govern its administration, including statutory

5   provisions that authorize one or more individuals to act as the head of the agency.  *See e.g.*, 10 U.S.C.

6   §§ 111, 113 (Defense); 16 U.S.C. § 551 (Agriculture/Forest Service); 38 U.S.C. §§ 301, 303 (VA); 42

7   U.S.C. §§ 202, 203 (HHS); 42 U.S.C §§ 281, 282 (NIH); 42 U.S.C. § 7131 (Energy).

8       114.    The President's Constitutional authority is set forth in Article II.  U.S. Const. art. II §

9   1, cl. 1. ("The executive Power shall be vested in a President of the United States of America.").  The

10   President has no constitutional legislative authority.  *INS v. Chadha*, 462 U.S. 919, 951, 956–59

11   (1983); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952).  Thus, the President has

12   no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes.  *Clinton*

13   *v. City of New York*, 524 U.S. 417, 438–39 (1998).  The declared purpose of separating and dividing

14   the powers of government was to "diffuse[] power the better to secure liberty."  *Youngstown Sheet &*

15   *Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring); *see also Bowsher v. Synar*,

16   478 U.S. 714, 721–22 (1986) ("Justice Jackson's words echo the famous warning of Montesquieu,

17   quoted by James Madison in The Federalist No. 47, that 'there can be no liberty where the legislative

18   and executive powers are united in the same person, or body of magistrates'...."  The Federalist No.

19   47, p. 325 (J. Cooke ed. 1961).").

20       115.    The Article II "Take Care Clause" requires that "[the President] shall take Care that

21   the Laws be faithfully executed."  U.S. Const. art. II, § 3.  The Take Care Clause "refutes the idea that

22   [the President] is to be a lawmaker.  The Constitution limits his functions in the lawmaking process to

23   the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown Sheet*

24   *& Tube Co. v. Sawyer,* 343 U.S. 579, 587 (1952).

25       116.    And yet, the President does not execute the laws alone:  "He must execute them by the

26   assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926).  "To aid him in the

27

28   AMENDED COMPLAINT, No. 3:25-cv-03698-SI               27

1    performance of these duties, he is authorized to appoint certain officers, who act by his authority and

2    in conformity with his orders." *Marbury v. Madison*, 5 U.S. 137, 166 (1803).

3        117.    The President's Constitutional authority with respect to those who assist him in taking

4    care that the law is faithfully executed is established in the Appointments Clause which reads, "The

5    President … shall nominate, and by and with the Advice and Consent of the Senate, shall appoint …

6    [the] Officers of the United States, whose Appointments are not herein otherwise provided for, and

7    which shall be established by Law." U.S. Const. art. II, § 2, cl. 2. That power extends to removal of

8    those appointed officers. *See Myers*, 272 U.S. at 135.

9        118.    This does not mean, however, that the President has carte blanche authority over

10   federal agencies. The President may exercise Article II authority to create, reorganize, or abolish an

11   office that he established (such as the Executive Office of the President), but Article II does not

12   authorize the President to fundamentally reorganize the executive branch by, for example, ordering

13   government-wide terminations of federal employees, or restricting or abolishing the congressionally

14   authorized work of even a single agency that he did not establish. *Seila Law LLC v. Consumer Fin.*

15   *Prot. Bureau*, 591 U.S. 197, 217 (2020); *see also Bessent v. Dellinger*, No. 24A79 (U.S.) (Feb. 16,

16   2025 Application to Vacate the Order Issued by the U.S. District Court for the District of Columbia

17   and Request for an Immediate Administrative Stay), at *27 (U.S. Solicitor General conceding:

18   *"Agency heads…control hiring and firing decisions for subordinates*." (emphasis added)).

19       119.    "The President's power, if any, to issue [an] order must stem either from an act of

20   Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579,

21   585 (1952). The President may, therefore, exercise only that legislative authority that Congress has

22   constitutionally delegated. *Id.* at 587.

23       120.    The President does not employ the millions of federal employees; the agencies do. 5

24   U.S.C. § 3101 ("General authority to employ": "Each Executive agency, military department, and the

25   government of the District of Columbia may employ such number of employees of the various

26   classes recognized by chapter 51 of this title as Congress may appropriate for from year to year.").

27   Thus, Congress has largely delegated authority, particularly for employment decisions, to the heads of

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    28

**Add. 66**

the federal agencies, not to the President. *Id.*; *see also, e.g.*, 26 U.S.C. §§ 7803, 7804 (IRS: "the Commissioner of Internal Revenue is authorized to employ such number of persons as the Commissioner deems proper for the administration and enforcement of the internal revenue laws, and the Commissioner shall issue all necessary directions, instructions, orders, and rules applicable to such persons.").

121.    Congress has never delegated corresponding authority to the President to make the employment decision to lay off federal employees.  Instead, Congress has delegated to the President only rule-making authority to issue government-wide regulations consistent with merit-systems principles required by Congress.  *E.g.*, 5 U.S.C. § 2301 (delegating to President rule-making authority "necessary to ensure that personnel management is based on and embodies the merit system principles."); *id.* § 3301 (regulations for the efficiency of hiring); *id.* § 3302 (authority to create excepted service from the usual competitive requirements).  Likewise, to the extent that the authority to engage in reductions-in-force is grounded in statute, that statute only delegates the authority to OPM (not the President) and only to make government-wide rules for the "order of retention," not to make the decisions.  5 U.S.C. § 3502.

122.    Nor has Congress delegated to the President the authority to transfer or excise specific programs, functions, or offices that Congress established and placed within a specific agency's statutory authority or discretion.  Such a delegation would come dangerously close to the line-item veto struck down as unconstitutional in *Clinton v. City of New York*, 524 U.S. 417 (1998).  Many of President Trump's recent actions effectively assume that line-item veto power, namely the power to excise programs that do not fall within the President's desired vision.

123.    Finally, Congress has not delegated to President Trump the broader authority to impose his transformation on the federal government.  When Congress has wanted to grant reorganization authority to a President, it has done so; but that grant of authority that has been used by Presidents over the last century has *not* been reactivated for President Trump.

## II. The 100-Year History of Congressionally Authorized Government Reorganization

124. Congress first delegated to a President the legislative authority to propose reforms to federal agencies in 1932. Economy Act of 1932, Pub. L. 72-212, tit. VI, §§ 401-408, 47 Stat. 413. Since then, from time to time, Congress has delegated to presidential administrations limited authority to propose reorganizations of the executive branch under specified conditions, usually within specified time limits. *See, e.g.*, Economy Act of 1933, Pub. L. 73-2, tit. VI, §§ 401-408, 47 Stat. 1517; Reorganization Act of 1939, Pub. L. 76-19, 53 Stat. 561; Reorganization Act of 1945, Pub. L. 79-263, 59 Stat. 613; Reorganization Act of 1949, Pub. L. 81-109, 63 Stat. 203, as amended by 67 Stat. 4 (1953), 69 Stat. 14 (1955), 71 Stat. 611 (1957), 75 Stat. 41 (1961), 78 Stat. 240 (1964), 79 Stat. 135 (1965), 83 Stat. 6 (1969), and 85 Stat. 574 (1971); and the Reorganization Act of 1977, Pub. L. No. 95-17, 91 Stat. 29 (1977) (codified at 5 U.S.C. §§ 901-913 (1982)), as amended by 94 Stat. 329 (1980) and 98 Stat. 3192 (1984).

125. Nine different Presidents on 16 occasions have been granted this authority to fast-track reorganizations of government, large and small, through the legislative process. *See* Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* (Dec. 11, 2012) ("Presidents used the authority for a variety of purposes, from relatively minor reorganizations within individual agencies to the creation of large new organizations, including the Department of Health, Education, and Welfare; the Environmental Protection Agency; and the Federal Emergency Management Agency."). Presidents have submitted many other proposals that have not been accepted: "Between 1932 and 1984, presidents submitted 126 reorganization proposals to Congress, of which 93 were implemented and 33 were affirmatively rejected by Congress." *Id.*

126. A House of Representatives committee report for the Reorganization Act of 1977 explained the history of such laws: "Reorganizations, of course, may be made in the executive branch by legislation proposed by the President or originating within the Congress. This reorganization authority [in the Reorganization Act], however, is a cooperative effort by the President

1  and the Congress to expedite needed reorganizations and to respond readily to changed

2  requirements." H.R. Rep. 95-105, 2, 1977 U.S.C.C.A.N. 41, 42.

3      127.    The most recent authorization, the Reorganization Act of 1977, as amended, expired

4  on December 31, 1984, and has not been renewed. 5 U.S.C. § 905(b). The expired law remains

5  codified, however, and is instructive. The law defines reorganization as including changes to the

6  structure of federal agencies effectuated by consolidating and transferring functions *between*

7  agencies, and *within* agencies:

> (2) the abolition of all or a part of the functions of an agency, except that no
> enforcement function or statutory program shall be abolished by the plan;
> …
> (4) the consolidation or coordination of part of an agency or the functions thereof with
> another part of the same agency or the functions thereof;
> …
> (6) the abolition of the whole or a part of an agency which agency or part does not have,
> or on the taking effect of the reorganization plan will not have, any functions.

5 U.S.C. § 903(a).

14     128.    In that same law, Congress imposed requirements on the President, first requiring the

15  President to transmit any reorganization plan to Congress, and then that the President explain how

16  any changes to federal agencies would comport with statutory requirements and congressionally

17  authorized funding levels to facilitate Congress's consideration of the reforms reflected in such a

18  plan:

> In his message transmitting a reorganization plan, the President shall specify with
> respect to each abolition of a function included in the plan the statutory authority for
> the exercise of the function.
>
> The message shall also estimate any reduction or increase in expenditures (itemized so
> far as practicable), and describe any improvements in management, delivery of
> Federal services, execution of the laws, and increases in efficiency of Government
> operations, which it is expected will be realized as a result of the reorganizations
> included in the plan.
>
> In addition, the President's message shall include an implementation section which
> shall (1) describe in detail (A) the actions necessary or planned to complete the
> reorganization, (B) the anticipated nature and substance of any orders, directives, and
> other administrative and operational actions which are expected to be required for
> completing or implementing the reorganization, and (C) any preliminary actions which
> have been taken in the implementation process, and (2) contain a projected timetable

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    31

for completion of the implementation process.

The President shall also submit such further background or other information as the Congress may require for its consideration of the plan.

5 U.S.C. § 503(b).

129.    On some occasions, Congress has denied presidential requests for reorganization authority, as when President Barack Obama sought such authority in 2012. *See* S. 2129, 112th Cong. (2012); H.R. 4409, 112th Cong. (2012). *See also Retooling Government for the 21st Century: The President's Reorganization Plan and Reducing Duplication*: *Hearing Before the S. Comm. on Homeland Sec. & Gov't Aff.*, 112th Cong. (2012) (S. Hrg. 112-531). In 2003, reorganization authority for then-President Bush passed the House, but was defeated in the Senate. CRS Report R42852, *supra*, at 32-33.

130.    Congress, exercising its Article I legislative authority, has also over the decades rejected specific presidential reorganization plans presented through the regular legislative process. These have included, for example, proposals to eliminate the Department of Education, *see, e.g.*, H.R. 714, 98th Cong. (1983) and H.R. 1510, 115th Cong. (2017); to merge the Department of Labor, the Department of Commerce, and the Small Business Administration, *see, e.g.* S. 1116, 112th Cong. (2011); and to consolidate parts of several agencies into a new Food Safety Administration. H.R. 609, 114th Cong. (2015); among others.

131.    At other times, Congress has authorized reorganizations via regular legislation, after legislative debate and compromise by the people's representatives in Congress, such as when Congress enacted the Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135; *Communication from the President of the United States: A Reorganization Plan for the Department of Homeland Sec.*, 108th Cong. 16 (Jan. 7, 2003); Cong. Rsch. Serv., RL31493, *Homeland Security Department of Organization and Management – Legislative Phase* (Feb. 25, 2003). Congress has also sometimes delegated to the President limited reorganization authority with respect to specific executive agencies, under specific conditions, and for specific periods of time. One such law, for example, authorized a reorganization of the U.S. Agency for International Development ("USAID") and related foreign affairs agencies in 1998. *See, e.g.,* Pub. L. 105-277, div. G, subdiv. A, § 1601,

112 Stat. 2681-795 (1998) (codified at 22 U.S.C. § 6601).  Such laws typically set expiration dates for the delegated authority:  that particular law, for example, prohibits presidential reorganization of USAID after the effective date of the reorganization plan authorized in 1998.  22 U.S.C. § 6601(e).

132.    The long history of this reorganization authority legislation makes abundantly clear that the power is legislative, rests with Congress, and is only delegated to the President when Congress expressly decides to do that.

**III.    President Trump's First Unsuccessful Attempt at Government Reorganization**

133.    President Trump should be well aware that he does not possess the constitutional authority to order reorganization of the government and that that is an authority that rests with Congress, as evidenced by his experience during his first term.

134.    On March 13, 2017, during his first term, President Trump issued Executive Order 13781, which required the Director of OMB "to propose a plan to reorganize governmental functions and eliminate unnecessary agencies ... , components of agencies, and agency programs."  Exec. Order No. 13781, 82 Fed. Reg. 13959 (2017).  OMB's implementing memorandum created a process for both agency and public input to contribute to a proposed plan.  Memorandum from Mick Mulvaney, OMB Director, to Heads of Executive Departments and Agencies re: Comprehensive Plan for Reforming the Federal Government and Reducing the Federal Civilian Workforce, M-17-22, at 2 (Apr. 12, 2017).[17]

135.    OMB released its comprehensive plan to the public on June 21, 2018.  OMB, *Delivering Government Solutions in the Twenty-First Century:  Reform Plan and Reorganization Recommendations* (June 2018) (hereinafter "2018 Reorganization Plan").[18]

136.    The 2018 Reorganization Plan listed 32 proposals and conceded that "significant changes will require legislative action."  *Id.* at 4; *id.* at 21 (emphasizing the Administration's need for "the support of the Congress,"); *id*. at 55 ("Fully and effectively achieving the end-state vision

---

[17] Available at: https://web.archive.org/web/20170716192101/https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2017/M-17-22.pdf.

[18] Available at: https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-Reorg-Plan.pdf.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                33

**Add. 71**

1   presented here would necessarily require a partnership with the Congress, including the granting of

2   statutory authorities as necessary."). The 2018 Plan committed that, in September 2018, OMB would

3   begin negotiations with Congress for legislative action. *Id.* at 6.

4          137.    In 2018, Rep. Jody Hice (R-GA) introduced a bill that would have resurrected 5

5   U.S.C. ch. 9 to give President Trump reorganization authority. *See* H.R.6787, 115th Congress (2017-

6   2018).[19] Senator Ron Johnson (R-WI) introduced a companion bill in the Senate. *See* S.3137,115th

7   Congress (2018).[20] The Senate bill cleared the committee following a hearing, but it was never

8   brought up for a vote in the Senate. The Senate's committee report does not appear to indicate (or

9   even suggest) that the Trump administration expressly requested authority, but OMB's deputy

10  director testified in support of Trump's reorganization plan at the committee hearing. *See Reforming*

11  *Government Act of 2018 Report of Comm. on Govt'l Aff. to Accompany S. 3137*, 115th Cong. 381

12  (2018).[21]

13         138.    In 2019, the Trump administration issued an update on the progress of the 2018 Plan.

14  Off. of Mgmt. & Budget, Exec. Off. of the President, *One Year [sic] Update: Reform Plan and*

15  *Reorganization Recommendations* (2019) (hereinafter "2019 Update").[22] The update noted that

16  "some proposals require action by Congress." *Id.* at 2. Along those lines, the update acknowledged

17  that "Congress has taken action to consider at least 10 of the proposals, via hearings, legislation, or

18  discussions with Members or staff." *Id.*

19         139.    Congress gave due consideration to the Trump administration's first-term

20  reorganization ambitions by convening numerous hearings before and after OMB publicly released

21  the 2018 Plan. *See, e.g.*, *FAA Reauthorization: Administration Perspectives: Hearing Before the S.*

22  *Comm. on Commerce, Science & Transp.*, 115th Cong. (June 7, 2017) (S. Hrg. 115-221);[23] *Agency*

23

---

24  [19] Available at: https://www.congress.gov/bill/115th-congress/house-bill/6787/subjects.

25  [20] Available at: https://www.congress.gov/bill/115th-congress/senate-bill/3137.

26  [21] Available at: https://www.congress.gov/115/crpt/srpt381/CRPT-115srpt381.pdf.

27  [22] Available at:
    https://web.archive.org/web/20200716100903/https://www.performance.gov/GovReform/Reform-
    and-Reorg-Plan-Update.pdf.

28  [23] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg29974/CHRG-115shrg29974.pdf.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          34

1    *Approaches to Reorganization Examining OMB's Memorandum on the Federal Workforce: Hearing*

2    *Before S. Comm. on Homeland Sec. & Gov't Aff.*, 115th Cong. (June 15, 2017) (S. Hrg. 115-165);[24] *A*

3    *Review of the State Department Reauthorization Bill for Fiscal Year 2018 and the State Department*

4    *Reorganization Plans: Hearing Before the S. Comm. on For. Rel.*, 115th Cong. (July 17, 2017) (S.

5    Hrg. 115-704);[25] *Examining OMB's Memorandum on The Federal Workforce Part II: Expert Views*

6    *on OMB's Ongoing Government-Wide Reorganization: Hearing Before the S. Comm. on Homeland*

7    *Sec. & Gov't Aff.*, 115th Cong. (Sep. 13, 2017) (S. Hrg. 115-6177);[26] *Department of Energy:*

8    *Management and Priorities; Hearing Before the H. Comm. on Science, Space, & Tech.*, 115th Cong.

9    (Jan. 1, 2018) (Serial No. 115-45);[27] *Financing Overseas Development: The Administration's*

10   *Proposal: Hearing Before the H. Comm. on For. Rel.*, 115th Cong. (Apr. 11, 2018) (Serial No. 115-

11   119);[28] *Workforce for the 21st Century: Analyzing the President's Management Agenda: Hearing*

12   *Before the H. Comm. on Oversight & Gov't Reform*, 115th Cong. (May 16, 2018) (Serial No. 115-

13   96);[29] *USAID Resources and Redesign: Hearing Before the S. Comm. on For. Rel.*, 115th Cong. (June

14   20, 2018) (S. Hrg. 115-791);[30] *Examining the Administration's Government-Wide Reorganization*

15   *Plan: Hearing Before H. Comm. on Oversight & Gov't Reform*, 115th Cong. (June 27, 2018) (Serial

16   No. 115-88);[31] *Reviewing the Administration's Government Reorganization Proposal: Hearing Before*

17   *the S. Comm. on Homeland Sec. & Gov't Aff.,* 115th Cong. (July 18, 2018) (S. Hrg. 115-547);[32]

18   *Administration Reorganization and Modernization Proposals Related to the Department of Energy*

19

20   [24] Available at: https://www.govinfo.gov/content/pkg/CHRG-115shrg27394/pdf/CHRG-

21   115shrg27394.pdf.
     [25] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg38105/CHRG-115shrg38105.pdf.

22   [26] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg28405/CHRG-115shrg28405.pdf.
     [27] Available at: https://www.congress.gov/115/chrg/CHRG-115hhrg28932/CHRG-

23   115hhrg28932.pdf.
     [28] Available at: https://www.congress.gov/115/meeting/house/108115/documents/HHRG-115-FA00-

24   Transcript-20180411.pdf.
     [29] Available at: https://www.congress.gov/115/chrg/CHRG-115hhrg31422/CHRG-

25   115hhrg31422.pdf.
     [30] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg40341/CHRG-115shrg40341.pdf.

26   [31] Available at: https://www.congress.gov/115/chrg/CHRG-115hhrg31276/CHRG-

27   115hhrg31276.pdf.
     [32] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg34573/CHRG-115shrg34573.pdf.

28   AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    35

*and the Department of the Interior: Hearing Before S. Comm. on Energy and Nat'l Resources*, 115th Cong. (July 19, 2018) (S. Hrg. 115-524);[33] *The Challenges and Opportunities of the Proposed Government Reorganization on OPM and GSA: Hearing Before the S. Comm. on Homeland Sec. & Gov't Aff.* (July 26, 2018) (S. Hrg. 115-451);[34] *Oversight Hearing on No Road Map, No Destination, No Justification: The Implementation and Impacts of the Reorganization of the Department of the Interior: Hearing Before the H. Comm. on Nat. Res.*, 116th Cong. (Apr. 30, 2019) (Serial No. 116-13);[35] *The Administration's War on a Merit Based Civil Service: Hearing Before the Subcomm. on Gov't Ops., H. Comm on Oversight & Reform*, 116th Cong. (May 21, 2019) (Serial No. 116-26);[36] *Document Production Status Update: OPM, FBI, and GSA: Hearing Before the Subcomm. on Gov't Ops., H. Comm on Oversight & Reform*, 116th Cong. 42 (June 27, 2019);[37] *BLM Disorganization: Examining the Proposed Reorganization and Relocation of the Bureau of Land Management Headquarters to Grand Junction, Colorado: Hearing Before the H. Comm. on Nat. Res.*, 116th Cong. (Sep. 19, 2019) (Serial No. 116-21).[38]

140.    The Congressional Research Service aided Congress in its deliberations by preparing a report, which discussed the 2018 Plan's 32 proposals and 3 significant subproposals.  Cong. Rsch. Serv., *Trump Administration Reform and Reorganization Plan: Discussion of 35 "Government-Wide" Proposals*, at 1 (July 25, 2018).[39]

141.    Congress largely did not support the proposed reforms.  *See The Administration's War on a Merit Based Civil Service: Hearing Before the Subcomm. on Gov't Ops., H. Comm on Gov't*

---

[33] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg30984/CHRG-115shrg30984.pdf.
[34] Available at: https://www.congress.gov/115/chrg/CHRG-115shrg32987/CHRG-115shrg32987.pdf.
[35] Available at: https://www.congress.gov/116/chrg/CHRG-116hhrg36257/CHRG-116hhrg36257.pdf.
[36] Available at: https://docs.house.gov/meetings/GO/GO24/20190521/109516/HMTG-116-GO24-Transcript-20190521.pdf.
[37] Available at: https://www.congress.gov/116/chrg/CHRG-116hhrg37283/CHRG-116hhrg37283.pdf.
[38] Available at: https://www.congress.gov/116/chrg/CHRG-116hhrg37679/CHRG-116hhrg37679.pdf.
[39] Available at: https://www.everycrsreport.com/files/20180725_ZZZ82A53B606F807500_43464c0b3704bd6aa820 6aed6f1bc07c69cfcdfc.pdf.

1    *Oversight & Reform*, 116th Cong. (May 21, 2019) (Serial No. 116-26); *see also* Fed. News Network,

2    *Congress not yet convinced of Trump administration's proposed OPM-GSA merger* (May 22, 2019)

3    ("Lawmakers on Tuesday afternoon expressed bipartisan concern and skepticism for the Trump

4    administration's proposed merger of the Office of Personnel Management with the General Services

5    Administration.  And they weren't alone.  The Government Accountability Office, OPM's inspector

6    general and a former agency director said the administration hasn't demonstrated enough evidence to

7    date to show the proposed OPM-GSA merger makes sense.");[40] Gov't Exec., *Omnibus Puts Kibosh*

8    *on White House Efforts to Unilaterally Reorganize Agencies, Shed Workers*. (Mar. 22, 2018);[41] Gov't

9    Exec., *Congress Begins Formally Blocking Trump's Government Reorganization Plan*. (Sep. 12,

10   2018).[42]

11   **IV.    President Trump's Second-Term Reorganization Without Congressional Authorization**

12        142.    Since Congress, as the representatives duly elected by the American people to the

13   legislative branch of government, may not support his reform proposals, President Trump has chosen

14   to proceed with his "Manhattan project of our time" without first obtaining Congressional

15   authorization—or even providing Congress with clear information about the unprecedented

16   reorganization he intends.  And unlike during President Trump's first term, there has been absolutely

17   no public process by which the Administration's current proposals have been vetted.  Instead, the

18   Administration is proceeding secretly, and by fiat.

19        143.    The President has acknowledged that he needs and does not have Congressional

20   authorization.  The President responded "Yeah," when asked in a February 18, 2025 interview by TV

21   host Sean Hannity whether his Executive Order would "have to be codified into law" and "need the

22

23

24

---

25   [40] Available at: https://federalnewsnetwork.com/opm-reorganization/2019/05/congress-not-yet-
     convinced-of-trump-administrations-proposed-opm-gsa-merger/.

26   [41] Available at: https://www.govexec.com/management/2018/03/omnibus-puts-kibosh-white-house-
     efforts-unilaterally-reorganize-agencies-shed-workers/146894/.

27   [42] Available at: https://www.govexec.com/management/2018/09/congress-begins-formally-blocking-
28   trumps-government-reorganization-plan/151218/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                               37

1    Republican Congress to follow up."  The White House: *Interview of President Trump and Elon Musk*
2    *by Sean Hannity, "the Sean Hannity Show"* (Feb. 18, 2025).[43]

3        **A.     The Mandate to OMB, OPM, and DOGE to Reform and Downsize**

4        144.    On January 20, 2025, the President created DOGE to engage in his project of radically
5    transforming the size and scope of the federal government.  Exec. Order No. 14158, 90 Fed. Reg.
6    8441 (Jan. 20, 2025) (Establishing and Implementing the President's ''Department of Government
7    Efficiency'').  That Order reorganized and renamed the U.S. Digital Service as DOGE and moved that
8    office from reporting to OMB within the Executive Office of the President to reporting directly to the
9    President's Chief of Staff.  *Id*.  The January 20 Order created two other structures:  a "U.S. DOGE
10   Service Temporary Organization … headed by the [DOGE] Administrator and … dedicated to
11   advancing the President's 18-month DOGE agenda" and "DOGE Teams" embedded at each agency
12   and jointly appointed by DOGE and the agency head.  *Id.*  The Administration has never made public
13   the "18-month DOGE agenda" for the federal government.  *Id*.

14       145.    On January 20, 2025, the President also issued a Presidential Memorandum imposing
15   a government-wide hiring freeze on all federal agencies, with limited exceptions.  The White House:
16   *Presidential Actions: Hiring Freeze* (Jan. 20, 2025).[44]  The President generally ordered: "this freeze
17   applies to all executive departments and agencies regardless of their sources of operational and
18   programmatic funding."  *Id.*  The President then ordered DOGE, OMB, and OPM to create a plan to
19   reduce the size of the federal government.  *Id.* ("Within 90 days of the date of this memorandum, the
20   Director of the Office of Management and Budget (OMB), in consultation with the Director of OPM
21   and the Administrator of the United States DOGE Service (USDS), shall submit a plan to reduce the
22   size of the Federal Government's workforce through efficiency improvements and attrition.").

23       146.    As other federal courts have found, individuals affiliated with DOGE, hired into the
24   federal government on a temporary basis, proceeded to embed within federal agencies and centralize
25   decision-making, with the part of DOGE based in the Executive Office of the President headed by

26   _____

27   [43] Available at: https://www.whitehouse.gov/remarks/2025/02/interview-of-president-trump-and-
     elon-musk-by-sean-hannity-the-sean-hannity-show/.
28   [44] Available at: https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    38

1   Elon Musk. *See, e.g.*, *Does v. Musk*, __ F. Supp. 3d __, No. 25-0462, 2025 WL 840574, at *1–4 (D.

2   Md. Mar. 18, 2025); *New York v. Trump*, __ F. Supp. 3d __, No. 25-CV-01144, 2025 WL 573771, at

3   *3–7 (S.D.N.Y. Feb. 21, 2025); *AFL-CIO v. Dep't of Lab.*, __ F. Supp. 3d __, No. 25-339, 2025 WL

4   1129227, at *1–4 (D.D.C. Apr. 16, 2025).

5        147.    In a March 2025 interview, Elon Musk, on behalf of DOGE, explained the DOGE

6   goals as follows:

> We want to reduce the spending by eliminating waste and fraud, reduce the spending
> by 15%, which seems really quite achievable.
> …
> We are cutting the waste and fraud in real time. Every day like that passes, our goal is
> to reduce the waste and fraud by $4 billion a day every day, seven days a week. And
> so far, we are succeeding.[45]

11        148.    The President issued many other directives aimed at furthering the goals of

12   transformation of the government and federal employment according to his vision, at each step

13   enlisting the aid of OPM, OMB and/or DOGE to implement his directives, including:

- Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) (Ending Radical and Wasteful Government DEI Programs and Preferencing) (OMB and OPM);

- Exec. Order No. 14170, 90 Fed. Reg. 8621 (Jan. 20, 2025) (Reforming the Federal Hiring Process and Restoring Merit to Government Service) (OMB, OPM, DOGE, working with "the Assistant to the President for Domestic Policy");

- Exec. Order No. 14171, 90 Fed. Reg. 8625 (Jan. 20, 2025) (Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce) (OPM); and

- Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) (Ending Illegal Discrimination and Restoring Merit-Based Opportunity) (OMB).

In the President's own words: "It is the policy of my Administration … to commence the

deconstruction of the overbearing and burdensome administrative state." Exec. Order No. 14219, 90

Fed. Reg. 10583 (Feb. 19, 2025) (Ensuring Lawful Governance and Implementing the President's

---

[45] Fox News, *Elon Musk and DOGE team give exclusive look at how they're cutting waste, handle critics* (Mar. 27, 2025), available at: https://www.foxnews.com/video/6370654825112. Transcript available at: https://www.rev.com/transcripts/musk-and-doge-on-brett-baier.

1    "Department of Government Efficiency" Deregulatory Initiative) (enlisting DOGE and OMB); *see*

2    *also* Exec. Order No. 14222, 90 Fed. Reg. 11095 (Feb. 26, 2025) (Implementing the President's

3    Department of Government Efficiency Cost Efficiency Initiative: enlisting DOGE in "a

4    transformation in Federal spending").

5         149.   The President also eliminated certain agencies with the following proclamation:

6    It is the policy of my Administration to dramatically reduce the size of the Federal
     Government, while increasing its accountability to the American people.  This order
7    commences a reduction in the elements of the Federal bureaucracy that the President
     has determined are unnecessary.  Reducing the size of the Federal Government will
8    minimize Government waste and abuse, reduce inflation, and promote American
     freedom and innovation.
9

10   Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025) (Commencing the Reduction of the

11   Federal Bureaucracy) (enlisting OMB and OPM to eliminate the Presidio Trust; the Inter-American

12   Foundation; the United States African Development Foundation; and the United States Institute of

13   Peace).

14        150.   The President further enlisted OMB to "reduce the performance" of the following

15   agencies to "the minimum presence and function required by law":  the Federal Mediation and

16   Conciliation Service; the United States Agency for Global Media; the Woodrow Wilson International

17   Center for Scholars in the Smithsonian Institution; the Institute of Museum and Library Services; the

18   United States Interagency Council on Homelessness; the Community Development Financial

19   Institutions Fund; and the Minority Business Development Agency.  Exec. Order No. 14238, 90 Fed.

20   Reg. 13043 (Mar. 14, 2025) (Continuing the Reduction of the Federal Bureaucracy).  The President

21   explained:  "This order continues the reduction in the elements of the Federal bureaucracy that the

22   President has determined are unnecessary." *Id*.

23        151.   The President also ordered the "closure" of the entire United States Department of

24   Education and transfer of certain functions to other agencies.  Exec. Order No. 14242, 90 Fed. Reg.

25   13679 (Mar. 20, 2025) (Improving Education Outcomes by Empowering Parents, States, and

26   Communities).  The President likewise closed the United States Agency for International

27

28   AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    40

Development, firing nearly all of its staff, and subsumed what remained into the State Department,[46] as well as shuttered the Consumer Financial Protection Bureau, attempting to fire nearly all of its staff as well.[47]  Most recently, the President decimated AmeriCorps, ending core programs and placing nearly all staff on leave before later laying them off and cutting the bulk of grants to AmeriCorps grantees.[48]

152.     DOGE and/or OPM have taken a series of other actions since January 20, 2025 aimed at deconstructing and drastically reducing the size of the federal government, including:  the "Fork in the Road" Deferred Resignation Program, announced via e-mail to millions of federal employees; the unlawful termination of probationary employees nationwide; the mandated email reporting ("5 bullets") to all federal employees and corresponding threats for failure to respond; and the placement of employees throughout the federal government on administrative leave for a variety of reasons.

**B.      President's February 11, 2025 Executive Order to All Federal Agencies to Downsize and Reorganize Themselves Via Agency RIF and Reorganization Plans**

153.     The President's February 11, 2025 Workforce Executive Order is in the same vein as these other actions, furthering the President's express goal of "transforming" and "deconstruct[ing]" the agencies of the federal government.  Ex. A.

154.     The Executive Order applies to the executive departments and agencies, including but not limited to the Federal Agency Defendants.  *Id.* (citing 44 U.S.C. § 3502).  There are currently

---

[46] Carnegie Endowment for International Peace, *Trump's Move to Gut USAID Reveals the Crux of His Foreign Policy* (Feb. 4, 2025), available at: https://carnegieendowment.org/emissary/2025/02/usaid-trump-foreign-aid-policy-why.

[47] NBC News, *Trump administration and Musk's DOGE plan to fire nearly all CFPB staff and wind down agency, employees say* (Feb. 28, 2025), available at: https://www.nbcnews.com/business/business/trump-administration-musks-doge-plan-fire-cfpb-staff-close-agency-rcna194217.

[48] NY Times, *DOGE Guts Agency That Organizes Community Service Programs* (Apr. 17, 2025), available at: https://www.nytimes.com/2025/04/17/us/politics/doge-cost-americorps-community-service.html; *see also* MSN, *AmeriCorps Faces Major Blow As Elon Musk-Led DOGE Slashes $400 Million In Federal Grants* (Apr. 26, 2025), available at: https://www.msn.com/en-in/news/world/americorps-faces-major-blow-as-elon-musk-led-doge-slashes-400-million-in-federal-grants/ar-AA1DEjSo.

1    fifteen executive cabinet-level departments, 5 U.S.C. § 101, and hundreds of federal agencies and

2    commissions.[49]

3        155.    The President ordered, in pertinent part:

4        a.    Reduction of the number of federal employees via hiring freezes, hiring/departure

5    ratios, and OMB and DOGE control of agency hiring.  Ex. A, Sec. 3.  Specifically, the President

6    required OMB to submit to him a "plan to reduce the size of the Federal Government's workforce"

7    that will "require that each agency hire no more than one employee for every four employees that

8    depart, consistent with the plan and any applicable exemptions and details provided for in the Plan."

9    *Id.*  The President allowed limited exceptions for "functions related to public safety, immigration

10   enforcement, or law enforcement."  The President required all agency heads to submit *all career*

11   *federal hiring* to DOGE for approval.  *Id.*

12       b.    All federal agencies "shall promptly undertake preparations to initiate large-scale

13   reductions in force (RIFs)."  *Id.*  In making these cuts, the President ordered that "[a]ll offices that

14   perform functions not mandated by statute or other law *shall be prioritized* in the RIFs, including":

15   •   "all agency diversity, equity, and inclusion initiatives";

16   •   "all agency initiatives, components, or operations that my Administration suspends or
17       closes"; and

18   •   "all components and employees performing functions not mandated by statute or other
19       law who are not typically designated as essential during a lapse in appropriations as
20       provided in the Agency Contingency Plans on the Office of Management and Budget
         website" ("Funding Lapse Plan Staffing Levels").

21   *Id.* (emphasis added).  The President allowed limited exceptions:  "This subsection shall not apply to

22   functions related to public safety, immigration enforcement, or law enforcement."  *Id.*

23       c.    All federal agencies shall submit to OMB a "reorganization plan" that "shall discuss

24   whether the agency or any of its subcomponents should be eliminated or consolidated."  *Id.*

25

26

27
     _____
28   [49] Available at: https://www.usa.gov/agency-index.
     AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    42

156.     The President's Executive Order removed agency discretion and authority, by ordering agencies to act.  The President's Executive Order necessarily orders agencies to disregard applicable statutory authorizations and appropriations, by implementing the following mandates:

a.     Agencies are *required* to implement "large-scale" RIFs (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions and appropriations);

b.     Agencies are *required* to prioritize in RIFs "all agency initiatives, components, or operations that [the] Administration suspends or closes" (irrespective of statutory requirements or authority delegated to the agencies);

c.     Agencies are *required* to prioritize in RIFs "all components and employees" not deemed "essential"—and therefore that do not continue working—during a government shutdown when annual appropriations have temporarily lapsed (aka Funding Lapse Plan Staffing Levels, which have nothing to do with the staffing needed to properly run fully appropriated agencies);

d.     Agencies are *required* to consider their own destruction, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements or authority delegated to the agencies);

e.     And finally, agencies are *required* to reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions.

157.     The President further granted OPM, rather than the agencies, the power to "grant exemptions from this order where those exemptions are otherwise necessary and shall assist in promoting workforce reduction."  *Id.*, Sec. 4.

158.     The President gave agencies a mere 30 days, after commencing their planning for the massive RIFs, to submit reorganization reports describing how they would pick up and organize the pieces of what will be left.  *Id.*, Sec. 3.

159.    Notwithstanding all of these requirements that order agencies to apply parameters that cannot be reconciled with agency statutory authority, the President then stated the Order should be implemented consistent with applicable law.  *Id.* Sec. 5.

**C.    OMB, OPM, and DOGE Implementation of the President's Orders: February 26 Directive, March 13 Deadline, and April 14 Deadline**

160.    On February 26, 2025, OMB and OPM issued a Memorandum to Heads of Executive Departments and Agencies, including but not limited to the Federal Agency Defendants, regarding "Guidance on Agency RIF and Reorganization Plans Requested by Implementing The President's 'Department of Government Efficiency' Workforce Optimization Initiative."  Ex. B.

161.    OMB and OPM echoed the President's purposes in transforming the federal bureaucracy, explaining:

> The federal government is costly, inefficient, and deeply in debt. At the same time, it is not producing results for the American public.  Instead, tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens.
>
> The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government.

*Id.*

162.    In this Memorandum, OMB and OPM directed federal agencies to comply with the President's Executive Order by submitting the "Agency RIF and Reorganization Plans" ("ARRPs") required by the Workforce Executive Order to OMB and OPM for "review and approval."  *Id.*

163.    The OMB and OPM February 26 Memorandum, by imposing onerous requirements under exceptionally unreasonable time frames, guarantees that agencies will not be able to comply with their statutory and regulatory mandates, will not exercise any existing discretion in a manner that is faithful to those mandates or results from considered, proper decision-making, and will instead do the President's unlawful bidding.  The OMB and OPM February 26 Memorandum, by endowing OMB and OPM with ultimate decision-making power as to the ARRPs, transfers decision-making to those without personal knowledge of or experience with the particular requirements and obligations

of these agencies, their component parts, or of the work performed by their employees—and the impacts of eliminating that work.

164.    OMB and OPM set forth requirements for the ARRPs that included instructing that ARRPs "should" include "[a] significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required."  OMB and OPM explained further: "Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily required functions." *Id.*  OMB and OPM further directed that agencies "should also[,]" among other things:

- "seek to consolidate areas of the agency organization chart that are duplicative";
- "consolidate management layers where unnecessary layers exist"; and
- "seek reductions in components and positions that are non-critical[.]"

OMB and OPM further instructed:  "When taking these actions, agencies should align closures and/or relocation of bureaus and offices with agency return-to-office actions to avoid multiple relocation benefit costs for individual employees." *Id.*

165.    OMB and OPM also directed agencies to work with DOGE in planning required RIFs for non-essential positions, and to use 2019 Funding Lapse Plan Staffing Levels as the "starting point" for identifying those positions that are "essential." Ex. B.

166.    Among the "tools" OMB and OPM directed agencies could use:  "Eliminating non-statutorily mandated functions through RIFs (Appendix 1 contains a sample timeline)."  Then, OMB and OPM directed that agencies must include the following in the plans submitted for approval:

> ARRPs should also list the competitive areas for large-scale reductions in force, the RIF effective dates (which may be a date prior to when the plan is submitted), the expected conclusion of the RIFs, the number of FTEs reduced, and additional impact of RIFs such as cancellation of related contracts, leases or overhead.

*Id.*

167.    OMB and OPM required the ARRPs to be submitted for approval in two phases, the first of which was due merely *two weeks* later on March 13, 2025, and the second on April 14, 2025, and then gave specific requirements for each phase. *Id.*

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                45

Add. 83

168. The March 13 "Phase 1 ARRPs shall focus on initial agency cuts and reductions." *Id.*
Agencies were required to identify, among other things, Funding Lapse Plan Staffing Levels:

> All agency components and employees performing functions not mandated by statute
> or regulation who are not typically designated as essential during a lapse in
> appropriations (because the functions performed by such employees do not fall under
> an exception to the ADA) using the Agency Contingency Plans submitted to OMB *in
> 2019* referenced above.

*Id.* (emphasis added). Agencies were also required to identify "[w]hether the agency or any of its
subcomponents should be eliminated or consolidated." *Id.*

169. The April 14 Phase 2 plans were required to contain further information regarding the
reorganization in light of the required RIFs, including a new organization chart and, among other
things:

- The agency's plan to ensure that employees are grouped, to the greatest extent possible, based
  on like duties and job functions to promote effective collaboration and management, and that
  the agency's real estate footprint is aligned with cross-agency efforts coordinated by GSA to
  establish regional federal office hubs.

- Any proposed relocations of agency bureaus and offices from Washington, D.C. and the
  National Capital Region to less-costly parts of the country.

- The competitive areas for subsequent large-scale RIFs.

- All reductions, including FTE positions, term and temporary positions, reemployed
  annuitants, real estate footprint, and contracts that will occur in relation to the RIFs.

- Any components absorbing functions, including how this will be achieved in terms of FTE
  positions, funding, and space.

*Id.*

170. In the sample timeline provided in Appendix 1, OMB and OPM explained that
"[a]gencies can accelerate [the] timelines" for conducting RIFs by "seek[ing] OPM waiver approval
for a 30-day notification period," instead of the 60-day period generally required by the RIF statute
and regulations. The RIF statute and regulations provide that OPM may approve such a waiver, at the
request of an agency, "[w]hen a reduction in force is caused by circumstances not reasonably
foreseeable." 5 C.F.R. § 351.801; *see* 5 U.S.C. § 3502. OMB and OPM stated that agencies can also

1    speed up the RIF process "through parallel processing . . . expediting process steps, and streamlining

2    stakeholder coordination."

3        171.    Finally, OMB and OPM instructed once again that "law enforcement, border security,

4    national security, immigration enforcement, or public safety responsibilities" as well as political

5    appointees were exempt from these "transformation" efforts and that agencies providing services to

6    the public were not permitted to implement any RIFs without OMB or OPM sign-off.  *Id.*

7        172.    On information and belief, it is not possible for any federal agency, let alone all federal

8    agencies, to create an ARRP that both accommodates the specific parameters required by the

9    President, OMB, and OPM *and* complies with all of the federal agency's statutory and regulatory

10   requirements in a mere two weeks, by the March 13 deadline, or even realistically by the April 14

11   deadline.  The OMB/OPM Memorandum did not provide agencies enough time to properly assess an

12   agency's statutory requirements, let alone assess how to comply with them *and* the President's

13   directives.

14       173.    The requirements for the ARRPs imposed by OMB and OPM on all federal agencies

15   effectively removed independent decision-making authority from the agencies and required agencies

16   to disregard the statutory authority governing the agency's organization, functions, personnel

17   requirements, and appropriations.  The language directing agencies to comply with applicable law in

18   creating these plans was disingenuous.

19       174.    The February 26, 2025 OMB and OPM memorandum contained new or modified rules

20   without engaging in notice and comment rule-making, and effectively required agencies (including

21   but not limited to Federal Agency Defendants) to comply with these new and modified rules

22   regardless of any prior existing regulations.

23       175.    On information and belief, DOGE, via individuals in the Executive Office of the

24   President and DOGE teams embedded at agencies (including but not limited to Federal Agency

25   Defendants), has enforced the requirements of the President's Executive Order and OMB/OPM

26   Memorandum, including by ordering federal agencies to make mandated cuts eliminating positions,

27   programs, offices, and functions.  On information and belief, DOGE has required federal agencies to

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    47

1  comply with required targets imposed by DOGE for spending reductions by eliminating positions,

2  programs, offices, and functions to meet the DOGE stated goal of imposing spending cuts

3  government-wide.

4       176.    In sum, OMB, OPM, and DOGE have usurped agency authority, exceeded their own

5  authority, acted in an arbitrary and capricious manner, and ignored procedural requirements by

6  requiring federal agencies throughout the government, including but not limited to Federal Agency

7  Defendants, to:

8      a.    Submit ARRPs for OMB and OPM approval;

9      b.    Include in those ARRPs large-scale RIFs (irrespective of whether staffing reductions

10      are necessary or even appropriate in light of agency functions and appropriations);

11      c.    Prioritize in those large-scale RIFs any functions that "[the President's]

12      Administration suspends or closes" (irrespective of statutory requirements or authority

13      delegated to the agencies);

14      d.    Prioritize in those large-scale RIFs 2019 government emergency shutdown levels of

15      staffing (which have nothing to do with the staffing needed to properly run fully appropriated

16      agencies);

17      e.    Include in their ARRPs consideration of their own destruction, by addressing whether

18      the agency or any subparts should be eliminated by the President (again, regardless of

19      statutory requirements or authority delegated to the agencies);

20      f.    Include in their ARRPs a plan to reorganize themselves by picking up and arranging

21      the pieces that are left, following these large-scale reductions;

22      g.    Submit these plans for approval on timeframes that do not permit agencies to actually

23      consider and assess their own needs or their statutory authority; and

24      h.    Impose cuts to functions and staffing according to "targets" and "goals" imposed by

25      DOGE.

26

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI    48

**D.    OMB, OPM, and DOGE Lack of Statutory Authority to Order Agencies to Reorganize or Engage in a RIF**

177.    OMB must source its authority either directly from an act of Congress, or a delegation by Congress to the President that the President has in turn delegated to OMB.  OMB lacks the authority to order federal agencies to downsize or reorganize themselves, or to assume final decision-making power by requiring agencies to submit such plans for OMB approval.  31 U.S.C. §§ 501-507.  Insofar as neither Article II nor any act of Congress gives the President authority to reorganize federal agencies or order them to engage in massive layoffs of federal employees, OMB cannot cloak itself in Presidential authority, either**.**

178.    OPM has no statutory authority to approve agency plans to reorganize or conduct RIFs in service of such a reorganization.  5 U.S.C. §§ 1101-1105.  OPM's statutory authority with respect to RIFs consists of setting government-wide order of retention rules for the release of employees in a RIF.  5 U.S.C. § 3502.  OPM cannot order federal agencies to downsize or reorganize themselves, or assume final decision-making power by requiring agencies to submit such plans for approval.  *See, e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v. Off. of Pers. Mgmt.*, No. 3:25-cv-01780-WHA (N.D. Cal.), ECF No. 45 (Feb. 28, 2025 Order), ECF No. 132 (Mar. 14, 2025 Order), ECF No. 202 (Apr. 18, 2025 Order).  To the extent that Congress has generally authorized OPM to implement the President's rules for the federal workforce (5 U.S.C. § 1103), that authorization is coextensive with the President's authority and cannot exceed it.  Insofar as neither Article II nor any act of Congress gives the President authority to reorganize federal agencies or order them to engage in massive layoffs of federal employees, OPM cannot cloak itself in Presidential authority, either**.**

179.    DOGE has no statutory authority at all.  Insofar as neither Article II nor any act of Congress gives the President authority to reorganize federal agencies or order them to engage in massive layoffs of federal employees, DOGE cannot cloak itself in Presidential authority, either**.**

**E.    The Administration's Lack of Transparency Regarding Reorganization Plans**

180.    The Trump Administration has never made public the "18-month DOGE agenda" referenced in Executive Order 14158.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                                      49

**Add. 87**

181.    The Trump Administration has never made public any plan being created by DOGE in conjunction with OPM and OMB pursuant to the President's January 20, 2025 Memorandum requiring a "plan to reduce the size of the Federal Government's workforce."

182.    When asked by Fox News in March 2025 whether DOGE's actions would result in a report ("And the process is a report at some point?  At 100 days?"), Elon Musk responded on behalf of DOGE:  "Not really a report.  We are cutting the waste and fraud in real time.  Every day like that passes, our goal is to reduce the waste and fraud by $4 billion a day every day, seven days a week. And so far, we are succeeding."[50]

183.    The Trump Administration has refused to make public the phase-one agency ARRPs that were to be submitted by March 13 to OMB and OPM for approval, including in response to requests from members of the public via the Freedom of Information Act ("FOIA"), federal employee unions, the press, and Congress.

184.    In lawsuits filed against the Trump Administration seeking disclosure under FOIA of the March 13 plans submitted to OMB and OPM, OMB and OPM refused to disclose those plans on the ground that they were "pre-decisional" and described them as pending OMB review and approval. *See, e.g.*, *Democracy Forward Foundation v. Off. of Mgmt. & Budget*, No. 1:25-cv-00858 (D.D.C.), ECF No. 9 (Defendants' Apr. 2, 2025 Motion to Dismiss:  "'[A]gency reduction-in-force plans are still under development by the Executive Branch[,] and OMB is currently actively reviewing these plans as part of Phase 1' … OMB explained, the plans Plaintiff requested 'are part of a longer two-phase process that has just been initiated.'").

185.    Executive Order 14210 did not, in ordering agencies to prepare and submit reorganization plans to OMB and OPM, create any process for notice and public comment, unlike the reorganization Executive Order issued in President Trump's first term.

186.    On March 13, 2025, the Washington Post reported: "Agencies across the federal government faced a Thursday deadline to submit plans for a large-scale firing of employees, but scant details were made public about what the White House said would be a 'mass reduction' of the federal

---

[50] *Supra*, n.9.

1  workforce.  The White House did not preview the plans, saying only that it would share their contents

2  'once the plans are enacted.'"  Wash. Post, *White House expects 'mass reduction' of federal*

3  *workforce as deadline looms* (Mar. 13, 2025).[51]  White House press secretary Karoline Leavitt said:

4  "The coming mass reduction will 'streamline our broken bureaucracy, save taxpayers millions of

5  dollars and make the government more efficient for all.'"  *Id.*

6      187.    On March 27, 2025, the Washington Post published a report regarding "an internal

7  White House document obtained by The Washington Post" that "contains closely held draft plans for

8  reshaping the 2.3-million-person bureaucracy."  Wash. Post, *Internal White House document details*

9  *layoff plans across U.S. agencies* (Mar. 27, 2025).[52]  The Post explained:  "The details are compiled

10 from plans that President Donald Trump ordered agencies to submit, according to two people familiar

11 with the document who spoke on the condition of anonymity because they were not authorized to talk

12 about it."  *Id.*  The document shows that "[f]ederal officials are preparing for agencies to cut between

13 8 and 50 percent of their employees as part of a Trump administration push to shrink the federal

14 government."  When confronted with questions regarding this document, the Post reports that White

15 House Principal Deputy Press Secretary Harrison Fields responded by e-mail:

16      "It's no secret the Trump Administration is dedicated to downsizing the federal
       bureaucracy and cutting waste, fraud, and abuse.  This document is a pre-deliberative
17     draft and does not accurately reflect final reduction in force plans… When President
       Trump's Cabinet Secretaries are ready to announce reduction in force plans, they will
18     make those announcements to their respective workforces at the appropriate time."

19 *Id.*

20      188.    When individuals at agencies have gone public with information regarding the wide-

21 scale (and unlawful) scope of these plans, the Trump Administration has claimed they are

22 "fraudulent."  For example:  On April 9, 2025, the Las Vegas ABC-news affiliate KTNV published a

23 report titled, "As concerns among veterans rise, VA source shares details of workforce reduction

24

25

---

26 [51]Available at: https://www.washingtonpost.com/politics/2025/03/13/government-agency-
    reorganization-rif-federal-workers/.

27 [52]Available at: https://www.washingtonpost.com/politics/2025/03/27/federal-worker-layoffs-
    government-agencies/.

28 AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                             51

1    plan."[53]  The source described in detail the plans for cutting 80,000 jobs.  The VA responded by

2    calling the document "fraudulent" and an "intentionally false leaked document."  *Id.*

3         189.    The Trump Administration has largely refused to make the April 14 ARRPs publicly

4    available either, until it starts issuing RIF notices (and not even then).

5         190.    Members of Congress have submitted multiple requests for information to the Trump

6    Administration regarding these reorganization plans.

7         191.    For example, on April 7, the Ranking Member of the Senate Budget Committee sent a

8    demand letter requesting the OMB provide the Senate with documents including the March 13 plans

9    as well as any further plans, and expressing concern that "[t]hese sweeping workforce reductions will

10   not only strain agency operations and delay critical services for seniors and veterans, but they will

11   also harm the government's efforts to protect public health, conserve natural resources, and manage

12   federal lands."[54]

13        192.    On April 10, another group of Senators wrote to OPM and OMB, requesting

14   documents pertaining to the RIF and Reorganization plans; expressing concern regarding the

15   illegality, harm, and lack of transparency; and noting that the parameter to use government-shutdown

16   levels as a baseline could threaten the jobs of *700,000 federal employees.*  Letter from Senators to

17   Off. of Mgmt. and Budget and Off. of Pers. Mgmt. (Apr. 10, 2025), attached hereto as Exhibit C.  The

18   Senators continued:

19        Further, the size and scope of the reported RIF plans are clearly not about government
20        efficiency.  The Department of Education has announced layoffs of 50% and the
         Department of Veterans Affairs has proposed cuts of over 80,000 employees.  The
21        Department of Defense is seeking to reduce its civilian workforce by 5-8%, or 61,000
         employees, and the IRS reportedly plans to cut around 25% of its workforce, or 20,000
22        employees.  On April 1, 2025, the Department of Health and Human Services began
         the process of firing 10,000 employees, in addition to 10,000 employees who left their
23        positions through the deferred resignation program and other downsizing efforts.  Two
         days later, Secretary Kennedy suggested that 20% of these terminations could be
24        mistakes.  The Secretary stated, "[p]ersonnel that should not have been cut were cut…

25   _____

26   [53] Available at: https://www.ktnv.com/news/as-concerns-among-veterans-rise-va-gives-timeline-of-
     how-their-workforce-reduction-plan-will-affect-them.

27   [54] Letter from Jeffrey Merkley, Ranking Member of S. Comm. on the Budget, to Russell Vought,
     OMB Director (Apr. 7, 2025), available at:

28   https://www.budget.senate.gov/imo/media/doc/letter_to_omb_re_rif_plans.pdf.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          52

that was always the plan.  Part of the DOGE, we talked about this from the beginning, is we're going to do 80% cuts, but 20% of those are going to have to be reinstated, because we'll make mistakes."  The Social Security Administration (SSA) has already lost over 7,000 employees through terminations and resignations since February and closed 6 of 10 regional offices, leading to increased wait times and multiple website crashes over the past month—yet SSA plans to cut thousands more.

*Id.*

193.    As a result of the Trump Administration's secrecy, federal employees throughout the federal agencies, their labor representatives, state and local governments, organizations including Plaintiffs, non-profits, and the public have been kept in the dark, intentionally, regarding this Administration's plans.  As late as March 28, 2025, *after* the March 13 ARRPs with the required "large-scale RIFs" had been submitted for approval, Elon Musk and his selected DOGE representatives, sitting down for a lengthy interview with Fox News, minimized the terminations of federal employees:

[DOGE lead at OPM] Anthony Armstrong:

And President Trump's been very clear: it's scalpel not hatchet.  And that's the way it's getting done.

And then once those decisions are made, there's a very heavy focus on being generous, being caring, being compassionate, and treating everyone with dignity and respect.  And if you look at how people have started to leave the government, it is largely through voluntary means.  There's voluntary early retirement, there's voluntary separation payments.  We put in place deferred resignation, the eight-month severance program.

So there's a very heavy bias towards programs that are long-dated, that are generous, that allow people to exit and go and get a new job in the private sector.  And you've heard a lot of news about RIFs, about people getting fired.  At this moment in time, less than .15, not 1. 5, less than .15 of the federal workforce has actually been given a RIF notice.

Elon Musk:

*Basically almost no one's gotten fired, is what we're saying.*[55]

---

[55] *Supra*, n.9.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    53

**Add. 91**

1

**F.    Current and Impending Implementation of the President's Mandated ARRPs**

2        194.    Despite the Trump Administration's failure to provide the public, federal employees

3    and their labor representatives, the press, and Congress with detailed advance information regarding

4    these plans, information about the ARRPs that Plaintiffs have been able to obtain confirmation that

5    some agencies have already begun to implement the large-scale RIFs and reorganization plans

6    ordered by the President, and many other agencies are poised to do so imminently.  Plaintiffs set forth

7    their current information regarding actual and imminent implementation of President Trump's plans

8    to transform the federal government.

9        **1.    Ongoing RIFs and Reorganization**

10        195.    At least the following Federal Agency Defendants have begun to implement their

11    ARRPs by commencing plans to reorganize, including notifying employees of large-scale RIFs:

12    • **Health and Human Services**

13        196.    On March 27, 2025, HHS announced:  "Today, the U.S. Department of Health and

14    Human Services (HHS) announced a dramatic restructuring in accordance with President Trump's

15    Executive Order, 'Implementing the President's 'Department of Government Efficiency' Initiative.'"

16    Press Release, U.S. Dep't of Health and Human Servs., *HHS Announces Transformation to Make*

17    *America Healthy Again* (Mar. 27, 2025).[56]  The restructuring involves "a reduction in workforce of

18    about 10,000 full-time employees who are part of this most recent transformation."  *Id*.

19        197.    HHS explained the restructuring and consolidation of functions that it was engaging in

20    as being pursuant to the President, DOGE, and OMB's orders.  *Id.*  Secretary Kennedy explained,

21    "We aren't just reducing bureaucratic sprawl.  We are realigning the organization…."  *Id.*; *see also*

22    *Fact Sheet: HHS' Transformation to Make America Healthy Again*, U.S. Dep't of Health and Human

23    Servs. (Mar. 27, 2025) ("The restructuring of HHS is proceeding in accordance with President

24    Trump's Executive Order").[57]

25

26

---

[56] https://www.hhs.gov/press-room/hhs-restructuring-doge.html
[57] https://www.hhs.gov/press-room/hhs-restructuring-doge-fact-sheet.html

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                54

**Add. 92**

198.   HHS also revealed that the immediate 10,000-person reduction was just the beginning of a planned reduction:  "The current 82,000 full-time employees will be reduced to 62,000."  *Id.* The cuts will affect the following subagencies:

- FDA will decrease its workforce by approximately 3,500 full-time employees;

- The CDC will decrease its workforce by approximately 2,400 employees;

- The NIH will decrease its workforce by approximately 1,200 employees;

- CMS will decrease its workforce by approximately 300 employees;

- 28 divisions will be consolidated to 15;

- 10 regional offices will become 5; and

- Human Resources, Information Technology, Procurement, External Affairs, and Policy will be centralized.

*Id.*

199.   The CDC has eliminated the sexually transmitted disease ("STD") lab branch, put on leave CDC staff responding to a current measles outbreak in Texas, and has (because of RIFs) effectively shut its offices on injury control, birth defects, and smoking and health.  The Administration for Children and Families terminated employees administering programs that paid for the heating and cooling bills for low-income households, and eliminated a division that oversaw a case management system tracking child abuse and neglect.  And the National Institute for Occupational Safety and Health (NIOSH) shut down a federal screening program for black lung disease, halting routine mine safety inspections, eliminating a program that investigates and recommends ways to reduce exposure to health hazards in workplaces, and stopping its evaluation and approval of respirators (and potentially other forms of personal protective equipment) that are new to the market.  Reporting indicates that HHS' RIFs have affected programs that were mandated by Congress, and that "[s]ome congressionally mandated programs saw their entire staff dismissed."[58]

---

[58] Politico, *RFK Jr., DOGE gutted legally required offices. Courts may undo it all* (May 11, 2025), available at: https://www.politico.com/news/2025/05/11/trump-transforms-congressionally-mandated-health-offices-into-ghost-towns-00340176.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                55

200.    Secretary Kennedy told the New York Times, "We're going to do more with less," even as he acknowledged that it would be "a painful period for H.H.S."[59] Senator Patty Murray "called Mr. Kennedy's comments about doing more with less an 'absurd suggestion' that 'defies common sense.' Her sentiments were echoed by several agency employees, who spoke on the condition of anonymity to avoid retribution." *Id.*

201.    HHS has never made public the ARRPs submitted to OMB and OPM for approval in conjunction with the March 13 and April 14 deadlines.

- **Department of Labor**

202.    On April 15, 2025, the Department of Labor placed the "vast majority" of the staff of the Office of Federal Contract Compliance Programs (OFCCP) on administrative leave.[60] That office is responsible for ensuring contractors across government agencies comply with a variety of federal laws. The email to employees stated they were being put on administrative leave "due to the agency's 'significantly reduced scope of mission.'" *Id.* On May 6, DOL issued RIF notices to OFCCP's employees, explaining the Department was conducting a RIF pursuant to the Workforce Executive Order. A "DOL memo indicated the department plans to ultimately cut 90% of the OFCCP's workforce." *Id.*

203.    For the RIFs at OFCCP, DOL requested from OPM a waiver of the 90-day notice period for RIFs involving newly-established competitive areas and approval for a 30-day notice period. OPM granted the request. The only justification given by OPM for its decision was: "*In accordance with the E.O. stated above, DOL must act quickly to conduct a RIF of employees in the divisions, offices, and units, mentioned in your request.*"

---

[59] NY Times, *10,000 Federal Health Workers to Be Laid Off* (Mar. 27, 2025), available at: https://www.nytimes.com/2025/03/27/us/politics/health-department-job-layoffs-rfk-jr.html.
[60] Bloomberg Law, *DOL Puts Contractor Watchdog Employees on Leave as Layoffs Loom* (Apr. 16, 2025), available at: https://news.bloomberglaw.com/daily-labor-report/dol-puts-contractor-watchdog-employees-on-leave-as-layoffs-loom.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                     56

204. Previously, on April 14, 2025, the Secretary of Labor had also warned publicly that more layoffs across the Department "should be expected" in the coming weeks.[61] One protesting employee explained: "This is no ordinary federal agency. This is literally the firewall between workers and exploitation. The people in this building are training people for jobs. They're ensuring that they come home safe." *Id.*

205. DOL has never made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **AmeriCorps**

206. On April 9, 2025, AmeriCorps announced to employees that the agency would be taking steps to "comply" with the Executive Order and ARRP, including by implementing a RIF of 50% or more of AmeriCorps staff.

207. On April 16, 2025, AmeriCorps began sending boilerplate notices of administrative leave to AmeriCorps agency staff, both at headquarters in Washington, D.C. and in regional offices across the country, placing the vast majority of them on leave and locking them out of their computer systems shortly thereafter.

208. AmeriCorps is a federal agency that staffs community service work around the country, including disaster relief. As the New York Times reported:

> The independent federal agency that organizes community service work in the United States has placed on administrative leave almost all of its federal staff at the direction of Elon Musk's cost-cutting team, according to people familiar with developments at the agency.

NY Times, DOGE Guts Agency That Organizes Community Service Programs (April 17, 2025).

209. On Thursday, April 24, 2025, the AmeriCorps employees began to receive RIF notices from the agency.

210. AmeriCorps has not made public the ARRP submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

---

[61] Bloomberg Law, *Lawmakers, Workers Push Chavez-DeRemer to Stop Labor DOGE Cuts* (Apr. 14, 2025), available at: https://news.bloomberglaw.com/daily-labor-report/lawmakers-workers-push-chavez-deremer-to-stop-labor-doge-cuts.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                        57

- **Small Business Administration**

211.    On April 18, 2025, employees at the SBA throughout the COVID-19 Economic Injury Disaster Loan Serving Center were laid off, effective in dates through May 2025.[62] "They are firing us just to fire us," one SBA employee was quoted as saying. "We literally made money for the government by taking loan payment and recovering money in bankruptcy." *Id*.

212.    Between March and April, employees throughout other offices at the SBA also received RIF notices, including the Office of Entrepreneurial Development and Office of Entrepreneurial Education, the procurement office, and positions in field, district, and branch offices. For example, the entire Office of Entrepreneurial Education received RIF notices; that office is responsible for administering a $17 million grant that helps small businesses throughout the country.

213.    Previously, on March 21, 2025, the SBA issued a news release stating that, as required by President Trump's Workforce Executive Order, "the agency will reduce its workforce **by 43%** – ending the expansive social policy agenda of the prior Administration, eliminating non-essential roles, and returning to pre-pandemic staffing levels." [63]  The agency referred to this elimination of over 2,700 jobs as a "strategic reorganization." *Id*.

214.    The SBA Administrator explained that SBA has "submitted" such a reorganization plan to OMB for approval. *Id*.  The news release concluded:  "SBA's reorganization plan will provide for the preservation of public services through a strategic transfer of duties.  It will be actioned in the coming weeks." *Id*.

215.    Notwithstanding the RIF notices going out by email on April 18, the SBA has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

---

[62] Gov't Exec., *SBA hit with more layoffs* (Apr. 18, 2025), available at: https://www.govexec.com/workforce/2025/04/sba-hit-more-layoffs/404682/.

[63] U.S. Small Bus. Admin.*, Small Business Administration Announces Agency-Wide Reorganization* (Mar. 21, 2025), available at: https://www.sba.gov/article/2025/03/21/small-business-administration-announces-agency-wide-reorganization (emphasis added).

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                  58

- **<u>Environmental Protection Agency</u>**

216.    On April 22, 2025, the EPA began sending RIF notices to some employees across its headquarters and regional offices.[64]

217.    Previously, both President Trump and EPA Administrator Lee Zeldin expressed that up to 65% of the EPA workforce will eventually be cut.

218.    The New York Times reported on March 17, 2025 that the Trump Administration intends to "dismantle" EPA's Office of Research and Development:

> The Environmental Protection Agency plans to eliminate its scientific research arm, firing as many as 1,155 chemists, biologists, toxicologists and other scientists, according to documents reviewed by Democrats on the House Committee on Science, Space and Technology.  The strategy is part of large-scale layoffs, known as a "reduction in force," being planned by the Trump administration, which is intent on shrinking the federal work force.

NY Times, *Trump Administration Aims to Eliminate E.P.A.'s Scientific Research Arm*  (Mar. 17, 2025).[65]

219.    In response to these public statements, 51 former EPA officials from both Democratic and Republican Administrations sent an "Open Letter" to Congress on March 18, 2025, that explained:

> We are former Senate-confirmed officials and Regional Administrators who served in the U.S. Environmental Protection Agency during Republican and Democratic administrations.   We adhere to EPA's long-held core principles that the agency should be apolitical, professional, transparent, and dedicated to following the law and science.
>
> We are greatly alarmed by President Trump's recent comments that his administration is seeking to cut EPA by 65 percent.  We share the concerns expressed by former EPA administrators who recently wrote that "such cuts would render the agency incapable of protecting Americans from grave threats in our air, water and land."
>
> We are writing to urge Congress to ensure that EPA has sufficient staff and funding to effectively implement the Clean Air Act, Clean Water Act, and other bedrock environmental laws for the good of all Americans.

---

[64] Reuters, *EPA begins layoffs of environmental justice staff* (Apr. 22, 2025), available at: https://www.reuters.com/business/world-at-work/epa-begins-layoffs-environmental-justice-staff-2025-04-22/.

[65] Available at: https://www.nytimes.com/2025/03/17/climate/trump-eliminates-epa-science.html.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                              59

1   Deep cuts to EPA threaten more than 50 years of bipartisan progress under Republican
    and Democratic Congresses and presidents. Actions that diminish EPA's capabilities
2   will place at risk the quality of the air our children breathe, the water we all drink, and
    the waterways we swim, fish and play in. They would jeopardize EPA's responses to
3   toxic chemical spills and other disasters as well as basic compliance with America's
    environmental laws.
4

5   Policy changes are to be expected from one administration to the next, but not the
    dismantling of EPA. …
6

7   If the administration does not agree with the laws Congress has passed and the
    programs it has funded, it should work with Congress to seek changes, not unilaterally
8   and recklessly freeze, delay, or eliminate funding.[66]

9   220.    On May 2, 2025, the EPA announced the next phase of its plans to significantly

10  reorganize the agency and make major cuts to staffing.[67] The EPA is planning to reduce its staff to

11  Reagan-era levels, which involves cutting its workforce from about 15,000 to as few as 11,000

12  employees.[68] Specifically, EPA will make major cuts to the Office of Research and Development and

13  has encouraged the Office's 1,500 employees to apply for the approximately 500 new positions

14  created in the reorganization.

15  221.    Notwithstanding the RIF notices that began going out on or about April 22, the EPA

16  has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the

17  March 13 and April 14 deadlines.

18  •   **Housing and Urban Development**

19  222.    HUD has commenced the RIF of positions in the Office of Field Policy and

20  Management ("FPM") throughout the country, including management analysts, program analysts,

21  customer service representatives, and labor standards specialists. The FPM serves as the first point of

22  contact for HUD and housing-related questions and concerns within a community

23  _____

24  [66] Available at: https://www.environmentalprotectionnetwork.org/wp-
    content/uploads/2025/03/Senate-Confirmed-Officials-and-RA-Letter-to-Congress-Final.pdf.

25  [67] EPA, *EPA Announces Next Phase of Organizational Improvements to Better Integrate Science into
    Agency Offices, Deliver Clean Air, Land, and Water to All Americans* (May 2, 2025), available at:
26  https://www.epa.gov/newsreleases/epa-announces-next-phase-organizational-improvements-better-
    integrate-science-agency.

27  [68] NPR, *The Trump administration says it will cut EPA staffing to Reagan-era levels* (May 2, 2025),
    available at: https://www.npr.org/2025/05/02/nx-s1-5385272/epa-environmental-protection-agency-
28  cuts-trump-zeldin.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          60

223.    Notwithstanding the RIF notices that have been sent at HUD, it has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **General Services Administration**

224.    GSA has announced plans for a nearly 50% cut in staff, and has issued RIF notices throughout the agency.[69]  The agency issued RIF notices to at least 600 employees in the Public Buildings Service.[70]

225.    Notwithstanding the RIF notices that have been sent at GSA, it has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **OPM**

226.    On April 18, 2025, OPM issued RIF notices to all employees in the Center for Leadership Development, which provides leadership development training to federal employees across the government.[71]  OPM has also eliminated its office for Human Capital Data Management and Modernization, Office of Communications, and Office of Procurement as part of its RIF.

227.    Notwithstanding the RIF notices that have been sent at OPM, it has not made public the ARRPs submitted in conjunction with the March 13 and April 14 deadlines.

**2.    Imminent RIFs in Service of Government-wide Reorganization**

228.    At least the following federal agencies will begin to implement their ARRPs by commencing plans to reorganize, including notifying employees of large-scale RIFs, imminently:

---

[69] Fed. News Network, *GSA seeks 50% spending cuts, nonvoluntary RIF after OPM's resignation offer* (Feb. 4, 2025), available at:  https://federalnewsnetwork.com/hiring-retention/2025/02/gsa-seeks-50-spending-cuts-nonvoluntary-rif-after-opms-resignation-offer/.

[70] Gov't Exec., *GSA continues slow drip of ROFs, nearly wiping out entire offices* (Mar. 7, 2025), available at:  https://www.govexec.com/workforce/2025/03/gsa-continues-slow-drip-rifs-nearly-wiping-out-entire-offices/.

[71] Fed. News Network, *OPM shutters office that trained agency leaders, next generation of federal talent* (May 1, 2025), available at:  https://federalnewsnetwork.com/reorganization/2025/05/opm-shutters-office-that-trained-agency-leaders-next-generation-of-federal-talent/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                         61

- **USDA**

229.    As of filing, the USDA has not yet made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

230.    However, on April 7, 2025, Government Executive reported from USDA sources:

> Some employees have been told to expect the department to cut back to fiscal 2019 staffing levels—which would lead to USDA slashing around 9,000 of its 98,000 employees—while others have been told there is an overall federal workforce reduction number the administration has developed and the department will do its part proportionally to meet that target.

Gov't Exec., *USDA to slash headquarters, other staff and relocate some to new 'hubs' around the country* (Apr. 7, 2025).[72]

231.    In an email to USDA employees offering them another round of the Fork in the Road Deferred Retirement program, Secretary Rollins stated that RIFs were imminent.  *Id*.

232.    On April 15, 2025, Government Executive reported further:

> The Trump administration is planning to severely scale back or outright eliminate funding for many programs across the Agriculture Department, according to White House documents obtained by Government Executive, as it slashes workers and closes offices at the local level…. The proposed cuts come as USDA is planning to gut its Washington headquarters, consolidate mission areas and administrative functions and relocate some staff to new "hubs" around the country.[73]

- **Department of Commerce**

233.    In March, the press began reporting that the Department of Commerce would seek to cut 20 percent of the National Oceanic and Atmospheric Administration ("NOAA") staff.  Later in March, staff at NOAA were told they could take "voluntary" retirement offers rather than be laid off in the coming RIFs.  DOGE has also listed 19 NOAA facilities for lease termination, including the Radar Operations Center, which houses staff for the nation's Doppler radar network.[74]  RIFs have

---

[72] Available at: https://www.govexec.com/workforce/2025/04/usda-slash-headquarters-other-staff-and-relocate-some-new-hubs-around-country/404371/.

[73] Gov't Exec., *White House pitches layoffs, local office closures and program eliminations at USDA* (Apr. 15, 2025), available at: https://www.govexec.com/management/2025/04/white-house-pitches-layoffs-local-office-closures-and-program-eliminations-usda/404580/.

[74] PBS News, *As NOAA braces for more cuts, scientists say public safety is at risk (March 14, 2025)*, available at: https://www.pbs.org/newshour/nation/as-noaa-braces-for-more-cuts-scientists-say-public-safety-is-at-risk.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    62

also been announced for the National Centers for Environmental Information, which manages climate data critical to disaster preparation and response.[75]

234.    The Commerce Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Department of Defense**

235.    In March, Military Times reported on Defense Secretary Hegseth's goal of cutting 5-8 percent of the total Department civilian workforce, which amounts to 50,000 to 70,000 jobs.[76]

236.    The Defense Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Department of Energy**

237.    The Department of Energy's March 13 ARRP submitted to OMB and OPM for approval was, according to press reports, leaked to the press.[77]

238.    According to press reports, that ARRP identified 43 percent of its workforce as "non-essential" according to the provided parameters.  The report admitted:  "While the core group of essential personnel required to remain during a lapse are extremely minimal, such limited capabilities are neither intended nor capable of sustaining ongoing government operations."  *Id.*; *see also* Associated Press, *The Energy Department identifies thousands of nonessential positions at risk of DOGE cuts* (Apr. 4, 2025) ("The Energy Department has identified thousands of federal workers it deems "nonessential" and would not be protected if there is another round of large-scale firings, according to a document obtained by The Associated Press.").[78]

---

[75] Citizen Times, *NCEI, office critical to disaster prep and response, hit with more DOGE staffing cuts* (May 7, 2025), available at: https://www.citizen-times.com/story/news/local/2025/05/07/more-doge-staffing-cuts-at-ncei-as-reduction-in-force-looms/83477853007/.

[76] MilitaryTimes*, Almost 21,000 DOD employees approved to resign amid workforce cuts* (Mar. 18, 2025), available at: https://www.militarytimes.com/news/pentagon-congress/2025/03/18/almost-21000-dod-employees-approved-to-resign-amid-workforce-cuts/.

[77] Fed. News Network, *Energy Department extends hiring freeze, deems 43% workforce non-'essential' in reorganization plan* (Apr. 4, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/energy-department-extends-hiring-freeze-deems-43-workforce-non-essential-in-reorganization-plan/.

[78] Available at: https://apnews.com/article/energy-federal-employees-layoffs-rif-doge-db7b6446928095c26bfe79c608e1e8e7.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                              63

239.    Then, in early April 2025, U.S. Senate Democrats released a fact sheet detailing

information in the possession of Senators that:

> DOGE is reportedly proposing staffing cuts of up to 50% of the workforce at the
> Department of Energy (DOE), with new reductions in force (RIFs) hitting key
> priorities such as clean energy, grid resilience, and state and community programs the
> hardest while even targeting national security programs.

The document summarizes:

> The staffing cuts the Department is reportedly contemplating break down as follows:
>     1. 54% cut (1,800+ positions) to science and innovation programs
>     2. 61% cut (990+ positions) to energy infrastructure and deployment programs
>     3. 71% cut (3,000+ positions) to the Deputy Secretary's Office, environmental
>        management programs, and other policy programs
>     4. 18% cut (540+ positions) to the Nuclear National Security Administration (NNSA)
>     5. 10% cut (520+ positions) to the Power Marketing Administrations (PMAs)

240.    The Energy Department has not made public the ARRPs submitted for OMB and

OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Department of the Interior**

241.    The press began reporting the week of April 7, 2025 that a "major reorganization" of

the Department of Interior "looms."[79]  "DOGE is leading the reorganization plan," an Interior

employee anonymously told the press.  *Id.*  When asked,

> Interior spokesperson Elizabeth Peace said that "under President Trump's leadership,
> we are implementing necessary reforms to ensure fiscal responsibility, operational
> efficiency, and government accountability."
> Peace added, "We do not comment on personnel matters."

*Id.*

242.    On April 17, 2025, the Secretary of the Interior issued a Secretary's Order:

Consolidation, Unification and Optimization of Administrative Functions.  The Secretary explained:

> The Department is committed to supporting President Trump's Executive Order (EO)
> No. 14210, titled "Implementing the President's 'Department of Government
> Efficiency' Workforce Optimization Initiative," issued on February 11, 2025.  As part
> of that commitment, the Department will be unifying and consolidating many of its
> functions within the Office of the Secretary.

---

[79] E&E News, *Major reorganization looms for Interior* (Apr. 10, 2025), available at:
https://subscriber.politicopro.com/article/eenews/2025/04/10/major-reorganization-looms-for-
interior-00283745.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    64

1  Dept. of the Interior, Order No. 3429.  The Secretary then delegated the authority to "lead and

2  coordinate the consolidation, unification and optimization efforts within the Department and its

3  Bureaus and Offices" to an individual who is the DOGE Team lead at the Department (Tyler

4  Hassen).  *Id.*[80]

5  243.    Then, on April 23, 2025, news broke that "Interior solicits employees' resumes in

6  preparation for widespread layoffs."[81]  The U.S. Geological Service emailed employees regarding

7  coming RIFs, collecting resumes to determine which employees were essential.  The NPS was

8  reportedly not far behind.  Alyse Sharpe, an Interior spokesperson, told Government Executive that

9  the department was "adhering to guidelines as laid out by the Office of Personnel Management but

10  had no further details on RIF plans at this time[,]" according to that publication.[82]

11  244.    Interior has yet to explain the number of employees impacted by this reorganization,

12  or to provide any further details regarding the ARRPs submitted to OMB for approval, including with

13  respect to any of its important subagencies (including the National Park Service, the Bureau of Land

14  Management, and the Bureau of Reclamation).  An earlier memo stated that the Department will

15  implement RIFs "to maximize workforce efficiency," exempting only positions "critical to public

16  safety" or "directly linked to the highest priority programs."

17  245.    On April 9, 2025, Interior Secretary Doug Blumin denied having a "specific

18  headcount" for coming RIFs.[83]  A document provided to the Washington Post previously showed 1 in

19  4 positions at Interior being considered for cuts.[84]

---

[80] *See also* The Hill, *Interior Department gives broad powers to DOGE-tied official* (Apr. 21, 2025).

[81] Gov't Exec., *Interior solicits employees' resumes in preparation for widespread layoffs* (Apr. 23, 2025), available at: https://www.govexec.com/workforce/2025/04/interior-solicits-employees-resumes-preparation-widespread-layoffs/404786/.

[82] *Id.*

[83] E&E News, *How many Interior jobs will be cut? Doug Burgum's not sure, yet* (Apr. 9, 2025), available at: https://www.eenews.net/articles/how-many-interior-jobs-will-be-cut-doug-burgums-not-sure-yet/.

[84] Wash. Post*, Internal White House document details layoff plans across U.S. agencies* (Mar. 27, 2025), available at: https://www.washingtonpost.com/politics/2025/03/27/federal-worker-layoffs-government-agencies/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                65

246.    On May 7, 2025, the press reported that Interior "is finalizing reduction-in-force plans expected to target thousands of employees, including 1,500 at the National Park Service, with notices going out to employees within 10 days."[85]  The U.S. Geological Survey is also expected to terminate 1,000 employees focused on its Ecosystems Mission Area, the Bureau of Reclamation is expected to terminate around 100 to 150 employees, and the Bureau of Land Management and Fish and Wildlife Service are expected to terminate employees as well.

247.    The Interior Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **National Labor Relations Board**

248.    The National Labor Relations Board submitted its ARRP for approval to OMB, telling OMB it had determined it would not engage in any RIF, because the employees' work was too essential to the agency's mission.  OMB rejected the NLRB ARRP and required the agency to submit a different one.[86]

249.    On information and belief, forced to do so, the NLRB now plans to RIF employees.

250.    The NLRB has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **National Science Foundation**

251.    On information and belief, NSF submitted an initial ARRP that did not include large-scale RIFs and instead relied on voluntary separation offers to satisfy the Workforce Executive Order.

---

[85] Gov't Exec., *Thousands of layoffs to hit Interior, National Parks imminently* (May 7, 2025), available at: https://www.govexec.com/workforce/2025/05/thousands-layoffs-hit-interior-national-parks-imminently/405145/.

[86] Bloomberg Law, *White House pushed job cuts at agency that's clashed with Musk (2)* (April 29, 2025), available at: https://news.bloomberglaw.com/product/blaw/bloomberglawnews/exp/eyJpZCI6IjAwMDAwMTk2LTgyOTAtZDg3Yi1hM2Y2LWRlYjQ1NTZhMDAwNCIsImN0eHQiOiJETE5XIiwidXVpZCI6IjRtVHNJOURUUOUpCSDN3U0o2dzZtS1E9PURoNGFpbGdwdGjNMZjh0WUNRRRXZBU1E9PSIsInRpbWUiOiIxNzQ1OTQ3NTQ3NzIwIiwiY2lnIjoiVFpIbkdkwaEVOYkw1NEc1VG9xamtsNDZZZcURNPSIsInYiOiIxIn0=?source=newsletter&item=read-text&region=digest&channel=daily-labor-report.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                              66

But in late April, OMB, OPM, and DOGE rejected that plan, and according to the press, instructed NSF to lay off half of the agency's employees under "orders from the White House."[87]

252.    The press has also reported that NSF's "37 divisions—across all eight NSF directorates—are being abolished and the number of programs within those divisions will be drastically reduced."[88]  Current directors will also lose their titles and may be reassigned to other positions.  *Id.*  The press also reported that, as soon as May 9, 2025, NSF was expected to send layoff notices.  *Id.*  On May 9, 2025, NSF sent RIF notices to all employees working in the Division of Equity for Excellence in STEM.

253.    NSF has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Social Security Administration**

254.    On April 7, 2025, Government Executive reported that it had obtained a copy of the SSA's ARRP.[89]  That plan "includes 'field office consolidation' as a goal for next year—even as the agency maintains publicly that it isn't closing field offices."  *Id.*  This was after Elon Musk posted a list of federal real estate for sale that included *47 Social Security Administration field offices*.[90]

255.    That same leaked document confirmed a planned cut of approximately 5,000 to 7,000 employees.  *Id*.

256.    Back in February, the SSA confirmed that it would implement President Trump's executive order by implementing reductions in force that "could include abolishment of organizations and positions" and would "soon implement agency-wide organizational restructuring."  Press

---

[87] Science, *Exclusive: NSF director to resign amid grant terminations, job cuts, and controversy* (Apr. 24, 2025), available at:  https://www.science.org/content/article/nsf-director-resign-amid-grant-terminations-job-cuts-and-controversy.

[88] Science, *Exclusive: NSF faces radical shake-up as officials abolish its 37 divisions* (May 8, 2025), available at:

[89] Gov't Exec., *SSA reorg plan contemplates field office closures, contradicting public statements* (Apr. 7, 2025), available at: https://www.govexec.com/management/2025/04/ssa-reorg-plan-contemplates-field-office-closures-contradicting-public-statements/404369/.

[90] Associated Press, *A list of the Social Security offices across the US expected to close this year* (Mar. 19, 2025), available at: https://apnews.com/article/social-security-offices-closures-doge-trump-b2b1a5b2ba4fb968abc3379bf90715ff.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                          67

1   Release, Social Security Administration, *Social Security Announces Workforce and Organization*

2   *Plans* (Feb. 28, 2025).[91]

3       257.    The SSA has not made public the ARRPs submitted for OMB and OPM approval in

4   conjunction with the March 13 and April 14 deadlines.

5   • **State Department**

6       258.    The State Department has put forward conflicting accounts of a massive

7   reorganization plan.  Initially, on April 20, 2025, the New York Times reported on a draft

8   reorganization plan that would require congressional approval and would take the form of another

9   Executive Order.[92]  The State Department disclaimed responsibility and claimed that draft was "fake

10  news." *Id.*

11      259.    On April 22, 2025, the Department officially announced a reorganization plan as

12  follows:

13  > To deliver on President Trump's America First foreign policy, we must make the State
    > Department Great Again.

14  > …
    > In its current form, the Department is bloated, bureaucratic, and unable to perform its

15  > essential diplomatic mission in this new era of great power competition.  Over the past
    > 15 years, the Department's footprint has had unprecedented growth and costs have

16  > soared. …

17  > That is why today I am announcing a comprehensive reorganization plan that will
    > bring the Department into the 21 Century.  This approach will empower the

18  > Department from the ground up, from the bureaus to the embassies.  Region-specific
    > functions will be consolidated to increase functionality, redundant offices will be

19  > removed, and non-statutory programs that are misaligned with America's core national
    > interests will cease to exist.[93]

20  The announcement explained that "The Department will implement the changes methodically over

21  the next several months." *Id.*

22

23

24

25  [91] Available at: https://blog.ssa.gov/social-security-announces-workforce-and-organization-plans/.

26  [92] New York Times, *Trump Administration Draft Order Calls for Drastic Overhaul of State
    Department* (April 20, 2025), available at https://www.nytimes.com/2025/04/20/us/politics/trump-

27  state-department-overhaul.html.

    [93] U.S. State Dept., Building an America First State Department, available at:

28  https://www.state.gov/building-an-america-first-state-department/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                   68

260. The Department explained in a "Fact Sheet" that: "As part of the plan, the Under Secretaries will also submit a path to reducing staff in domestic offices by 15 percent, consistent with the President's Workforce Optimization Initiative."[94]

261. The Department also issued an "FAQ" that explained the RIFs are coming within the next 60 days. That FAQ included such questions as "Q: My office is being eliminated. What happens to me and my colleagues?" and "Q: My bureau is being moved to another office. What happens to me and my colleagues?"

262. The Department also explained the efforts to integrate the U.S. Agency for International Development (dismantled by prior Executive Order) into the State Department:

> While implemented separately, these two distinct reorganization efforts are highly complementary, and the Secretary and Department leadership continue to carefully consider the integration of former USAID programs and functions in developing and implementing the Department's reorganization plan.

263. Secretary of State Rubio explained further: "To transfer the remaining functions of USAID to such a monstrosity of bureaus would be to undo DOGE's work to build a more efficient and accountable government."[95]

264. Additional information regarding State Department RIFs have trickled out. The press has reported that the State Department is planning to terminate 3,400 employees beginning in early June,[96] and employees have begun to receive informal notifications that their roles will be cut. A cut of 3,400 employees amounts to more than 15 percent of Department staff.

265. The State Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

---

[94] Available at: https://www.nbcnews.com/politics/trump-administration/marco-rubio-unveils-massive-overhaul-state-department-reduction-staff-rcna202458.

[95] Available at: https://statedept.substack.com/p/a-new-state-department-to-meet-the.

[96] Gov't Exec., *State Dept. cuts poised to be more severe than previously outlined, with 3,400 employees on the chopping block* (May 9, 2025), available at: https://www.govexec.com/management/2025/05/state-dept-cuts-poised-be-more-severe-previously-outlined-3400-employees-chopping-block/405171/.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    69

- **Department of Transportation**

266.    On May 2, 2025, the press reported that Transportation Secretary Sean Duffy announced at a town hall meeting that the Department of Transportation "will perform reductions in force at the end of May as part of the Trump's administration goal to reduce the federal employee headcount."[97]  Secretary Duffy stated that the number of employees subject to the RIF will depend on the number of employees who participate in the second round of the deferred resignation program.

267.    The Department of Transportation has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Peace Corps**

268.    On April 28, 2025, the press reported that the Peace Corps was "planning to reduce the number of full-time staff who support volunteers overseas" at the direction of DOGE.[98]  The agency warned staff of "significant restructuring efforts at the agency."  *Id.*

269.    On May 9, 2025, the press reported that the "Peace Corps may reduce its global staff by 25 percent, potentially closing some of its 60 international posts."[99]  Cuts at the Washington D.C. headquarters were anticipated to be even more severe – ranging from 50 to 80 percent of headquarter staff.  *Id.*

270.    It is also common knowledge among Peace Corps employees that RIFs are on the horizon.  Departments of the Peace Corps told staff in all-staff meetings that RIFs were a possibility, and some managers have told employees that their positions will be cut in a RIF.  Employees have also overheard conversations and seen documents that indicate that the Peace Corps will soon RIF its employees.

---

[97] Gov't Exec., *Initial layoffs at Transportation Department expected in late May* (May 2, 2025), available at:  https://www.govexec.com/workforce/2025/05/initial-layoffs-transportation-department-expected-late-may/405041/.

[98] N.Y. Times, *Peace Corps, under review by DOGE, is said to plan 'significant' staff cuts* (April 28, 2025), available at:  https://www.nytimes.com/2025/04/28/us/politics/peace-corps-cuts-doge.html.

[99] Independent, *JFK-created Peace Corps prep for 'significant restructuring efforts' as DOGE targets humanitarian group* (May 9, 2025), available at:  https://www.independent.co.uk/news/world/americas/us-politics/peace-corps-restructuring-doge-review-b2748241.html.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                                 70

- **Department of the Treasury**

271.    On April 15, 2025, an internal IRS memo was leaked to the press detailing planned cuts of up to 40% of its workforce, including approximately 60,000 to 70,000 positions, through bi-weekly RIF notices starting "this week."[100]

272.    Previously, on April 9, 2025, leaked ARRP plans indicated that Treasury plans to cut up to 50% of its tax enforcement staff, and 20% across the board for other components.[101]

273.    The Treasury Department has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

- **Veterans Affairs**

274.    On March 4, 2025, the Chief of Staff of the Department of Veterans Affairs issued a *Memorandum – Department of Veterans Affairs Agency Reduction in Force (RIF) and Reorganization Plan (ARRP)*, Dep't of Veterans Affairs (Mar. 4, 2025).  That memo implements the President's Executive Order, and explains:  "For planning purposes, the Department's initial objective is to return to our 2019 end-strength numbers of 399,957 employees," which reflects an approximate cut of 80,000 jobs.[102]

275.    In early March, VA Secretary Doug Collins appeared on Fox & Friends and was asked about the plans to cut 80,000 jobs:

> "So, the 80,000 number that has come out, is that number already done? Have you already decided who to let go?" Fox's Brian Kilmeade questioned.
>  "No, that is a goal that was put out ... [as] President Trump and [the Office of Personnel Management] have said let's look at a reduction in force across

---

[100] Fed. News Network, *IRS outlines plan to cut up to 40% of workforce, as tax filing season ends* (Apr. 15, 2025), available at: https://federalnewsnetwork.com/workforce/2025/04/irs-outlines-plan-to-cut-up-to-40-of-workforce-as-tax-filing-season-ends; *see also* CNBC, *Tax attorneys say IRS has become a 'zombie' as agency cuts staff and halts audits of the wealthy* (Apr. 17, 2025), available at: https://www.cnbc.com/2025/04/17/irs-staff-cuts-fewer-audits-of-wealthy.html.

[101] Fed. News Network, *Treasury plans to cut up to 50% of IRS enforcement staff, 20% of other components* (Apr. 9, 2025), available at: https://federalnewsnetwork.com/reorganization/2025/04/treasury-plans-to-cut-up-to-50-of-irs-enforcement-staff-20-of-other-components/.

[102] Available at: https://www.afge.org/globalassets/documents/generalreports/2025/va-memo-3-4-25.pdf.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          71

*government*," Collins replied. "*And that is a goal, that is our target.*"[103]

276.    In April 2025, as the deadline for the April 14 ARRP approached, a VA employee leaked the contents of the plans to the press.  The plan is to RIF the 80,000 employees in four categories, in phases including:

1.    Administrative and Support Roles:
- Policy and program analysts
- HR personnel
- IT support staff in non-critical functions
- Clerical and data entry positions
2.    Medical and Healthcare Support Staff
- Non-patient-facing administrative healthcare roles
- Some contract positions in VA medical centers
- Certain research positions with reduced funding
3.    Regional and Central Office Staff:
- Veterans Affairs Central Office (VACO) will see cuts in operational, administrative, and policy roles
- Reductions in public affairs, strategic planning, and some procurement functions
4.    Field Office and Call Center Reductions:
- VA call centers are expected to be streamlined with automation, reducing the need for live agents
- Some regional field office roles will be merged or reassigned[104]

The VA responded to this report claiming the document was "fraudulent."  *Id.*

277.    On April 10, 2025, at a press conference in Chesapeake, Virginia, VA Secretary Doug Collins was questioned about the VA's plan to cut 80,000 jobs:

One reporter asked, "Did you end up doing this backwards? Talking about how many people you were going to cut before you actually had a plan to restructure the VA and to make it more efficient?"
"*No, I think one of the things is, it was put across when Donald Trump was elected, he said 'We're going to make government smaller and more efficient,*'" Collins replied.[105]

---

[103] The Hill, *VA Secretary: Cutting 80,000 is "our target,"* (Mar. 10, 2025), available at: https://www.yahoo.com/news/va-secretary-cutting-80-000-170115439.html.
[104] KTNV Las Vegas, *As concerns among veterans rise, VA source shares details of workforce reduction plan* (Apr. 11, 2025), available at: https://www.ktnv.com/news/as-concerns-among-veterans-rise-va-gives-timeline-of-how-their-workforce-reduction-plan-will-affect-them.
[105] The American Homefront Project, *How much of the VA's budget savings will go to patient care? Collins says it's 'up to the President',* (April 17, 2025), available at: https://americanhomefront.wunc.org/news/2025-04-17/how-much-of-the-vas-budget-savings-will-go-to-patient-care-collins-says-its-up-to-the-president.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    72

278.    The VA has not made public the ARRPs submitted for OMB and OPM approval in conjunction with the March 13 and April 14 deadlines.

***

279.    The agency plans described above are being created and implemented pursuant to the Workforce Executive Order.  Taken alone, as well as in conjunction with other government-wide actions ordered by this Administration, each would have constituted a "reorganization" within the meaning of the most recent, but now expired, statute authorizing the President to propose reorganizations.  5 U.S.C. § 903.

280.    There are no public reports, anywhere, of any federal agency planning to engage in "large-scale" RIFs of employees prior to President Trump's February 11, 2025 Executive Order.

281.    On information and belief, no agency had decided such reductions would be consistent with agency mission, statutory obligations, or good policy prior to President Trump's order to plan such reductions.

282.    On information and belief, as confirmed by the public statements of VA Secretary Collins and OMB and OPM's rejection of the initial ARRPs of at least NLRB and NSF (which proposed few or no RIFs), the "target" cuts in staff are being dictated to agencies by DOGE, in service of the President's policy agenda of "transforming" the federal government.

283.    On information and belief, no agency has or would independently decide to cut the entire offices, programs and functions that DOGE, acting the President's behalf, is ordering agencies to cut.

## V.    Widespread Actual and Imminent Irreparable Harm

284.    The above ongoing and imminent actions taken by the President, OMB and OPM, DOGE, and the Federal Agency Defendants to implement Executive Order 14210 and the OMB/OPM Memorandum and the resulting ARRPs, have and will cause harm, including irreparable harm, to Plaintiffs, their members, and others, including but not limited to the following:

1        285.    Plaintiffs were denied the opportunity for advance notice and to publicly comment on

2    the rules imposed by OMB and OPM in the February 26, 2025 Memorandum and thereby prevented

3    from exercising a right guaranteed by the Administrative Procedure Act.

4        286.    Plaintiffs AFGE, the AFGE locals, AFSCME, and SEIU each represent, and have as

5    members, federal employees who have been or will be laid off as a result of the ARRPs created

6    pursuant to the President's Executive Order No. 14210.  Those federal employees will lose their

7    income, their health benefits, and other incidents of employment, causing severe irreparable harm to

8    them, their families, and their communities.

9        287.    Plaintiffs AFGE, AFGE locals, AFSCME, and SEIU each represent, and have as

10   members, federal employees who, if they keep their job, will be subject to a reorganization resulting

11   from the large-scale RIFs that makes doing their job more difficult as result of the ARRPs created

12   pursuant to the President's Executive Order 14210.  Each federal employee who remains will be

13   required to do more to meet the agency's statutory mission and obligations, without the support of

14   colleagues who, until the implementation of the President's orders, the agency believed were needed

15   to perform the work of the agency.

16       288.    Each union Plaintiff has the core function of representing employees, including those

17   in federal bargaining units, in collective bargaining and providing counseling, advice, and

18   representation to employees in the event of adverse employment actions.  Each union Plaintiff has

19   and will be imminently prevented, by the mass terminations ordered by the President and directed by

20   DOGE, OMB, and OPM as part of the purported reorganization of the federal government, from

21   exercising those core functions as employee representatives.

22       289.    Each union Plaintiff has expended substantial time and resources as a result of the

23   President's Executive Order and OMB/OPM's implementing Memorandum, and the federal agencies'

24   implementing ARRPs, addressing member concerns and attempting to provide employees with

25   effective representation.  Each Plaintiff has been forced to divert resources that would be devoted to

26   representing employees who have or will experience adverse employment actions.

27

28
       AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                           74

290.     Each union Plaintiff has been harmed in multiple other ways by the actual and imminent termination of its members, including by the loss of dues income and bargaining power. For example, Plaintiffs AFSCME, SEIU, SEIU Local 521, SEIU Local 1000, and SEIU Local 1021 have each been harmed because the well-being, job security, and working conditions of their members who work for state, local government, and private employers are significantly and adversely impacted by the reduction in federal government services occasioned by the President's Executive Order, the OMB/OPM implementing Memorandum and the resulting ARRPs.

291.     Each non-profit organization Plaintiff and its members have suffered or will imminently suffer actual and ongoing harm as a result of the implementation of Executive Order 14210, the OMB/OPM Memorandum and the resulting ARRPs, as the direct result of delays and reduction in services provided by the federal agencies on which they rely.

292.     The Plaintiff non-profit organizations are being adversely impacted by these large-scale, agency-wide reorganizations and RIFs across the country and the harms caused by the reductions in staff are and will not be limited to a defined and particular geographic area.

293.     Each local government Plaintiff has suffered or will imminently suffer actual and ongoing harm as a result of the implementation of Executive Order 14210, the OMB/OPM Memorandum and the resulting ARRPs, as the direct result of delays and reduction in services provided by the federal agencies on which they rely.

294.     The Plaintiff local governments are being adversely impacted by these large-scale, agency-wide reorganizations and RIFs that have and will result in reductions in staff and services both within and without their borders, and often involve staff performing work in locations across the country not within the geographic borders of the local government.

295.     Plaintiffs describe some of those harms to the Plaintiffs, by Federal Agency Defendant, as follows.  Plaintiffs would also face severe and irreparable injury to the extent that other Federal Agency Defendants that have not publicly announced their plans, or taken action that has been made public, move forward with reorganization and reductions-in-force, including at the Department of Defense, Department of Homeland Security, and Department of Transportation.

Add. 113

- **USDA**

296.    Implementing the Executive Order and USDA ARRP to imminently terminate many thousands of USDA staff, to return staffing to 2019 levels, will irreparably and immediately harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiff AFSCME and Plaintiff AFGE.  It will also irreparably and immediately harm the non-federal employee members of Plaintiffs AFSCME and SEIU who work in food service in K-12 schools that rely on USDA's school food programs for funding and for dietary guidelines or provide family childcare services that rely on USDA's childcare food program reimbursements.

297.    These actions will also have a direct and severely detrimental impact on Plaintiff NOFA, its members, and the farmers and other communities the USDA serves.  For example, NOFA's members rely financially on the services provided by the Farm Services Agency (FSA) and the Natural Resources Conservation Service (NRCS), including FSA loans to purchase and improve farms, farm equipment, and anything necessary to run the farms, and rely on their local FSA and NRCS officers to understand their specific farm's physical characteristics and business plans and to conduct in-person business because many lack reliable internet access or proficiency.

298.    These actions will also have a severely detrimental impact on the American Geophysical Union as well as its members, who rely on the USDA's funding, collaboration with its scientists, and use of its research, which is vital to, among other things, supporting the health of forests and rangelands in the face of climate change and other ecological stressors.  Western Watersheds Project will also face injury from the impairment of the Department's ability to control livestock grazing on Forest Service lands, causing damage to riparian habitats and spawning streams that are critical to the survival of certain species, including on WWP-owned land.

299.    In addition, the implementation of the Executive Order and USDA ARRP will cause a direct, immediate and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to Plaintiffs King County, Harris County, County of Santa Clara, and the City and County of San Francisco.

Add. 114

300.    For example, Plaintiffs King County and Harris County own and/or operate some of the busiest airports and ports of entry in the nation.  The Department of Agriculture provides personnel at these major transportation centers to manage prey animals that attract predatory birds that create hazards to air traffic through risk of bird strikes to aircraft.  The Department also helps Plaintiff Harris County protect the food supply at food manufacturing facilities processing meat and dairy products.  Absent these critical food safety staff provided by the agency, Plaintiff Harris County lacks the staff capacity, expertise, training, and authority to replace these critical food safety roles and would struggle to prevent outbreaks of food borne illnesses and pathogens such as avian flu that necessitate the destruction of food supply.

301.    Similarly, Plaintiff Santa Clara relies on the USDA Wildlife Services program to depredate predators and other animals, including, for example, mountain lions, bears, and pigs, and then tests them to determine if they have any infectious diseases or pose any other risks.  In a recent example, USDA Wildlife Services staff depredated several feral swine in Santa Clara, and upon testing them learned—and alerted Santa Clara staff—that those specific swine carried diseases threatening residents, pets, agricultural producers, and the human food supply.  Reductions to the USDA Wildlife Services program within and outside Santa Clara, will cause an information gap that will  heighten the risks to Santa Clara, its agriculture industry, and its residents, and that Santa Clara (and no other local government) could make up for.

302.    Local jurisdictions also rely on USDA to prepare for, respond to, and recover from natural disasters and other emergencies.  For instance, in the aftermath of a major wildfire in Summer 2020, Santa Clara's Office of Emergency Management coordinated with USDA to facilitate USDA employees coming to the affected area.  The USDA set up and staffed a field station to help ranchers who lost grazing lands apply for low-interest loans, obtain machinery and tools, and even repair damaged equipment.  Reducing and relocating staff will necessarily adversely impact Santa Clara's ability to support its residents, including those who live in remote areas that are more difficult to serve, in the aftermath of wildfires and other natural disasters, particularly those that affect the substantial amount of agricultural production in the area.  The results could include a weakened

Add. 115

1    economy, potential loss or relocation of agricultural businesses, diminished community resilience

2    after disasters, and additional costs to Santa Clara itself (in the form of staff time and funds) to

3    support recovery.

4    303.    Diminishment of the U.S. Forest Service staffing would force local and state

5    firefighting agencies to carry more of the burden of responding to wildfires and go without the

6    assistance on which they often rely. The U.S. Forest Service performs essential work to manage

7    federal wildland, to mitigate the risks of wildfire, and to fight wildfires when they occur.  It is a

8    critical component of the system of mutual aid used by firefighters across the United States.  Santa

9    Clara has experienced several very large wildfires in recent years, including several that were, at the

10   time, the largest in California history.

11   304.    Reduction of the USDA's already understaffed Food Safety Inspection Service, which

12   is responsible for ensuring that the nation's meat supply is free from disease and contamination, will

13   directly impact local governments by increase the risks of suffer foodborne illness and disease, which

14   will burden local governments' health and hospital systems and public health departments, including

15   those operated by Plaintiff Santa Clara.  Reductions to the USDA's Animal and Plant Health

16   Inspection Service will hamper local governments' efforts to monitor and respond to agricultural

17   pests (such as the Mediterranean fruit fly, which was detected in the Bay Area in August 2024, after

18   which Santa Clara worked with USDA officials to establish a quarantine area to prevent its spread)

19   and could hamper or altogether eliminate Santa Clara's practical ability and legal authority to issue

20   certifications necessary to export agricultural goods or collect fees for the inspection and issuance of

21   those certifications.  Similarly, Santa Clara's Division of Agriculture also relies on USDA's

22   Smuggling Interdiction and Trade Compliance Program and reductions there would hamper local

23   government's ability to detect and respond to  invasive pests arriving from overseas (such as the

24   invasive pests that Santa Clara staff biologists found living in camellias illicitly imported from China,

25   and then coordinated immediately with USDA staff to establish a federal quarantine).  Agriculture

26   Departments across California coordinate with USDA in the same way.

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                          78

1          • **AmeriCorps**

2          305.    The implementation of the Executive Order and ARRP to virtually eliminate

3   AmeriCorps programs has harmed and will irreparably and immediately harm the employees and

4   members who are terminated, those who remain, and their labor representatives including Plaintiff

5   AFSCME.

6          306.    These actions will also have a detrimental impact on organizations that rely on

7   AmeriCorps programs.  For example, Plaintiff the American Public Health Association has a program

8   working with the CDC on the education and training of Public Health AmeriCorps members, and its

9   decimation will cause harm to the ability of APHA to build capacity to improve community health.

10         307.    In addition, the implementation of the Executive Order and AmeriCorps ARRP will

11  cause a direct and seriously detrimental injury to local governments that interact directly with this

12  agency and rely on its services every day, specifically including but not limited to AmeriCorps'  work

13  in schools; AmeriCorps' Disaster Response Team, which is often involved in disaster recovery work

14  for months and years after disasters such as the recent California wildfires; and King County's work

15  with AmeriCorps to expand capacity to deliver public health services, which will face increased costs

16  and reduced program reach if King County's partnerships with AmeriCorps are lost or diminished.

17         • **Department of Commerce**

18         308.    The implementation of the Executive Order and ARRP to imminently reduce of staff in

19  the Department of Commerce, including its announced plan to eliminate thousands of positions at

20  NOAA and closure of the Minority Business Development Agency, will have direct and severely

21  detrimental impacts on federal employees who are terminated, employees who remain, and their labor

22  representatives including Plaintiff AFGE.

23         309.    Terminations of staff at NOAA, which media reports indicate could eliminate 20

24  percent or more of the agency's 13,000 employees, will prevent NOAA from effectively carrying out

25  its critical work, ranging from research supporting the health of the ocean and aquatic species

26  conducted by the National Marine Fisheries Service to the foundational research conducted and data

27

28  
    AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                      79

1    collected by the Office of Oceanic and Atmospheric Research to understand hurricanes, weather

2    forecasts, extreme storms, and natural disasters.

3         310.    These actions will have a severely detrimental impact on Plaintiff AGU and its

4    members, who collaborate with NOAA scientists and rely on funding from NOAA as well as on

5    NOAA's funding, science, and research to provide AGU members with the foundational research and

6    data to understand hurricanes, weather forecasts, extreme storms, climate change, the oceans, and

7    natural disasters, among many other services. For example, AGU members will be harmed by the

8    loss of NOAA's provision of essential data services that they use to model coastal hazards and

9    research that tailors climate adaptation guidance to community organizations. These actions will also

10    cause injury to the Plaintiff Western Watersheds Project, which relies on NOAA's climate data, data

11    collected by NOAA's National Weather Service, and conservation services by NOAA's National

12    Marine Fisheries Service, and Plaintiff NRDC, which relies on research from NOAA and the Census

13    Bureau, as well as NRDC members, who rely on NOAA support and services.

14         311.    In addition, the implementation of the Executive Order and Commerce ARRP will

15    cause a direct and seriously detrimental injury to local governments that interact directly with this

16    agency and rely on its services every day, specifically including but not limited to all Plaintiff local

17    governments.

18         312.    All local government Plaintiffs rely on data, staff, services, and expertise provided by

19    NOAA, including data they need to inform emergency preparations, planning, and response. For

20    example, Plaintiffs Chicago, King County, Santa Clara, and San Francisco specifically rely on

21    forecasts, modeling, and real-time information for major public event safety planning and weather-

22    related operations at a granular level of detail with real-time updates, and Plaintiffs Harris County,

23    King County, Santa Clara County, and others use this same information for major weather events.

24    Plaintiff Chicago also relies on NWS personnel during large-scale outdoor City events, who are often

25    present on site to assist in real-time assessment and response to weather data as it comes in. And

26    King County relies on interagency County and National Weather Service teams to coordinate and

27    conduct outreach to communities and provide education before major weather events like the

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI          80

1    November 2024 "bomb cyclone" windstorm that resulted in several fatalities.  Plaintiff local

2    governments would lose valuable information and services that are essential to human safety and

3    resilience.

4         313.    King County also relies on NOAA Fisheries to assist in the development and

5    implementation of Puget Sound Salmon Recovery Plans that are critical to the recovery, management,

6    and protection of several species of salmon within King County—an essential component of the

7    region's economic, recreational, and cultural life.  Also, NOAA Fisheries' consultation and review of

8    capital projects for Endangered Species Act and Essential Fish Habitat compliance is a critical step in

9    permitting projects.  Delays would escalate construction costs, and elimination of review would

10   undermine progress toward salmon recovery and other marine life management and protection goals.

11   • **Department of Energy**

12        314.    The implementation of the Executive Order and ARRP to impose imminent reductions

13   of up to 50% of the staff at the Department of Energy will irreparably and immediately harm the

14   federal employees who are terminated, those who remain, and their labor representatives including

15   Plaintiff AFGE.

16        315.    These reductions, which are proposed to cut half of the science and innovation

17   programs, will also have a direct and substantially detrimental impact on the members of Plaintiff

18   American Geophysical Union who rely on research by and funding from the Department and

19   regularly collaborate with its scientists, and will directly impair the AGU's financial resources and

20   mission.  They will also harm Plaintiff NRDC, which relies on publications and databases updated

21   and maintained by the Federal Energy Regulatory Commission, National Renewable Energy

22   Laboratory, and Energy Information Administration.  By eliminating weatherization programs, they

23   will harm Plaintiff AFSCME, which has non-federal-employee members who perform weatherization

24   work funded, overseen, and assisted by the Department, which will be interrupted and injured.  And

25   they will cause substantial harm to members of the public, who depend on the Department to keep

26   them safe including by maintaining the nation's nuclear stockpile and operating environmental

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                          81

**Add. 119**

1    management programs that, among other things, clean up radioactive waste and prevent the material

2    from contaminating the soil and groundwater.

3        316.    In addition, the implementation of the Executive Order and Energy ARRP will cause a

4    direct and seriously detrimental injury to local governments that interact directly with this agency and

5    rely on its services every day.

6        317.    Crises stemming from understaffing of the programs of the Department of Energy will

7    enormously burden city and county governments, which will be left to handle environmental

8    disasters, specifically including but not limited to Plaintiffs City and County of San Francisco and the

9    City of Baltimore.

10       318.    For example, the Executive Order and AARP have already caused, and will continue

11   to cause, disruptions and harms to vital funding sources and supports.  For example, Plaintiff San

12   Francisco has received federal financial support from the Department of Energy to develop green

13   building standards, deploy EV charging infrastructure, and continue to transition city vehicles to Zero

14   Emission Vehicles.  Three 2024 Department of Energy grants awarded to San Francisco for these

15   purposes are in stasis awaiting information from San Francisco's last known federal program officers

16   on these grants—several of whom are no longer employed at the Department of Energy.  Similarly,

17   King County expects these actions to delay implementation of critical work funded by grants from

18   the Department of Energy.  As one example, Plaintiff King County is currently implementing a block

19   grant under the DOE's Energy Efficiency and Conservation Block Grant Program.  This grant will

20   allow King County to continue its efforts to reduce fossil fuel emissions and energy use, and improve

21   energy efficiency in various sectors.  On April 24, 2025, Plaintiff King County was advised that the

22   technical project officer for that particular grant was leaving the agency, and that it may reach out to

23   various email addresses unattached to specific people for issues and questions, and that a new

24   technical project officer has not yet been assigned to the grant.  King County expects that the

25   reductions at the Department of Energy have reduced or eliminated its ability to work on this grant.

26   Likewise, Plaintiff City of Baltimore also relies on the Department's data, models, training, and

27   support and funding for climate goals that affect it as a coastal city.

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    82

- **Environmental Protection Agency**

319.    The implementation of the Executive Order and ARRP to impose imminent substantial cuts at EPA—including the initial terminations of nearly 300 employees at environmental justice offices, planned elimination of the Office of Research and Development and layoffs of more than 1,000 employees working there, and targets to cut up to 65 percent of the budget, including employees—will directly and significantly harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiffs AFGE and SEIU.

320.    The actions will also have a direct and severely detrimental impact on Plaintiff American Geophysical Union and its members, who collaborate with and rely on the EPA's research and funding, as well as the public.  They will stop the EPA's research, tracking, and responses to health hazards in the air, water, and land.  And they will harm non-profits that rely on data, analysis, and funding from the EPA for their work, including Plaintiffs American Geophysical Union and the NRDC.  In particular, the cuts to the EPA include large-scale staffing reductions at the EPA Office of Research and Development, which produces critical research on PFAS and lead contamination on which NRDC relies, as well as at the EPA Office of Environmental Justice and External Civil Rights, which ran EJScreen, an environmental justice screening and mapping tool on which NRDC relies.

321.    In addition, the implementation of the Executive Order and ARRP will cause a direct and seriously detrimental injury to local governments, specifically including but not limited to Plaintiffs the City of Baltimore, City of Chicago, County of Santa Clara, City and County of San Francisco, and King County.

322.    For example, Plaintiffs including King County and Chicago rely on the EPA in dealing with hazardous materials including Superfund sites, where EPA staffing and support is necessary to protect public health through remediation and technical assistance.  Similarly, local government plaintiffs including Santa Clara rely on the EPA for tracking, tracing, and managing hazardous materials while in transit to, from, or through their jurisdictions, for which they rely on the e-Manifest system and protocols developed and managed by EPA.   Plaintiffs Santa Clara and Chicago also rely on the EPA in the aftermath of disasters, including clearing hazardous waste and determining whether

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                                 83

1   and when it is safe for residents to return to disaster-affected areas.  If the EPA's ARRP diminishes

2   EPA's capacity to deploy staff on-site after fires and other natural disasters, that will make it more

3   difficult and more protracted for Plaintiff Santa Clara to fulfill its role of protecting its residents and

4   the environment from hazardous material leaks and exposures and to facilitate recovery from natural

5   disasters.

6          323.    Localities like Plaintiff King County rely on EPA staff expertise, collaboration, and

7   data sharing to support effective climate and environmental assessments and program

8   implementation.  Diminished access to EPA staff could hinder accurate greenhouse gas inventories

9   and mitigation planning and limit Plaintiff King County's ability to target mitigation efforts in areas

10  with high pollution burdens and vulnerable populations.

11         324.    Localities, including Plaintiffs King County and San Francisco, also rely on EPA staff

12  for funding and resources to support local environmental justice work. Without EPA staff to manage

13  and process grants, support mapping tools and other resources, and provide technical assistance,

14  localities like Plaintiffs will be seriously harmed.  Plaintiff San Francisco's Environment Department

15  will also be impaired in fulfilling its mission to promote environmental justice, and these cuts will

16  detrimentally impact communities in San Francisco that are already harder hit by environmental

17  issues.

18         325.    In addition, the implementation of the Executive Order and ARRP will cause serious

19  injury to local governments with respect to their agricultural work.  EPA's ongoing work is a linchpin

20  for the agricultural industry across the country, including, for example, in Santa Clara.  Plaintiff Santa

21  Clara's Division of Agriculture regulates and monitors the use of pesticides in this industry, including

22  by issuing use permits and receiving and reviewing reports from producers of when the pesticides are

23  used.  But EPA, not local governments, primarily manages and implements the Federal Insecticide,

24  Fungicide, and Rodenticide Act, which governs the registration, labeling, distribution, sale, and use of

25  pesticides in the United States, by determining whether a given manufacturer's product can be

26  registered as a pesticide, which in turn requires EPA to determine its safety for use in the food supply.

27  The EPA's involvement is essential not only for registering new pesticides, but also when Plaintiff

28

1   Santa Clara detects new invasive species or pests that require urgent response but for which there is

2   not yet a registered pesticide.  In those instances, the EPA must issue approvals for "off-label" use of

3   registered pesticides.  Execution of EPA's ARRP could diminish if not altogether destroy EPA's

4   ability to register new pesticides and its ability to act promptly to permit famers to protect their crops

5   from new and emerging threats.  The risk is especially acute for Plaintiff Santa Clara: because the

6   Bay Area is a site of significant international travel, there is an especially heightened chance that

7   harmful pests will be detected first in or near Santa Clara.

8          326.    EPA's reorganization could also diminish or altogether block EPA's capacity to deploy

9   the on-scene coordinators who assist local governments including Plaintiff Santa Clara during

10  emergency response to releases of hazardous materials and other harmful chemicals.  Plaintiff Santa

11  Clara relies heavily and directly on EPA staff to provide interpretation, guidance, and training for

12  EPA's Spill Prevention, Control, and Countermeasure regulations.  Likewise, Plaintiff Santa Clara's

13  Department of Environmental Health also relies on modeling software that EPA develops, maintains,

14  and updates in order to assess potential offsite consequences of catastrophic releases of hazardous

15  substances.  If EPA does not maintain or continue to update this software, it would substantially

16  diminish the ability of Plaintiff Santa Clara—and, on information and belief, other local and state

17  agencies—to respond to these releases in ways that effectively protect residents.

18     • **General Services Administration**

19         327.    The implementation of the Executive Order and ARRP to impose imminent drastic

20  cuts to GSA staff—including a 63 percent reduction in Public Buildings Service staff, which will

21  eliminate more than 3,500 positions—will have direct and severely detrimental impacts on the federal

22  employees who are terminated, employees who remain, their labor representatives including Plaintiff

23  AFGE, and the public.

24         328.    Federal employees who work at and members of the public who visit federal office

25  buildings, courthouses, and other federal facilities rely on Public Buildings Service staff to ensure

26  their health and safety in the facilities by overseeing the testing of water in the buildings for the

27  presence of bacteria, lead, and copper; maintaining fire prevention systems; managing indoor air

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                         85

1    quality, including during wildfires; and containing the spread of infectious diseases in the buildings.

2    The severe reduction in Public Buildings Service staff will threaten the health and safety of AFGE

3    members, as well as other federal employees and visitors, at federal buildings and facilities

4    throughout the country.  Cuts to other parts of GSA will similarly undermine the agency's ability to

5    provide real estate, facilities management, procurement, technology, and other services to the federal

6    government and the public.

7        329.    SEIU has hundreds of members who are employed by federal contractors to provide

8    cleaning services at GSA locations, who are at risk of losing their jobs due to the reduction in GSA

9    staff.

10    • **Department of Health and Human Services**

11        330.    The implementation of the Executive Order and ARRP has already included RIFs

12    carried out at HHS in late March 2025 that eliminated roughly 10,000 positions across the agency,

13    including 3,500 at the Food and Drug Administration (FDA), 2,400 at the Centers for Disease Control

14    and Prevention (one-fifth of all CDC employees), 1,200 at the National Institutes of Health (NIH),

15    and 300 at the Centers for Medicare & Medicaid Services (CMS).  Many offices and programs were

16    eliminated entirely or lost the vast majority of their employees, including the National Center for

17    Injury Prevention and Control, National Institute for Occupational Safety and Health, Office of

18    Health Equity, National Center on Birth Defects and Developmental Disabilities, certain programs

19    within the National Center for Environmental Health, and various CDC laboratories.  Five large HHS

20    offices were shuttered: in New York City, Boston, Chicago, Seattle, and San Francisco.

21        331.    These layoffs have caused immediate and severe harm to the federal employees who

22    were terminated, as well as those who remain, and to their labor representatives including Plaintiffs

23    AFGE.  They are also directly harming Plaintiffs AFSCME and SEIU, and their non-federal

24    employee members, some of whom are employed by Head Start programs that rely on HHS-

25    administered funding, training, technical support, and investigation and enforcement of rules; some of

26    whom are family childcare providers who depend upon HHS's Office of Child Care for the timely

27    receipt of grant funds, regulatory compliance guidance, and oversight; and many of whom work in

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                              86

1    state administration of Medicaid and in public health positions who have been and will continue to be

2    injured by cuts to CMS and the CDC.  SEIU also has members who are employed by federal

3    contractors to provide cleaning services at HHS locations, who are at risk of losing their jobs due to

4    the reduction in HHS staff.

5         332.    The actions will also have a direct and severely detrimental impact on Plaintiff

6    American Public Health Association and its members.  Many APHA members are public health

7    officials who work in state and local health departments who have lost access to critical services.  For

8    example, the CDC terminated employees who had been working on the ground responding to the

9    worsening measles outbreak in Texas that has already claimed the lives of two children and lead

10   experts who had been ready to provide essential on-the-ground support to Milwaukee public schools

11   that were closed due to the discovery of widespread presence of lead.  State and local public health

12   officials and offices that relied on data, expertise, and support from HHS will have to expend

13   significant resources in response to these sweeping terminations and reorganization and run the risk

14   of new or worsening public health crises.  The actions will also harm Plaintiff American Geophysical

15   Union and its members, who regularly collaborate with CDC and NIH researchers, as well as Plaintiff

16   NRDC, all of whom rely on CDC and NIH research including on lead contamination.

17        333.    The virtual elimination of NIOSH, which has seen 93% of the staff given RIF notices,

18   will harm non-federal employee members of Plaintiffs SEIU and AFSCME because it will halt

19   NIOSH's research, investigations, and guidance to prevent, mitigate, and address occupational

20   injuries and illnesses across all types of workplaces, including coal mines, fire departments, oil and

21   gas wells, healthcare facilities, and small businesses (including Plaintiff Main Street Alliance

22   members) and thereby increase health and safety risks to workers across the country.  In particular,

23   cuts to a longstanding program offering coal miners free screenings for black lung, and an

24   opportunity for miners at risk of advancing their black lung to transfer to less dangerous positions,

25   has been eliminated.  Firefighter safety programs, which address exposure to toxins and chemicals

26   and cancer risk, have also been shuttered or virtually eliminated.

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                87

**Add. 125**

334.    NIOSH is also essential to a wide range of activities undertaken by the local government plaintiffs, so its demise is already harming, and will continue to harm, those plaintiffs. For instance, Plaintiff Santa Clara relies on NIOSH's review, testing, evaluation, and/or certification of stafety equipment, including Personal Protective Equipment (PPE) such as N95 respirators, protective gowns, and equipment designed to protect against hearing loss, across its operations.  If NIOSH remains shuttered, Santa Clara expects it will be forced to make impossible choices, such as choosing between cancelling medical procedures that are clinically indicated for patients, or procuring and using PPE that NIOSH has not reviewed or certified, and which may therefore fail to comply with applicable regulations and inadequately protect workers and patients from harm.  And if the decimation of NIOSH is not forestalled, Plaintiff Santa Clara and its residents—and likely governments and residents across the country—will be left exposed to new and emerging hazards for which there is not yet any NIOSH guidance or NIOSH-reviewed PPE.  That risk is especially pronounced for Plaintiff Santa Clara for numerous reasons, including because it operates a large health and hospital system, is a hub for international travel, is the home of numerous sites considered to be targets for potential bioterrorist attacks, and has a location that leaves it susceptible to new and emerging infections as well as respiratory and other atmospheric risks caused by wildfires and exacerbated by climate change.

335.    In addition, the implementation of the Executive Order and HHS ARRP will cause a direct and seriously detrimental injury to local governments that interact directly with the CDC and rely on its services every day, specifically including but not limited to all local government Plaintiffs.

336.    For example, Plaintiff San Francisco operates an extensive public health system that relies on CDC services in numerous ways.  The CDC supports San Francisco's public health efforts, including through trainings, guidance, public health pipeline programs, transportation services for rare but particularly infectious patients who cannot be treated at San Francisco's public hospital, reference lab services, and surveillance support that is crucial for identifying and tracking the spread of infections and diseases, including resistant strains.  Absent adequate CDC support, Plaintiff San Francisco will have to divert and expend resources.

337.    The RIFs and reorganization at HHS are limiting or eliminating national data collection projects, and limiting access to staff with related subject-matter expertise, which will negatively affect the ability of local governments to respond to public health emergencies.  For example, Plaintiff Chicago's Department of Public Health relies upon CDC data and guidance to effectively surveil the spread of sexually transmitted diseases, control the spread of infectious diseases like measles and Mpox, and efficiently allocate resources to address chronic diseases like diabetes and opioid addiction.

338.    Local governments, including Plaintiff Santa Clara, also rely heavily on the CDC's Laboratory Response Network, as well as several CDC laboratories that are the only ones authorized or capable of testing for certain infectious diseases, including some sexually transmitted diseases. Delays or disruptions in CDC's ability to test specimens or report results to Plaintiff Santa Clara's Public Health Department will produce information gaps and delays that result in unnecessary spread of infectious diseases as well as inadequate directions or recommendations to affected patients. Indeed, Plaintiff Santa Clara's Public Health Department has protocols that often require its staff to contact and share specimens with the CDC very quickly and to monitor results that the CDC shares not only for its own specimens, but for tests of specimens from other parts of the country.  When the CDC operates the only laboratory that can conduct the testing, HHS's reorganization could mean the difference between life and death, between effective and ineffective treatment, between spread or containment of infectious disease, and whether residents suffer.

339.    Reductions to the CDC's extensive work developing information about emerging infectious-disease threats in other parts of the world, will directly impact Santa Clara and other local governments where there is frequent travel between Santa Clara and those areas.  When the CDC develops and shares information about outbreaks of Ebola, novel influenza, mpox, and other diseases—including not only COVID-19, but more recently Marburg virus disease (formerly known as Marburg haemorrhagic fever) and tuberculosis—localities including Plaintiff Santa Clara can be better prepared to handle potential cases that may emerge locally.  The CDC played a critical role in assisting Santa Clara in its response to these threats, including by sending experts with specific

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                                 89

1    expertise in medicine, epidemiology, infection control, community mitigation, and communications

2    to Santa Clara to coordinate with Santa Clara's Emergency Operations Center, and to develop a

3    community mitigation plan.

4    340.    When there is a terrorist attack, disease outbreak, earthquake, or other emergency, and

5    local government health systems (including both public health departments and hospitals) require use

6    of medicines, including those that are not quickly or commercially available or in quantities that

7    would exhaust local supplies, those departments can access medicine from the Strategic National

8    Stockpile, which is administered and staffed by HHS's Administration for Strategic Preparedness and

9    Response (ASPR).  The time-sensitive availability of the Strategic National Stockpile is critical.  If

10    HHS's ARRP closes or reduces the capacity of ASPR to operate the Strategic National Stockpile,

11    CDC to operate the Drug Service, or FDA to operate the expanded access program, it would reduce if

12    not altogether block the ability of Plaintiff Santa Clara's Public Health Department and Health

13    System—and other local and state hospitals, clinics, and public health departments—to access these

14    vital, life-preserving resources in times of emergency.

15    341.    Additionally, NIOSH provides local governments with essential investigative support

16    in fire safety, particularly in the aftermath of industrial incidents.  Plaintiff Harris County contains

17    extensive petrochemical infrastructure, and has relied on NIOSH to identify causation in fires where

18    initial assessments were inconclusive.  Loss of NIOSH personnel and institutional knowledge will

19    compromise this function, leaving Plaintiff Harris County ill-equipped to respond to industrial

20    hazards and fire risks.

21    • **Department of Housing and Urban Development**

22    342.    The implementation of the Executive Order and ARRP to impose an imminent RIF of

23    up to 50 percent reduction in HUD staff, which will eliminate certain offices and more than 4,000

24    positions, will directly and significantly harm the federal employees who are terminated, those who

25    remain, their labor representatives including Plaintiff AFGE, and members of the public who depend

26    on HUD's services.  It will prevent individuals and communities across the country from being able

27    to access funding and support for disaster relief, community development, rental assistance,

28    AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    90

1    homeownership, homelessness, and housing discrimination complaints, and exacerbate the housing

2    crisis and housing-related issues throughout the country.

3        343.    These actions will also cause irreparable injury to Plaintiff AFSCME and SEIU, and

4    their non-federal employee members, who work at housing authorities across the country—including

5    in California—that depend on the regular and timely distribution of HUD funding and who will be

6    harmed by the closure of local HUD offices.  SEIU also represents hundreds of members employed

7    by service contractors who provide cleaning, security, and other services at housing authorities in

8    numerous states, and risk losing their jobs due to the significant reduction in HUD staff and closure

9    of offices.  SEIU Local 1000 members work at a California state agency that administers affordable

10   housing programs funded exclusively by HUD, and the cuts to HUD staff and dozens of office

11   closures will imperil the agency's critical functions and services, impede oversight and enforcement,

12   diminish critical technical assistance and support, and threaten affordable housing programs and

13   projects, harming SEIU Local 1000's members and the members of the public whom they serve.

14       344.    These actions will cause a direct and seriously detrimental injury to local governments

15   that interact directly with this agency and rely on its services every day, specifically including but not

16   limited to Plaintiffs City of Baltimore, County of Santa Clara and King County.

17       345.    For example, delays in receiving technical assistance and guidance from HUD staff on

18   topics critical to the governance of the Community Development Block Grant, HOME programs, and

19   Section 108 Loan Programs will impact localities like Plaintiff Baltimore.  These programs rely on

20   HUD staff to, *inter alia*, review and provide approvals necessary for processing the flow of funds

21   under these programs; reduced staff will hamper the ability of localities like Plaintiff Baltimore to use

22   these funds and to refinance loans through the 108 Loan program, causing financial and economic

23   harms.

24       346.    In addition, HUD's reorganization will cause delays in processing invoices and

25   payment to local governments and nonprofits in connection with nationwide housing assistance and

26   grant programs.  HUD's inability to timely process invoices and payments to grantees, provide

27   technical assistance, or manage future grant cycles will not only hamper the ability of local

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                      91

1   governments to assist beneficiaries through housing support offices such as Plaintiff Santa Clara's

2   Office of Supportive Housing, but will also cause more residents to experience homelessness due to

3   lack of availability of shelters and services.

4       • **Department of Interior**

5        347.    The implementation of the Executive Order and ARRP to impose imminent mass

6   layoffs at the Department of the Interior will have an immediate and detrimental impact on the federal

7   employees who are terminated, those who remain, and their labor representatives including Plaintiffs

8   AFGE and SEIU.

9        348.    These actions will also inflict irreparable injury upon Plaintiff American Geophysical

10  Union and its members, who regularly collaborate with and depend on the agency—in particular, on

11  the U.S. Geological Survey (USGS), Bureau of Land Management, and Fish and Wildlife—for

12  funding and research.  The targeting of USGS will compromise vital public services, including

13  providing reliable science to resource managers, emergency response, other scientists who rely on it,

14  and the public.  For example, the planned reductions of 20 percent will eliminate regional centers that

15  partner with local natural resource managers and communities to help them deal with mounting

16  challenges of climate change, from wildfires to sea level rise.

17       349.    The reductions in staffing will also harm Plaintiff NRDC, which relies on publications

18  and databases updated and maintained by the Fish and Wildlife Service, U.S. Geological Survey, and

19  the Bureau of Land Management; and Plaintiff Coalition to Protect America's National Parks and its

20  members, because inadequate staffing will endanger animal and plant species and compromise park

21  functioning and operations, harming the recreational activities of members in national parks.  It will

22  harm Plaintiff Western Watersheds Project, by impeding timely access to public records necessary to

23  accomplish its conservation mission, adversely affecting the Bureau of Land Management's

24  prevention of ecologically destructive grazing on federal public lands, hindering WWP's ability to

25  research and obtain information related to conservation efforts, impacting the U.S. Fish and Wildlife

26  Service's ability to categorize and protect endangered species such as the Wyoming toad and Arctic

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI           92

**Add. 130**

1   grayling, and causing other adverse effects that will decimate the National Wildlife Refuge, harm

2   WWP's ability to protect native wildlife, and impede the enjoyment of land by WWP's members.

3          350.    In addition, the implementation of the Executive Order and the Interior ARRP will

4   cause a direct and seriously detrimental injury to local governments, specifically including but not

5   limited to Plaintiffs Santa Clara and King County.  It will harm Plaintiff Santa Clara's emergency-

6   planning efforts and capabilities, which rely on information about earthquake hazards developed by

7   USGS to plan for and respond to earthquakes.  Indeed, Plaintiff Santa Clara is a member of the

8   Association of Bay Area Governments, which partners closely with USGS to provide resources and

9   guidance related to earthquakes.  Similarly, implementation of the Executive Order and the Interior

10  ARRP would significantly slow Plaintiff King County's ability to complete infrastructure,

11  transportation, and environmental projects, increase costs, and reduce the effectiveness of efforts to

12  protect endangered species and historic resources.  It would result in Plaintiff King County

13  experiencing, among other things, increased uncertainty and project delays due to extended

14  consultation and permit review and issuance in ESA and EFH reviews conducted by U.S. Fish and

15  Wildlife Service along with NOAA Fisheries, which oversee species like Chinook Salmon and Bull

16  Trout.  It would also cause delays in compliance with federal laws requiring consultation with the

17  Bureau of Indian Affairs and other DOI agencies on the impacts of federally funded or permitted

18  projects on historic properties, potentially stalling project approvals.

19       • **<u>Department of Labor</u>**

20          351.    The implementation of the Executive Order and ARRP to impose imminent large-scale

21  layoffs at the Department of Labor will have a direct and severely detrimental impact on the federal

22  employees who are terminated, those who remain, and their labor representatives including Plaintiff

23  AFGE.  For example, the Department has eliminated the enforcement division of the Office of

24  Federal Contract Compliance Programs (OFCCP) and plans to cut OFCCP by 90 percent.

25          352.    These actions will also have a direct and severely detrimental impact on Plaintiffs

26  AFSCME and SEIU, whose non-federal employee members depends on many programs and

27  subagencies of the Department including the Occupational Health and Safety Administration

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                    93

("OSHA"), Wage and Hour Division, Bureau of Labor Statistics, and Employee Benefits Security Administration. SEIU also represents members employed by service contractors who provide cleaning services at DOL offices, and risk losing their jobs due to the significant reduction in staff. Plaintiff AFGE and its members will also be harmed by cuts to OSHA which, among many other vital roles, is responsible for ensuring effective occupational safety and health programs within federal agencies, and the Office of Workers' Compensation Programs, which administers Federal Employees' Compensation Act claims.

353. In addition, the implementation of the Executive Order and the Labor ARRP will cause a direct and seriously detrimental injury to local governments.

- **National Labor Relations Board**

354. The implementation of the Executive Order and ARRP to impose a large-scale reduction-in-force at the NLRB will have a direct and severely detrimental impact on the federal employees who are terminated, those that remain, and their labor representatives.

355. In addition, these actions will also have a direct and severely detrimental impact on Plaintiffs AFSCME and SEIU, both of whom represent private-sector members who depend on the NLRB and who regularly file unfair practice charges and representation petitions at the NLRB. Due to flat-line budgeting, case processing time has increased over the past decade from 100 days to 444 days. Decreasing staff will further extend the time it takes for the NLRB to prosecute violations of federal labor law, leaving workers and unions unprotected. Plaintiffs AFSCME and SEIU who regularly file unfair practice charges at the NLRB presently have significant pending petitions for representation and unfair labor practice charges that are not being timely processed due to current low staffing levels. The delay will mean that NLRA violations will effectively go unremedied and workers will be thwarted in having unions certified as their collective bargaining representatives because the NLRB will not be able to conduct timely elections.

1      • **National Science Foundation**

2           356.    The implementation of the Executive Order and ARRP to impose imminent layoffs of

3      up to half of NSF staff will have a direct and severely detrimental impact on the federal employees

4      who are terminated, those who remain, and their labor representatives including Plaintiff AFGE.

5           357.    They will also cause severe harm to science in the United States.  NSF has already

6      abolished eleven of its thirteen advisory panels.  It is a major funder of critical scientific research, and

7      the elimination of staff will cause serious disruptions in funding that created chaos and instability

8      among researchers.  For these reasons, the reduction in NSF staff will have a direct and substantially

9      detrimental impact on the members of Plaintiff the American Geophysical Union, who rely on

10     research by and funding from, and often collaborate with, the NSF.  It will also harm Plaintiff

11     Western Watersheds Project, which regularly uses NSF-funded research for protection and restoration

12     of wildlife and native ecosystems,

13     • **OPM**

14          358.    Planned RIFs at OPM will cause imminent harm to Plaintiff AFGE's members, who

15     will lose their jobs, and to Plaintiff AFGE itself by: impairing its mission, depriving it of membership

16     dues, and forcing it to allocate resources and attention to responding to RIFs instead of other

17     organizational goals.

18     • **Peace Corps**

19          359.    Planned RIFs at the Peace Corps will cause imminent harm to Plaintiff AFSCME's

20     members who will lose their jobs, and to Plaintiff AFSCME itself by: impairing its mission, depriving

21     it of membership dues, and forcing it to allocate resources and attention to responding to RIFs instead

22     of other organizational goals.

23     • **Small Business Administration**

24          360.    The implementation of the Executive Order and ARRP to impose an imminent 43

25     percent reduction in SBA staff, which will eliminate thousands of positions, will cause a direct and

26     severely detrimental impact on the federal employees who are terminated, those who remain, and

27     their labor representatives including Plaintiff AFGE.

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                        95

361.     This reduction will also cause harm to Plaintiffs AFGE, AFSCME, and SEIU members who carry student loan debt, many of whom have benefited from the Public Service Loan Forgiveness program and income-driven repayment options that attach to the federal student loans of those employed in the public sector.  Because the Administration intends to transfer the processing of student loans from the (now eliminated) Department of Education to the SBA, understaffing in the SBA will cause delays in processing loan forgiveness or requests to adjust income-based repayment, causing significant financial harm to AFSCME, SEIU, and AFGE members.

362.     The reductions will also have a severely detrimental impact on the small businesses across the United States, including the members of Plaintiff Main Street Alliance, who rely on SBA services, which include loans, loan guarantees, grants, disaster relief, assistance connecting with government contracting opportunities, a mentoring program, and a national network of Small Business Development Centers that provide counseling and training to help entrepreneurs start their own businesses.

363.     In particular, Main Street Alliance members and other small businesses that have suffered substantial injuries in national disasters rely on the SBA's Emergency Injury Disaster Loan ("EIDL") program.  But without adequate staff, EIDL loan processing will be delayed and loan recipients facing repayment difficulty will be unable to reach EIDL to renegotiate payments, causing them to end up in default and be sent to collection.  Reductions in staffing will also slow the processing of loan guarantees, which will have detrimental effects not only on small business loan recipients but also on contractors and suppliers, and their employees.  Many of these effects have already begun to occur.  The SBA office that funds an important mentoring program has been effectively eliminated.  At least one Small Business Development Center has already closed, with more to come.  As the RIFs continue to unfold, they will have extremely detrimental effects on small businesses throughout the nation including many members of Main Street Alliance.

364.     In addition, the implementation of the Executive Order and SBA ARRP will cause a direct and seriously detrimental injury to local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to Plaintiffs the City and County

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                                              96

Add. 134

1    of San Francisco and King County.  The elimination of positions at the SBA threatens the Plaintiff

2    local governments' ability to support communities that are recovering after major disasters, by

3    slowing critical financial assistance.  They will cause delays in, among other things, damage

4    assessments, establishment of Disaster Loan Outreach Centers, and servicing of disaster loans, which

5    are currently fully managed by SBA employees.  In addition, residents and businesses that depend on

6    timely access to disaster loans will face financial harm.  Without sufficient SBA staff to travel to

7    disaster locations to perform assessments and provide loan application technical assistance, residents

8    in disaster areas will face difficulty obtaining low-interest federal disaster loans, therefore hindering

9    their ability to rebuild and recover from disasters

10       • **Social Security Administration**

11       365.    The implementation of the Executive Order and ARRP to imminently eliminate the

12    jobs of 7,000 of the 57,000 SSA employees—at a time when the SSA was already at a 50-year

13    staffing low just as the peak of the Baby Boomer generation become eligible for SSA retirement

14    benefits—will have a direct and severely detrimental impact on the federal employees who are

15    terminated, those who remain, and their labor representatives including Plaintiff AFGE.

16       366.    These layoffs will also affect Plaintiffs AFSCME, SEIU, and SEIU Local 1000 and

17    their non-federal employee members who work for state agencies that determine eligibility for Old

18    Age, Survivors and Disability Insurance and depend on SSA-administered technology to make their

19    assessments, for local or state determination entities, and/or for medical providers that make those

20    determinations, which also depend on SSA staff.  SEIU Local 1000 members are employed by the

21    California state agencies that rely on the provision of social security numbers when issuing driver's

22    licenses and processing unemployment benefits applications, and will likely face long delays in

23    speaking with SSA staff and resolving problems with social security numbers, which, in turn, will

24    delay the provision of state service, including driver's licenses and unemployment/disability

25    insurance.

26       367.    In addition, these actions will also have a direct and severely detrimental impact on

27    Plaintiff Alliance for Retired Americans and its members, who are already experiencing long wait

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                97

**Add. 135**

1    times for appointments in person and long wait times (already up to 90 minutes) on the 800-number

2    to apply for benefits or to correct benefit problems by phone.  Employees processing benefits

3    applications will no longer have the necessary information technology support, causing problems

4    including website disruptions that prevent ARA members and others from applying for benefits or

5    calculating benefits to make retirement decisions.  And adding the caseload of employees who are

6    terminated to SSA employees' already overwhelming caseload will mean the current problem of

7    almost one-fifth of benefit applications not being timely processed will expand and people who are

8    entitled to receive Social Security benefits, including ARA members, will not timely receive them.

9    These same issues will also affect Plaintiffs AFSCME's and AFGE's significant number of retired

10   members and their families.

11       • **State Department**

12        368.    The implementation of the Executive Order and ARRP imminently to impose

13   sweeping cuts at the State Department—including staff reductions in domestic offices of 15%, on top

14   of the elimination of entire offices—will have a direct and severely detrimental impact on the federal

15   employees who are terminated, those who remain, and their labor representatives including Plaintiff

16   AFGE.  SEIU also represents members employed by service contractors who provide cleaning

17   services at State Department offices, and risk losing their jobs due to the significant reduction in staff.

18        369.    These reductions will also cause immediate, substantial, and irreparable harm to the

19   vital diplomatic work the Department performs.  For example, the planned reorganization eliminates

20   numerous Special Envoys, Representatives, and Coordinators, positions that provide high-level,

21   specialized attention to pressing issues such as climate change, global criminal justice, hostage

22   affairs, nuclear nonproliferation and particularly geopolitically sensitive States like Iran, Sudan, and

23   North Korea.  The scale of the Reorganization Plan announced on April 22 will also make it

24   extremely hard for the employees who remain to keep the work of their offices going without severe

25   disruptions.

26

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                     98

**Add. 136**

- **Department of Transportation**

370.  The implementation of the Executive Order and ARRP to cut many positions at the Department of Transportation will have a negative impact on federal employees who are terminated, those that remain, and their labor representatives including SEIU, AFSCME, and AFGE.

371.  Planned reductions will harm plaintiff AFSCME, whose members work as, among other positions, highway maintenance workers that would be impacted if reduced DOT staff are unable to timely process grant applications.  Plaintiff AFSCME also employs members that work at transit agencies, which rely on the federal government to cover large portions of operations and maintenance costs.  Any disruption in federal grants, caused by staffing levels at DOT, would risk AFSCME members' livelihoods.

372.  Planned reductions will also cause immediate harm to city and county plaintiffs. Reductions will imperil the approval of DOT grants, environmental reviews, and airport certifications for plaintiff King County.  Plaintiff Baltimore will suffer from slower and lower quality responses to transportation disasters, including to its ports and bridges, and grant delays for infrastructure and traffic projects.

- **Department of the Treasury**

373.  The implementation of the Executive Order and ARRP to impose the planned and ongoing 40 percent reduction to the IRS workforce will have a direct and severely detrimental impact on the federal employees who are terminated, those who remain, and their labor representatives.

374.  The IRS plans to reduce its workforce from 102,000 employees to roughly 60,000 to 70,000, with especially high staffing cuts in taxpayer services and compliance, and to close more than 110 offices with taxpayer assistance centers.  These staffing cuts will reduce the IRS's ability to accomplish its core functions and will directly and severely harm Plaintiff the Center for Taxpayer Rights, the members of its LITC Connect program, the clients of its own Low Income Tax Clinic, and taxpayers across the country.  The planned IRS staffing shortfalls will cause simple, quick cases to snowball into labor-intensive, years-long matters for the Center's advocates, requiring more technical assistance from the Center and leaving low-incoming taxpayers unassisted.  The Center's members

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                99

will be required to expend more resources per case and be less able to accomplish their missions. Clients will suffer financially through delayed or denied tax refunds, the inability to reach the IRS to stop automatic assessments, and—for some prospective clients— the inability to be served by overwhelmed LITCs that are forced to impose client caps.

375.    These actions will also have a direct and severely detrimental impact on local governments that interact directly with this agency and rely on its services every day, specifically including but not limited to Plaintiff Santa Clara.  Federal law entitles local governments to reimbursement from the IRS for certain interest payments they make on "Qualified Energy Conservation Bonds."  For example, Plaintiff Santa Clara issued such bonds to provide low-interest financing to promote alternative energy usage, and is therefore entitled to monthly reimbursement payments from the IRS.  Because these reimbursements depend on staff for processing, reorganization will likely cause slowdowns in the issuance of these reimbursement payments.

376.    The Department of Treasury is also responsible for processing federal payments and disbursing them to state and local governments, including money for block grants, formula grants, and direct payments for specified use by those state and local governments.  The predicted across the board staffing cuts at the Department pose a significant threat to a functional Treasury.  With a lower-staffed Treasury Department, these payments could be delayed or stop altogether, severely harming members of AFSCME and SEIU who work in state and local government, and jeopardizing their jobs.

- **Department of Veterans Affairs**

377.    The implementation of the Executive Order and ARRP to imminently roll out the elimination of approximately 80,000 positions at the VA will directly and significantly harm the federal employees who are terminated, those who remain, and their labor representatives including Plaintiffs AFGE, AFSCME, and SEIU.

378.    This massive reorganization will also harm Plaintiffs AFSCME, SEIU, and SEIU Local 1000 and their non-federal employee members, who are employed by facilities that provide

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                100

**Add. 138**

1    care to veterans and are operated by state government but depend on the VA to timely process

2    government funding.

3         379.    These actions will also cause immediate and irreparable injuries to veterans who rely

4    on VA services including members of Plaintiffs Common Defense and VoteVets, and to the

5    organizational mission of those organizations.  For example, cuts to support medical and healthcare

6    support staff, IT support, and clerical and data entry positions make it significantly more difficult for

7    VA health care providers to do their jobs and for veterans to make medical appointments and be

8    connected with services.  The RIFs will exacerbate staffing shortages that already exist at many VA

9    facilities and make it harder for veterans to access health care, including mental health care, and other

10   veterans' services including crisis support.  Cuts to research staff will also disrupt important work that

11   benefits veterans and the public generally.  The reductions will stress understaffed veterans' hospitals

12   and other services to the breaking point.  These same issues will also affect Plaintiff AFGE's

13   significant number of members who are veterans.

14        380.    In addition, the implementation of the Executive Order and VA ARRP will have

15   substantial and deleterious effects on the veterans living in Plaintiff cities and counties and will also

16   impose costs and burdens on the local governments themselves, specifically including but not limited

17   to the County of Santa Clara.

18        381.    For example, the delays, closures, and loss of staff at the VA—both at VA hospitals

19   and in offices that perform centralized functions like call centers and benefits processing—will also

20   prevent or hinder Plaintiff Santa Clara's Office of Veterans Services from doing its primary, core

21   function of connecting veterans to the healthcare and benefits-processing staff at the VA.  Reduction

22   in force at the VA will also impose additional burdens on hospitals, like those operated by Plaintiff

23   Santa Clara, that operate emergency departments because delays and/or elimination of care options

24   for veterans will make them more reliant on services provided by Plaintiff Satna Clara and other local

25   governments such as housing support and behavioral and medical health care.  And reduced VA staff

26   will impact Plaintiff King County's ability to serve veterans experiencing homelessness or housing

27

28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          101

**Add. 139**

instability, weakening a nationally recognized, award-winning program that had been advancing

veteran support services.

### CLAIMS FOR RELIEF

#### Claim I:
#### Separation of Powers/*Ultra Vires*
#### Against Defendant President Donald J. Trump

382.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

383.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official

action that is *ultra vires*.

384.    The Constitution vests the legislative power in Congress.  U.S. Const., art. I.; *I.N.S. v.

Chadha*, 462 U.S. 919, 951 (1983).  Congress exercised that Article I legislative authority to create

the agencies of the federal government.  Congress has not delegated to the President the authority to

employ and discharge the subordinate employees of the agencies or to spend appropriated funds on

those positions; rather, it delegated those functions exclusively to the heads of federal agencies.

385.    From time to time in this nation's history, Congress has delegated to the President the

authority to fast-track legislation proposing the reorganization of federal agencies.  But Congress has

given President Trump no such authority.  While Congress has also delegated certain authorities to

President Trump to enact regulations with respect to the management and conduct of the federal civil

service, none of those delegations authorize the sweeping authority President Trump has claimed for

himself to order agencies to engage in large-scale RIFs, eliminate programs and offices at his

direction, reduce staffing to 2019 or government shutdown levels, and otherwise reorganize the

federal government.

386.    The Constitution vests executive power in the President, U.S. Const., art. II, and

imposes on the President a duty to "take Care that the Laws be faithfully executed," U.S. Const. art.

II, § 3.  The President cannot usurp Congress's legislative authority on his own mandate; any

legislative authority wielded by the President must have been delegated within the confines of the

Constitutional limitations protecting the respective spheres.  The President has no constitutional

power to enact, amend, or repeal parts of duly enacted statutes.  *Clinton v. City of New York*, 524 U.S.

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                                          102

**Add. 140**

1    417, 438–39 (1998).  The President lacks the constitutional or statutory authority to order large-scale

2    terminations of federal employees, to require agencies to eliminate offices and functions, to require

3    agencies to consider their own elimination, to move agency functions as between agencies, or

4    otherwise to engage in large-scale government reorganization.  The President likewise has no

5    constitutional or statutory authority to impose parameters and requirements for such RIFs and

6    reorganizations that require agencies to defy and ignore their authorizing statutes.

7         387.    Executive Order 14210 exceeds the President's lawful authority, at a minimum, by

8    ordering agencies, including but not limited to Federal Agency Defendants, to:

9         a.    Implement large-scale RIFs (irrespective of whether staffing reductions are necessary

10             or even appropriate in light of agency functions, needs, and appropriations);

11        b.    Prioritize in RIFs any functions that "my Administration suspends or closes"

12             (irrespective of statutory requirements or authority delegated to the agencies);

13        c.    Prioritize in RIFs 2019 and/or government emergency shutdown levels of staffing

14             (aka, Funding Lapse Plan Staffing Levels, which have nothing to do with the staffing needed

15             to properly run fully appropriated agencies);

16        d.    Consider their own abolition in whole or part, by addressing whether the agency or

17             any subparts should be eliminated by the President (again, regardless of statutory

18             requirements or authority delegated to the agencies); and

19        e.    Reorganize themselves by picking up and arranging the pieces that are left, following

20             these large-scale reductions.

21        388.    Therefore, the President's Executive Order 14210 ordering agencies to engage in

22   large-scale RIFs and reorganization plans, and impose hiring freezes, limits, and controls, is not

23   authorized by Article II and usurps Congress's Article I authority, and is thus *ultra vires*.

24                                   **Claim II:**
                           **Separation of Powers/*Ultra Vires***
25                    **Against Defendants OMB, OPM, DOGE and their Directors**

26        389.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

27

28

390.    Plaintiffs have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

391.    Congress exercised its Article I legislative authority to create the agencies of the federal government.  *See generally* United States Code, Title 5 (Government Organization and Employees).  To the agency heads, Congress has also expressly delegated the power to manage the functions of the agencies, including the right to employ and discharge subordinate employees of the agencies and to spend appropriated funds on those positions.

392.    In addition to agency-specific authorizing statutes, Congress has also generally authorized the heads of administrative agencies to make employment decisions (5 U.S.C. § 3101), manage the employees of that agency (5 U.S.C. § 301), or delegate to subordinate officers the management decisions, including the hiring and firing of employees (5 U.S.C. § 302).

393.    Neither OMB, OPM nor DOGE have the statutory authority to supplant the decision-making authority of the federal agencies with respect to federal agency employment or organization; to require agencies to take general or specific action with respect to employment or organization; or to impose substantive requirements that effectively demand agencies to disregard statutory and regulatory requirements.

394.    The February 26, 2025 Memorandum from OMB and OPM to agency heads exceeds statutory authority and usurps the authority delegated by Congress to the agencies, not to OMB or OPM, by, at a minimum, requiring agencies, including but not limited to Federal Agency Defendants, to:

  a.    Submit ARRPs for OMB and OPM approval;

  b.    Include in those ARRPs large-scale RIFS (irrespective of whether staffing reductions are necessary or even appropriate in light of agency functions and appropriations);

  c.    Prioritize in those large-scale RIFs any functions that "[the President's] Administration suspends or closes" (irrespective of statutory requirements or authority delegated to the agencies);

d.      Prioritize in those large-scale RIFs 2019 government emergency shutdown levels of staffing (which have nothing to do with the staffing needed to properly run fully appropriated agencies);

e.      Include in their ARRPs consideration of their own abolition in whole or part, by addressing whether the agency or any subparts should be eliminated by the President (again, regardless of statutory requirements or authority delegated to the agencies);

f.      Include in their ARRPs a plan to reorganize themselves by picking up and arranging the pieces that are left, following these large-scale reductions; and

g.      Submit these plans for approval on timeframes that do not permit agencies to actually consider and assess their own needs or the staffing needed to meet their statutory responsibilities.

395.    DOGE has no statutory authority.  DOGE exceeds any authority it may have to implement the President's orders by usurping the authority delegated by Congress to the agencies, not to the President or DOGE.  DOGE has no authority at all to dictate to the agencies created and governed by Congress any level of staffing cut or spending reduction.  DOGE therefore exceeds any authority by ordering agencies, including but not limited to Federal Agency Defendants, to impose cuts to functions and staffing according to "targets" and "goals" imposed by DOGE.

396.    Therefore, the actions and orders of OMB, OPM, and DOGE to implement the President's February 11, 2025 Executive Order, including but not limited to the February 26, 2025 Memorandum to all agencies, as well as any direction, approval, or requirement imposed with respect to any ARRPs that result from that Executive Order, exceed OMB, OPM, and DOGE's authority and are contrary to statute and thus *ultra vires*.

**Claim III:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A) and (C)**
**Against Defendants OMB, OPM, DOGE and their Directors**
**(Action Not in Accordance With Law and Exceeding Statutory Authority)**

397.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

398.    The Plaintiff unions' federal employee members are subject to the requirements of OMB, OPM, and DOGE actions here at issue, and all Plaintiffs (and/or their members) are persons

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                    105

1    who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the

2    actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal

3    Directors, for purposes of 5 U.S.C. § 702.

4         399.    Congress exercised its Article I legislative authority to create the agencies of the

5    federal government.  *See generally* United States Code, Title 5 (Government Organization and

6    Employees).  To the agency heads, Congress has also expressly delegated the power to manage the

7    functions of the agencies, including the right to employ and discharge subordinate employees of the

8    agencies and to spend appropriated funds on those positions.

9         400.    In addition to specific authorizing statutes, Congress has also generally authorized the

10   heads of administrative agencies to make employment decisions (5 U.S.C. § 3101), manage the

11   employees of that agency (5 U.S.C. § 301), or delegate to subordinate officers the management

12   decisions, including the hiring and firing of employees (5 U.S.C. § 302).

13        401.    Neither OMB, OPM nor DOGE have the statutory authority to supplant the decision-

14   making authority of the federal agencies with respect to federal agency employment.

15        402.    The February 26, 2025 Memorandum from OMB and OPM to agency heads exceeds

16   statutory authority and usurps the authority delegated by Congress to the agencies (including but not

17   limited to Federal Agency Defendants), and not to OMB or OPM, by: requiring agencies to submit

18   Agency RIF and Reorganization Plans to OMB and OPM for approval; requiring agencies to include

19   in those plans large-scale RIFs; and imposing an assortment of other parameters and requirements,

20   including considering Funding Lapse Plan Staffing Levels as a baseline.

21        403.    DOGE has no statutory authority.  DOGE exceeds any authority it may have to

22   implement the President's orders by usurping the authority delegated by Congress to the agencies

23   (including but not limited to Federal Agency Defendants), not to the President or DOGE.  DOGE has

24   no authority at all to dictate to the agencies created and governed by Congress any level of staffing

25   cut or spending reduction.

26        404.    Therefore, the actions and orders of OMB, OPM, and DOGE to implement the

27   President's February 11, 2025 Executive Order, including but not limited to the February 26, 2025

1    Memorandum to all agencies, and any direction, approval, or requirement imposed with respect to

2    any ARRPs that result from that Executive Order, exceed authority and are contrary to statute.

3        405.    OMB, OPM, and DOGE are all agencies that Congress has made subject to the APA.

4    5 U.S.C. § 701. OMB and OPM's issuance and implementation of the February 26, 2025

5    Memorandum, any decision "approving" an ARRP, and DOGE's directives ordering agencies to

6    make staffing and spending cuts are all final agency action under the APA.  5 U.S.C. § 704.

7        406.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "not

8    in accordance with law" (5 U.S.C. § 706(2)(A)), or that is "in excess of statutory jurisdiction,

9    authority, or limitations, or short of statutory right" (5 U.S.C. § 706(2)(C)).

10        407.    The actions of OMB, OPM, and DOGE therefore violate the Administrative Procedure

11    Act because they are inconsistent with law in violation of 5 U.S.C. § 706(2)(A) and exceed statutory

12    authority in violation of 5 U.S.C. § 706(2)(C), and for those reasons are also arbitrary and capricious

13    in violation of 5 U.S.C. § 706(2)(A).

14
15
**Claim IV:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A)**
**Against Defendants OMB, OPM, DOGE and their Directors**
**(Arbitrary and Capricious Agency Action)**

16        408.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

17        409.    The Plaintiff unions' federal employee members are subject to the requirements of

18    OMB, OPM, and DOGE actions here at issue, and all Plaintiffs (and/or their members) are persons

19    who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the

20    actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal

21    Directors, for purposes of 5 U.S.C. § 702.

22        410.    OMB, OPM, and DOGE are all agencies that Congress has made subject to the APA.

23    5 U.S.C. § 701. OMB and OPM's issuance and implementation of the February 26, 2025

24    Memorandum, any decision "approving" an ARRP, and DOGE's directives ordering agencies to

25    make staffing and spending cuts are all final agency action under the APA.  5 U.S.C. § 704.

26        411.    The actions of OMB and its Director, OPM and its Acting Director, and DOGE and its

27    actual and nominal Directors, violate the APA because they are arbitrary and capricious, in violation

28
AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                              107

1  of 5 U.S.C. § 706(2)(A), including because they: 1) order federal agencies to cede decision-making

2  authority to OMB OPM, and/or DOGE, regardless of the requirements of any applicable statute or

3  regulation; 2) require agencies to disregard their authorizing statutes and regulations and follow the

4  President's unconstitutional directions and directions of OMB,OPM, and/or DOGE;  3) categorically

5  impose requirements to engage in large-scale RIFs that are necessarily contrary to agency function

6  and authorizing statutes and regulations; 4) categorically impose requirements to RIF employees at

7  the President's direction, according to the offices, programs and functions the President and his

8  Administration eliminate regardless of statute or regulation; 5) categorically require agencies to

9  engage in RIFs that will align the agency with Funding Lapse Plan Staffing Levels, which necessarily

10 and by definition cannot adequately staff agencies; 6) require agencies to abandoned reasoned

11 decision-making considering all relevant factors, in service of the President's orders; 7) require

12 agencies to act under unrealistic timeframes that necessarily will result in plans that are not supported

13 by rational reasoning or the agency's considered judgment; and 8) require the process for the creation

14 and approval of plans to radically transform the entire federal government to proceed in secret.

**Claim V:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(D)**
**Against Defendants OMB, OPM, DOGE and their Directors**
**(Notice and Comment)**

18  412.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

19  413.    The Plaintiff unions' federal employee members are subject to the requirements of

20  OMB, OPM, and DOGE actions here at issue, and all Plaintiffs (and/or their members) are persons

21  who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the

22  actions of OMB and its Director, OPM and its Acting Director, and DOGE and its actual and nominal

23  Directors, for purposes of 5 U.S.C. § 702.

24  414.    OMB, OPM, and DOGE are all agencies that Congress has made subject to the APA.

25  5 U.S.C. § 701.

26  415.    Under the APA, a court shall "hold unlawful and set aside agency action …found to be

27  …. without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                      108

Add. 146

416.    OMB and OPM's February 26, 2025 Memorandum, and any decision "approving" an ARRP, and DOGE's directives ordering agencies to make staffing and spending cuts, are all "rules" for purposes of the APA.  5 U.S.C. § 551(4).

417.    Neither OMB, nor OPM, nor DOGE, has published and provided opportunity for notice and comment on its actions pursuant to Executive Order 14210, including but not limited to the February 26, 2025 Memorandum, any decision "approving" an ARRP, or DOGE's directives ordering agencies to make staffing or spending cuts.

418.    Neither OMB nor its Director, OPM nor its Acting Director, nor DOGE and its actual and nominal Directors complied with the rule-making provisions set forth in 5 U.S.C. § 553 before issuing OMB and OPM's February 26, 2025 Memorandum.  That memorandum, as well as any decision "approving" an ARRP and DOGE's directives ordering agencies to make staffing or spending cuts, are all "rules" for purposes of the APA.  5 U.S.C. § 551(4).

419.    OMB, OPM, and DOGE's actions therefore also violate 5 U.S.C. § 706(2)(D) by failing to observe procedures required by law.

**Claim VI:**
**Administrative Procedure Act, 5 U.S.C § 706(2)(A) and (C)**
**Against Federal Agency Defendants**
**(Action Not in Accordance With Law)**

420.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

421.    The Plaintiff unions' federal employee members are subject to the requirements of Federal Agency Defendants' actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of the Federal Agency Defendants, for purposes of 5 U.S.C. § 702.

422.    Each Federal Agency Defendant is an agency that Congress has made subject to the APA.  5 U.S.C. § 701. The implementation of ARRPs by RIFing federal employees, closing offices, functions, and programs, and otherwise reorganizing agency functions are all final agency action under the APA.  5 U.S.C. § 704.

423.  On information and belief, each of the Federal Agency Defendants has created and submitted for OMB and OPM approval an ARRP, according to the parameters imposed by OMB, OPM and DOGE.

424.  None of the Federal Agency Defendants have the statutory authority to cede their decision-making authority with respect to the employees of that agency to the President, OMB, OPM, or DOGE.  None of the Federal Agency Defendants have the statutory authority to implement the President's unconstitutional direction to engage in large-scale RIFs, including with respect to functions, programs, or offices that *the President and those acting on his* authority have decided to cut; or to impose staffing cuts that take an agency, irrespective of duty or need, back to government-shutdown lapse levels.  The Federal Agency Defendants have exceeded their authority by implementing the President's unconstitutional plans.

425.  Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" (5 U.S.C. § 706(2)(A)), or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" (5 U.S.C. § 706(2)(C)).

426.  The actions of Federal Agency Defendants therefore violate the Administrative Procedure Act because they are inconsistent with law in violation of 5 U.S.C. § 706(2)(A) and exceed statutory authority in violation of 5 U.S.C. § 706(2)(C), and are for those reasons also arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A).

### Claim VII:
### Administrative Procedure Act, 5 U.S.C § 706(2)(A)
### Against Federal Agency Defendants
### (Arbitrary and Capricious Agency Action)

427.  Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

428.  The Plaintiff unions' federal employee members are subject to the requirements of Federal Agency Defendants' actions here at issue, and all Plaintiffs (and/or their members) are persons who have suffered legal wrong as a result of, and have been adversely affected or aggrieved by the actions of the Federal Agency Defendants for purposes of 5 U.S.C. § 702.

429.　Congress made each Federal Agency Defendant subject to the APA. 5 U.S.C. § 701. The implementation of ARRPs by RIFing federal employees, closing offices, functions, and programs, and otherwise reorganizing agency functions are all final agency action under the APA. 5 U.S.C. § 704.

430.　Each of the Federal Agency Defendants has created and submitted for OMB and OPM approval an ARRP, according to the parameters imposed by OMB, OPM and DOGE.

431.　The actions of the Federal Agency Defendants, including but not limited to implementing the President's unconstitutional orders to reorganize and RIF employees, pursuant to the terms dictated by the President, violate the APA because they are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), for reasons that include the following: they 1) cede decision-making authority to OMB and OPM, regardless of the requirements of any applicable statute; 2) disregard their authorizing statutes and follow the President's unconstitutional directions and directions of OMB and OPM;  3) engage in large-scale RIFs that are necessarily contrary to agency's ability to maintain required function and authorizing statute; 4) RIF employees at the President's direction, according to the offices, programs and functions the President and his Administration eliminate regardless of statute; 5) RIF according to Funding Lapse Plan Staffing Levels, which necessarily and by definition cannot staff agencies at the level necessary to adequately perform; 6) abandon reasoned decision-making considering all relevant factors, in service of the President's orders; 7) act under unrealistic timeframes that necessarily will result in plans that are not supported by rational reasoning or agencies' considered judgment; and 8) conduct the process for the creation and approval of plans to radically transform the entire federal government in secret.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray that this Court:

1. Declare that President Donald J. Trump has violated the United States Constitution by engaging in wholesale transformation of the federal government without any Congressional authorization by and through the Workforce Executive Order;

2. Declare that OMB, OPM, and DOGE have exceeded statutory authority and acted in an arbitrary and capricious manner and therefore acted unlawfully by ordering federal agencies to act in accordance with the President's unconstitutional mandate by and through the Workforce Executive Order and the February 26, 2025 OMB/OPM Memorandum;

3. Declare that Federal Agency Defendants have acted contrary to statutory authority and in an arbitrary and capricious manner and therefore acted unlawfully by implementing the President's unconstitutional Workforce Executive Order and the February 26, 2025 OMB/OPM Memorandum to reorganize the federal government and RIF large numbers of federal employees, without Congressional authorization;

4. Vacate the February 11, 2025 Workforce Executive Order, the February 26, 2025 OMB and OPM Memorandum implementing that order; any and all approvals or exemptions awarded by OMB, OPM, or DOGE; any and all orders by OMB, OPM, or DOGE with respect to federal agency ARRPs; and the ARRPs; and issue all necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings under 5 U.S.C. § 705;

5. Temporarily restrain and enjoin the Defendants from implementing or enforcing the February 11, 2025 Workforce Executive Order; the February 26, 2025 OMB and OPM Memorandum implementing that order; any and all approvals or exemptions awarded by OMB, OPM, or DOGE; any and all orders by OMB, OPM, or DOGE with respect to federal agency ARRPs; and the ARRPs, pending further orders from this Court;

6. Pursuant to 5 U.S.C. § 706, vacate, hold unlawful and set aside the February 11, 2025 Workforce Executive Order; the February 26, 2025 OMB and OPM Memorandum implementing that order; any and all approvals or exemptions awarded by OMB, OPM, or DOGE; any and all orders by OMB, OPM, or DOGE with respect to federal agency ARRPS; and the ARRPs;

7. Enter preliminary and/ permanent injunctive relief;

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                           112

8. Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements as appropriate; and

9. Grant such other relief as this Court may deem proper.

DATED: May 14, 2025

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Corinne Johnson
Alice X. Wang
Robin S. Tholin
Aaron Schaffer-Neitz
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
Fax: (415) 362-8064
sleyton@altshulerberzon.com
bchisholm@altshulerberzon.com
dleonard@altshulerberzon.com

By: */s/ Danielle Leonard*

*Attorneys for All Union and Non-Profit Organization Plaintiffs*

Elena Goldstein (pro hac vice)
Skye Perryman (pro hac vice)
Tsuki Hoshijima (pro hac vice)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel: (202) 448-9090
Fax: (202) 796-4426
egoldstein@democracyforward.org
sperryman@democracyforward.org
thoshijima@democracyforward.org

By: */s/ Elena Goldstein*

*Attorneys for All Union and Non-Profit Organization Plaintiffs (except NRDC) and for Plaintiffs City of Chicago, IL; Martin Luther King, Jr. County, WA; Harris County, TX; and City of Baltimore, MD*

AMENDED COMPLAINT, No. 3:25-cv-03698-SI

113

**Add. 151**

1

2          Jules Torti (pro hac vice)
           PROTECT DEMOCRACY PROJECT
3          82 Nassau St., #601
           New York, NY 10038
4
5          Erica J. Newland (pro hac vice)
           Jacek Pruski (pro hac vice)
6          PROTECT DEMOCRACY PROJECT
           2020 Pennsylvania Ave., N.W., Suite 163
7          Washington, D.C. 20006
           Tel: 202-579-4582
8          jules.torti@protectdemocracy.org
           erica.newland@protectdemocracy.org
9          jacek.pruski@protectdemocracy.org

10     By: */s/ Jules Torti*

11
           *Attorneys for All Union and Non-Profit Organization*
12         *Plaintiffs (except NRDC)*

13
           Norman L. Eisen (pro hac vice)
14         Spencer W. Klein (pro hac vice app. forthcoming)
           STATE DEMOCRACY DEFENDERS FUND
15         600 Pennsylvania Avenue SE #15180
           Washington, D.C. 20003
16         Tel: (202) 594-9958
           Norman@statedemocracydefenders.org
17         Spencer@statedemocracydefenders.org
18
19     By: */s/ Norman L. Eisen*

20         *Attorneys for All Union and Non-Profit Organization*
           *Plaintiffs (except NRDC)*
21

22         Rushab Sanghvi (SBN 302809)
23         AMERICAN FEDERATION OF GOVERNMENT
           EMPLOYEES, AFL-CIO
24         80 F Street, NW
           Washington, D.C. 20001
25         Tel: (202) 639-6426
           Sanghr@afge.org
26
27     By: */s/ Rushab Sanghvi*

28
           AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                    114

           **Add. 152**

1
2

*Attorney for Plaintiffs American Federation of
Government Employees, AFL-CIO (AFGE) and AFGE
locals*

3

4       Teague Paterson (SBN 226659)
        Matthew Blumin (pro hac vice)
5       AMERICAN FEDERATION OF STATE, COUNTY,
        AND MUNICIPAL EMPLOYEES, AFL-CIO
6       1625 L Street, N.W.
        Washington, D.C. 20036
7       Tel: (202) 775-5900
8       TPaterson@afscme.org
        MBlumin@afscme.org
9

10      By: */s/ Teague Paterson*

11      *Attorneys for Plaintiff American Federation of State
        County and Municipal Employees, AFL-CIO (AFSCME)*
12

13      Steven K. Ury (SBN 199499)
        SERVICE EMPLOYEES INTERNATIONAL UNION,
14      AFL-CIO
        1800 Massachusetts Ave., N.W.
15      Washington, D.C. 20036
        Tel: (202) 730-7428
16      steven.ury@seiu.org
17

18      By: */s/ Steven K. Ury*

19      *Attorney for Plaintiff Service Employees International
        Union, AFL-CIO (SEIU)*
20

21      David Chiu (SBN 189542)
        City Attorney
22      Yvonne R. Meré (SBN 175394)
        Chief Deputy City Attorney
23      Mollie M. Lee (SBN 251404)
        Chief of Strategic Advocacy
24      Sara J. Eisenberg (SBN 269303)
        Chief of Complex and Affirmative Litigation
25      Molly J. Alarcon (SBN 315244)
        Alexander J. Holtzman (SBN 311813)
26      Deputy City Attorneys
27      OFFICE OF THE CITY ATTORNEY FOR THE CITY
28

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                    115

**Add. 153**

AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
San Francisco, CA 94102
molly.alarcon@sfcityatty.org
alexander.holtzman@sfcityatty.org

By: */s/ David Chiu* _____

*Attorneys for Plaintiff City and County of San Francisco*


Tony LoPresti (SBN 289269)
COUNTY COUNSEL
Kavita Narayan (SBN 264191)
Meredith A. Johnson (SBN 291018)
Raphael N. Rajendra (SBN 255096)
Hannah M. Godbey (SBN 334475)
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, 9th Floor
San José, CA 95110
Tel: (408) 299-5900

By: */s/ Tony LoPresti* _____

*Attorneys for Plaintiff County of Santa Clara, Calif.*


David J. Hackett (pro hac vice)
General Counsel to King County Executive & Special
Deputy Prosecutor
Alison Holcomb (pro hac vice)
Deputy General Counsel to King County Executive &
Special Deputy Prosecutor
Erin King-Clancy (pro hac vice app. forthcoming)
Senior Deputy Prosecuting Attorney
OFFICE OF KING COUNTY PROSECUTING
ATTORNEY LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
(206) 477-9483
David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov
aclancy@kingcounty.gov

By: */s/ David J. Hackett* _____

*Attorneys for Plaintiff Martin Luther King, Jr. County*


Sharanya Mohan (SBN 350675)

AMENDED COMPLAINT, No. 3:25-cv-03698-SI                                    116

PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Tel: (510) 738-6788
sai@publicrightsproject.org

By: */s/ Sharanva Mohan*

 *Attorney for Plaintiffs Baltimore, MD, Chicago, IL,*
 *Harris County, TX, and King County, WA*


Christian D. Menefee
Harris County Attorney

Jonathan G.C. Fombonne (pro hac vice app. forthcoming)
Deputy County Attorney and First Assistant
Tiffany Bingham (pro hac vice app. forthcoming)
Managing Counsel
Sarah Utley (pro hac vice app. forthcoming)
Division Director – Environmental Division
Bethany Dwyer (pro hac vice app. forthcoming)
Deputy Division Director - Environmental Division
R. Chan Tysor (pro hac vice)
Senior Assistant County Attorney
Alexandra "Alex" Keiser (pro hac vice)
Assistant County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002
Tel.: (713) 274-5102
Fax: (713) 437-4211

jonathan.fombonne@harriscountytx.gov
tiffany.bingham@harriscountytx.gov
sarah.utley@harriscountytx.gov
bethany.dwyer@harriscountytx.gov
chan.tysor@harriscountytx.gov
alex.keiser@harriscountytx.gov

By: */s/ Jonathan G.C. Fombonne*  \_

 *Attorneys for Plaintiff Harris County, Texas*


Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago

AMENDED COMPLAINT, No. 3:25-cv-03698-SI    117

1    Stephen J. Kane (IL ARDC 6272490) (pro hac vice app.
     forthcoming)
2    Rebecca A. Hirsch (IL ARDC 6279592) (pro hac vice
     app. forthcoming)
3    Lucy Prather (IL ARDC 6337780) (pro hac vice)
     City of Chicago Department of Law,
4    Affirmative Litigation Division
     121 N LaSalle Street, Suite 600
5    Chicago, Illinois 60602
     Tel: (312) 744-6934
6    Stephen.kane@cityofchicago.org
     Rebecca.Hirsch2@cityofchicago.org
7    Lucy.Prather@cityofchicago.org
8
9    By: /s/ Stephen J. Kane                              _
10       Attorneys for Plaintiff City of Chicago
11
12       Ebony M. Thompson
         Baltimore City Solicitor
13
         Sara Gross (pro hac vice app. forthcoming)
14       Chief of Affirmative Litigation
         Baltimore City Department of Law
15       100 N. Holliday Street
         Baltimore, Maryland 21202
16       Tel: (410) 396-3947
         sara.gross@baltimorecity.gov
17
     By: /s/ Sara Gross                          _____
18
         Attorneys for Plaintiff City of Baltimore
19
20
21
22
23
24
25
26
27
28
     AMENDED COMPLAINT, No. 3:25-cv-03698-SI                          118

# Exhibit A

Federal Register

Vol. 90, No. 30

Friday, February 14, 2025

# Presidential Documents

Title 3—

The President

Executive Order 14210 of February 11, 2025

## Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* To restore accountability to the American public, this order commences a critical transformation of the Federal bureaucracy. By eliminating waste, bloat, and insularity, my Administration will empower American families, workers, taxpayers, and our system of Government itself.

**Sec. 2**. *Definitions.* (a) "Agency" has the meaning given to it in section 3502 of title 44, United States Code, except that such term does not include the Executive Office of the President or any components thereof.

(b) "Agency Head" means the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director, unless otherwise specified in this order.

(c) "DOGE Team Lead" means the leader of the Department of Government Efficiency (DOGE) Team at each agency, as defined in Executive Order 14158 of January 20, 2025 (Establishing and Implementing the President's "Department of Government Efficiency").

(d) "Employee" has the meaning given to it by section 2105 of title 5, United States Code, and includes individuals who serve in the executive branch and who qualify as employees under that section for any purpose.

(e) "Immigration enforcement" means the investigation, enforcement, or assisting in the investigation or enforcement of Federal immigration law, including with respect to Federal immigration law that penalizes a person's presence in, entry, or reentry to, or employment in, the United States, but does not include assisting individuals in applying for immigration benefits or efforts to prevent enforcement of immigration law or to prevent deportation or removal from the United States.

(f) "Law enforcement" means:

(i) engagement in or supervision of the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law; or

(ii) the protection of Federal, State, local, or foreign government officials against threats to personal safety.

(g) "Temporary employee" has the meaning given to it in 5 C.F.R. part 316.

(h) "Reemployed annuitant" has the meaning given to it in 5 C.F.R. part 837.

**Sec. 3**. *Reforming the Federal Workforce to Maximize Efficiency and Productivity.* (a) *Hiring Ratio.* Pursuant to the Presidential Memorandum of January 20, 2025 (Hiring Freeze), the Director of the Office of Management and Budget shall submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition (Plan). The Plan shall require that each agency hire no more than one employee for every four employees that depart, consistent with the plan and any applicable exemptions and details provided for in the Plan. This order does not affect the standing freeze on hiring as applied to the Internal Revenue Service. This ratio shall not apply to functions related to public safety, immigration

enforcement, or law enforcement. Agency Heads shall also adhere to the Federal Hiring Plan that will be promulgated pursuant to Executive Order 14170 of January 20, 2025 (Reforming the Federal Hiring Process and Restoring Merit to Government Service).

(b) *Hiring Approval.* Each Agency Head shall develop a data-driven plan, in consultation with its DOGE Team Lead, to ensure new career appointment hires are in highest-need areas.

(i) This hiring plan shall include that new career appointment hiring decisions shall be made in consultation with the agency's DOGE Team Lead, consistent with applicable law.

(ii) The agency shall not fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled.

(iii) Each DOGE Team Lead shall provide the United States DOGE Service (USDS) Administrator with a monthly hiring report for the agency.

(c) *Reductions in Force.* Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFs, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by statute or other law who are not typically designated as essential during a lapse in appropriations as provided in the Agency Contingency Plans on the Office of Management and Budget website. This subsection shall not apply to functions related to public safety, immigration enforcement, or law enforcement.

(d) *Rulemaking.* Within 30 days of the date of this order, the Director of the Office of Personnel Management (OPM) shall initiate a rulemaking that proposes to revise 5 C.F.R. 731.202(b) to include additional suitability criteria, including:

(i) failure to comply with generally applicable legal obligations, including timely filing of tax returns;

(ii) failure to comply with any provision that would preclude regular Federal service, including citizenship requirements;

(iii) refusal to certify compliance with any applicable nondisclosure obligations, consistent with 5 U.S.C. 2302(b)(13), and failure to adhere to those compliance obligations in the course of Federal employment; and

(iv) theft or misuse of Government resources and equipment, or negligent loss of material Government resources and equipment.

(e) *Developing Agency Reorganization Plans.* Within 30 days of the date of this order, Agency Heads shall submit to the Director of the Office of Management and Budget a report that identifies any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. The report shall discuss whether the agency or any of its subcomponents should be eliminated or consolidated.

(f) Within 240 days of the date of this order, the USDS Administrator shall submit a report to the President regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified, or terminated.

**Sec. 4.** *Exclusions.* (a) This order does not apply to military personnel.

(b) Agency Heads may exempt from this order any position they deem necessary to meet national security, homeland security, or public safety responsibilities.

(c) The Director of OPM may grant exemptions from this order where those exemptions are otherwise necessary and shall assist in promoting workforce reduction.

**Sec. 5**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*February 11, 2025.*

[FR Doc. 2025–02762
Filed 2–13–25; 11:15 am]
Billing code 3395–F4–P

# Exhibit B



**U.S. Office of
Management and Budget**

**U.S. Office of
Personnel Management**



# MEMORANDUM

| | |
|---|---|
| **TO:** | Heads of Executive Departments and Agencies |
| **FROM:** | Russell T. Vought, Director, Office of Management and Budget; Charles Ezell, Acting Director, Office of Personnel Management. |
| **DATE**: | February 26, 2025 |
| **RE**: | Guidance on Agency RIF and Reorganization Plans Requested by *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* |

## I.   Background

The federal government is costly, inefficient, and deeply in debt. At the same time, it is not producing results for the American public. Instead, tax dollars are being siphoned off to fund unproductive and unnecessary programs that benefit radical interest groups while hurting hard-working American citizens.

The American people registered their verdict on the bloated, corrupt federal bureaucracy on November 5, 2024 by voting for President Trump and his promises to sweepingly reform the federal government.

On February 11, 2025, President Trump's Executive Order *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (*Workforce Optimization*) "commence[d] a critical transformation of the Federal bureaucracy." It directed agencies to "eliminat[e] waste, bloat, and insularity" in order to "empower American families, workers, taxpayers, and our system of Government itself."

President Trump required that "Agency Heads shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law." President Trump also directed that, **no later than March 13, 2025**, agencies develop Agency Reorganization Plans.

The U.S. Office of Management and Budget ("OMB") and the U.S. Office of Personnel Management ("OPM") now submit guidance on these Agency RIF and Reorganization Plans ("ARRP"), along with the instruction that such plans be submitted to OMB and OPM.

## II.   Principles to Inform ARRPs

ARRPs should seek to achieve the following:

1.  Better service for the American people;

2. Increased productivity;

3. A significant reduction in the number of full-time equivalent (FTE) positions by eliminating positions that are not required;

4. A reduced real property footprint; and

5. Reduced budget topline.

Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions.

Agencies should also seek to consolidate areas of the agency organization chart that are duplicative; consolidate management layers where unnecessary layers exist; seek reductions in components and positions that are non-critical; implement technological solutions that automate routine tasks while enabling staff to focus on higher-value activities; close and/or consolidate regional field offices to the extent consistent with efficient service delivery; and maximally reduce the use of outside consultants and contractors. When taking these actions, agencies should align closures and/or relocation of bureaus and offices with agency return-to-office actions to avoid multiple relocation benefit costs for individual employees.

Agencies should review their statutory authority and ensure that their plans and actions are consistent with such authority.

Agency heads should collaborate with their Department of Government Efficiency ("DOGE") team leads within the agency in developing competitive areas for ARRPs. In addition, the agency should specifically identify competitive areas that include positions not typically designated as essential during a lapse in appropriations. When making this determination, agencies should refer to the functions that are excepted from the Antideficiency Act (ADA) in the Agency Contingency Plans submitted to OMB in 2019 as the starting point for making this determination.

## III.    Available Tools

In their ARRPs, agencies should employ all available tools to effectuate the President's directive for a more effective and efficient government and describe how they will use each.  Such tools include:

1. Continuing to comply with the hiring freeze outlined in the January 20, 2025 Presidential Memorandum *Hiring Freeze* or (with approval of OPM and OMB) implementing the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart;

2. Establishing internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers;

Add. 163

3. Eliminating non-statutorily mandated functions through RIFs (Appendix 1 contains a sample timeline);

4. Removing underperforming employees or employees engaged in misconduct, and continuing to evaluate probationary employees;

5. Reducing headcount through attrition and allowing term or temporary positions to expire without renewal;

6. Separating reemployed annuitants in areas likely subject to RIFs; and

7. Renegotiating provisions of collective bargaining agreements (CBAs) that would inhibit enhanced government efficiency and employee accountability.

ARRPs should also list the competitive areas for large-scale reductions in force, the RIF effective dates (which may be a date prior to when the plan is submitted), the expected conclusion of the RIFs, the number of FTEs reduced, and additional impact of RIFs such as cancellation of related contracts, leases or overhead.

Agencies should also closely consider changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents or speed up the implementation of ARRPs.

### IV.    Phase 1 ARRPs

Each agency will submit a Phase 1 ARRPs to OMB and OPM for review and approval **no later than March 13, 2025**. Phase 1 ARRPs shall focus on initial agency cuts and reductions. Each Phase 1 ARRP should identify:

1. A list of agency subcomponents or offices that provide direct services to citizens. Such subcomponents or offices should be included in ARRPs to improve services to citizens while eliminating costs and reducing the size of the federal government. But for service delivery subcomponents or offices, implementation shall not begin until certified by OMB and OPM as resulting in a positive effect on the delivery of such services.

2. Any statutes that establish the agency, or subcomponents of the agency, as statutorily required entities. Agency leadership must confirm statutes have not been interpreted in a way that expands requirements beyond what the statute actually requires. Instead, statutes should be interpreted to cover only what functions they explicitly require.

3. All agency components and employees performing functions not mandated by statute or regulation who are not typically designated as essential during a lapse in appropriations (because the functions performed by such employees do not fall under an exception to the ADA) using the Agency Contingency Plans submitted to OMB in 2019 referenced above.

3

**Add. 164**

4. Whether the agency or any of its subcomponents should be eliminated or consolidated; and which specific subcomponents or functions, if any, should be expanded to deliver on the President's priorities.

5. The specific tools the agency intends to use to achieve efficiencies, including, as to each, the number of FTEs reduced and any potential savings or costs associated with such actions in Fiscal Years 2025, 2026 and 2027:

   a. Continuation of the current hiring freeze;
   b. Regular attrition (e.g., retirement, movement between agencies and the private sector);
   c. Attrition through enhanced policies governing employee performance and conduct;
   d. Attrition through the termination or non-renewal of term or limited positions or reemployed annuitants;
   e. Attrition achieved by RIFs. Please refer to Appendix 1 for specific steps and timing. For purposes of the Phase 1 ARRP, the agency should include the following information:

      i. The competitive areas and organizational components that the agency has targeted or will target for initial RIFs, and
      ii. The agency's target for reductions in FTE positions via RIFs.

6. A list by job position of all positions categorized as essential for purposes of exclusion from large-scale RIFs, including the number per each job position and total by agency and subcomponent.

7. The agency's suggested plan for congressional engagement to gather input and agreement on major restructuring efforts and the movement of fundings between accounts, as applicable, including compliance with any congressional notification requirements.

8. The agency's timetable and plan for implementing each part of its Phase 1 ARRP.

## V.    Phase 2 ARRPs

Agencies should then submit a Phase 2 ARRP to OMB and OPM for review and approval **no later than April 14, 2025**. Phase 2 plans shall outline a positive vision for more productive, efficient agency operations going forward. Phase 2 plans should be planned for implementation by September 30, 2025. The Phase 2 plan should include the following additional information:

1. The agency's proposed future-state organizational chart with its functional areas, consolidated management hierarchy, and position titles and counts clearly depicted.

2. Confirmation that the agency has reviewed all personnel data, including each employee's official position description, four most recent performance ratings of record, retention service computation date, and veterans' preference status.

4

**Add. 165**

3. The agency's plan to ensure that employees are grouped, to the greatest extent possible, based on like duties and job functions to promote effective collaboration and management, and that the agency's real estate footprint is aligned with cross-agency efforts coordinated by GSA to establish regional federal office hubs.

4. Any proposed relocations of agency bureaus and offices from Washington, D.C. and the National Capital Region to less-costly parts of the country.

5. The competitive areas for subsequent large-scale RIFs.

6. All reductions, including FTE positions, term and temporary positions, reemployed annuitants, real estate footprint, and contracts that will occur in relation to the RIFs.

7. Any components absorbing functions, including how this will be achieved in terms of FTE positions, funding, and space.

8. The agency's internal processes that ensure agency leadership has visibility and/or direct sign-off on all potential job offers and candidates prior to extending offers.

9. The agency's data-driven plan to ensure new career appointment hires are in highest-need areas and adhere to the general principle that, subject to appropriate exemptions, no more than one employee should be hired for every four employees that depart. Until the agency has finalized its post-hiring-freeze plan, agencies should continue to adhere to the current hiring freeze.

10. Any provisions of collective bargaining agreements that would inhibit government efficiency and cost-savings, and agency plans to renegotiate such provisions.

11. An explanation of how the ARRPs will improve services for Americans and advance the President's policy priorities.

12. The framework and criteria the agency has used to define and determine efficient use of existing personnel and funds to improve services and the delivery of these services.

13. For agencies that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care), the agency's certification that implementation of the ARRPs will have a positive effect on the delivery of such services. The certification should include a written explanation from the Agency Head and, where appropriate, the agency's CIO and any relevant program manager.

14. The programs and agency components not impacted by the ARRP, and the justification for any exclusion.

5

**Add. 166**

15. Plans to reduce costs and promote efficiencies through improved technology, including through the adoption of new software or systems, and elimination of duplicative systems.

16. Any changes to regulations and agency policies, including changes that must be pursued through notice-and-comment rulemaking, that would lead to the reduction or elimination of agency subcomponents, or speed up implementation of ARRPs.

17. The agency's timetable and plan for implementing each part of its Phase 2 ARRP, and its plan for monitoring and accountability in implementing its ARRPs.

Agencies should continue sending monthly progress reports each month on May 14, 2025, June 16, 2025, and July 16, 2025. All plans and reports requested by this memorandum should be submitted to OPM at tracking@opm.gov and OMB at workforce@omb.eop.gov; when submitting plans and reports, please ensure both OPM and OMB addresses are included on the message.

## VI.    Exclusions

Nothing in this memorandum shall have any application to:

1. Positions that are necessary to meet law enforcement, border security, national security, immigration enforcement, or public safety responsibilities;

2. Military personnel in the armed forces and all Federal uniformed personnel, including the U.S. Coast Guard, the Commissioned Corps of the U.S. Public Health Service, and the Commissioned Officer Corps of the National Oceanic and Atmospheric Administration;

3. Officials nominated and appointed to positions requiring Presidential appointment or Senate confirmation, non-career positions in the Senior Executive Service or Schedule C positions in the excepted service, officials appointed through temporary organization hiring authority pursuant to 5 U.S.C. § 3161, or the appointment of any other non-career employees or officials, if approved by agency leadership appointed by the President;

4. The Executive Office of the President; or

5. The U.S. Postal Service.

Finally, agencies or components that provide direct services to citizens (such as Social Security, Medicare, and veterans' health care) shall not implement any proposed ARRPs until OMB and OPM certify that the plans will have a positive effect on the delivery of such services.

cc: Chief Human Capital Officers ("***CHCOs***"), Deputy CHCOs, Human Resources Directors, Chiefs of Staff, and DOGE team leads.

6

**Add. 167**

## Appendix 1- Sample RIF Timeline

This sample timeline is prepared in accordance with the U.S. Office of Personnel Management **Workforce Reshaping Operations Handbook.** RIF timing may vary based on agency-specific requirements, collective bargaining agreements, and workforce considerations. Agencies can accelerate these timelines through parallel processing, securing OPM waivers to policy, expediting process steps, and streamlining stakeholder coordination.

**Step 1: Identification of Competitive Areas and Levels (by March 13, 2025 for Phase 1 ARRPs)**

1. Identify competitive areas and levels and determine which positions may be affected. If applicable, seek OPM waiver approval to adjust competitive areas within 90 days of the RIF effective date.
2. For Phase 1 ARRPs, this step should be completed no later than March 13, 2025.

**Step 2: Planning, Preparation & Analysis (up to 30 days)**

1. Explore use of VSIP/VERA.
2. Conduct an impact assessment.
3. Review position descriptions for accuracy, validate competitive levels, and verify employee retention data (e.g., veteran preference, service computation dates).
4. Develop retention register.
5. Draft RIF notices and seek OPM waiver approval for a 30-day notification period.
6. Develop transition materials.
7. Notify unions (if required).
8. Prepare congressional notification (if required).

**Step 3: Formal RIF Notice Period (60 days, shortened to 30 days with an OPM waiver)**

1. Issue official RIF notices.
2. Provide employees with appeal rights, career transition assistance, and priority placement options.
3. Execute any required congressional notification and notice to the Department of Labor, state, and local officials, if applicable.

**Step 4: RIF Implementation & Separation (Final Step)**

1. Officially implement separations, reassignments, or downgrades.
2. Provide final benefits counseling, exit processing, and documentation.
3. Update HR systems and notify OPM of personnel actions.

7

**Add. 168**

1

2

3

4                    UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    AMERICAN FEDERATION OF              Case No.  25-cv-03698-SI
     GOVERNMENT EMPLOYEES, AFL-CIO,
8    et al.,
                                         **ORDER SETTING BRIEFING
9                    Plaintiffs,         SCHEDULE FOR MOTION FOR
                                         PROTECTIVE ORDER AND
10           v.                          POSTPONING DISCOVERY
                                         DEADLINE**
11   DONALD J. TRUMP, et al.,
                                         Re: Dkt. No. 88
12                   Defendants.

13

14          On Friday, May 9, 2025, the Court issued an order that compelled certain expedited

15   discovery from defendants, with a deadline for production of Tuesday, May 13, at 4:00 p.m. (PDT).

16   Dkt. No. 85.  On Sunday, May 11, 2025, defendants filed a Motion for Protective Order or in the

17   Alternative For Reconsideration on the basis of the deliberative process privilege, seeking a stay of

18   the production deadline.  Dkt. No. 88.  The parties have conferred and neither plaintiffs nor

19   defendants oppose a postponement of the May 13 discovery deadline while the motion is more fully

20   considered by the Court.  Accordingly, the deadline in the Court's expedited discovery order in

21   Docket Number 85 that requires defendants Office of Budget and Management and Office of

22   Personnel Management to produce certain materials by Tuesday, May 13, 2025 (*see* Dkt. No. 85 at

23   40), is stayed until the Court rules on defendants' motion.

24          The Court sets the following briefing schedule:

25          Plaintiffs' response to defendants' motion is due on Tuesday, May 13, 2025.

26          Defendants may file a reply on Wednesday, May 14, 2025.

27   ///

28   ///

United States District Court
Northern District of California

1       The Court will determine whether to schedule a hearing on the motion after considering the

2   parties' written submissions.

3

4       **IT IS SO ORDERED**.

5   Dated: May 12, 2025

6   _____

7   SUSAN ILLSTON
    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Fax: (415) 436-6748

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
ANDREW M. BERNIE
Trial Attorney
Civil Division, Federal Programs Branch

    1100 L Street, NW
    Washington, DC 20005
    Telephone: (202) 353-7203
    andrew.m.bernie@usdoj.gov

Counsel for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, *et al.*

    Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

    Defendants.

Case No. 3:25-cv-03698-SI

**NOTICE**

In Defendants' motion filed earlier this evening, Defendants stated that "Defendants emailed counsel for Plaintiffs at 1:26 pm Pacific Time today to obtain their position on this motion but, as of the filing of this motion, Defendants have not received a response. Due to the urgency of this motion, Defendants are filing this motion now." Undersigned counsel has since learned that

1   Plaintiffs did respond but that they responded to a Department of Justice email address for the

2   undersigned as to which undersigned counsel has temporarily lost access. Undersigned counsel

3   sincerely regrets this error. Undersigned counsel has since conferred with Plaintiffs. Plaintiffs state

4   that they intend to file an opposition Tuesday and do not oppose an order stating that Defendants

5   need not produce or file the ARRPs until the Court has ruled on Defendants' motion.

6   Dated: May 11, 2025                    Respectfully submitted,

7                                          PATRICK D. ROBBINS (CABN 152288)
                                           Acting United States Attorney
8                                          U.S. ATTORNEY'S OFFICE
                                           450 Golden Gate Avenue, Box 36055
9                                          San Francisco, California 94102-3495

10                                         ERIC J. HAMILTON (CABN 296283)
                                           Deputy Assistant Attorney General
11
                                           DIANE KELLEHER
12                                         Branch Director

                                           CHRISTOPHER HALL
13                                         Assistant Branch Director

14                                         s/ Andrew M. Bernie
                                           1100 L Street, NW
15                                         Washington, DC 20005
                                           Telephone: (202) 353-7203
16                                         andrew.m.bernie@usdoj.gov

17                                         *Counsel for Defendants*

18

19

20

21

22

23

24

25

26

27

28

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    Fax: (415) 436-6748

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General
DIANE KELLEHER
Branch Director
CHRISTOPHER HALL
Assistant Branch Director
ANDREW M. BERNIE
Trial Attorney
Civil Division, Federal Programs Branch

    1100 L Street, NW
    Washington, DC 20005
    Telephone: (202) 353-7203
    andrew.m.bernie@usdoj.gov

Counsel for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, *et al.*

    Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

    Defendants.

Case No. 3:25-cv-03698-SI

**DEFENDANTS' MOTION FOR A
PROTECTIVE ORDER OR IN THE
ALTERNATIVE FOR
RECONSIDERATION AND REQUEST
FOR AN IMMEDIATE
ADMINISTRATIVE STAY;
MEMORANDUM OF POINTS AND
AUTHORITIES**

    Defendants respectfully move, pursuant to Federal Rules of Civil Procedure 26(c)(1) and

59(e), for either a protective order relating to or reconsideration of the Court's order that Agency

1  RIF and Reorganization Plans (ARRPs) submitted to the Office of Management and Budget
2  (OMB) and Office of Personnel Management (OPM) be disclosed by Tuesday, May 13 at 4:00
3  p.m. Pacific Time (Disclosure Order). Defendants respectfully request that the Court rescind the
4  requirement that Defendants produce these documents, either by issuing a protective order or
5  reconsidering the Disclosure Order. At the very least (and although Defendants would still seek
6  relief from the Court of Appeals from any such modified order), Defendants respectfully ask the
7  Court to enter a protective order restricting any produced ARRPs to Plaintiffs' counsel and
8  prohibiting Plaintiffs' counsel from further disclosing the ARRPs (including to their clients).
9  Further, Defendants also request an immediate administrative stay of the Disclosure Order while
10 the Court considers this motion and, if the Court denies this motion, a seven-day administrative
11 stay to allow for orderly briefing in the Court of Appeals. Given the imminence of the deadline,
12 Defendants also intend to seek mandamus relief from the Disclosure Order in the Ninth Circuit
13 tomorrow morning, as well as an immediate administrative stay from that Court. Defendants do
14 not through this motion seek a stay of the Court's order granting a temporary restraining order
15 (TRO).[1] Defendants are seeking a stay of that order from the Ninth Circuit. But this Court already
16 denied a motion to stay its injunctive order, and Defendants have appealed that order.[2]

17      Defendants emailed counsel for Plaintiffs at 1:26 pm Pacific Time today to obtain their
18 position on this motion but, as of the filing of this motion, Defendants have not received a response.
19 Due to the urgency of this motion, Defendants are filing this motion now.[3]

---

[1] To be clear, Defendants do not accept that this order is properly characterized as a TRO, *see Sampson v. Murray*, 415 U.S. 61, 86-87 (1974), but for ease of reference, Defendants will refer to it as a TRO here..

[2] The Court has jurisdiction to enter the relief requested. The Court issued two orders in one document (the TRO and the Disclosure Order), and Defendants are appealing only the former. And even if the Disclosure Order were before the Court of Appeals, at most, this Court would be divested of jurisdiction to quash that Order; it would not be divested of the authority to impose a protective order, in the same way a district court can still grant a full or partial stay of a preliminary injunction that has been appealed.

[3] Defendants acknowledge that this Court's Local Rules provide that party must obtain leave of Court prior to filing a reconsideration motion. Defendants are filing this motion now given the exigent circumstances and to give the Court a reasonable opportunity to rule on the motion before the Tuesday deadline.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ARGUMENT**

Upon a party's showing of "good cause," courts may issue protective orders to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). A district court has "broad discretion" to decide "when a protective order is appropriate and what degree of protection is required," *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984). A court may also grant a motion for reconsideration "(1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011). "A court considering a Rule 59(e) motion is not limited merely to these four situations." *Id.*

The Court should either grant Defendants a protective order from the obligation to disclose the ARRPs or reconsider the Disclosure Order because the ARRPs are privileged pre-decisional and deliberative agency planning documents. They also contain significant, highly sensitive information the disclosure of which will irreparably harm OPM, OMB, and the Defendant Agencies, harm that cannot be undone once the documents are disclosed. Defendants submit that the Court's grant of this extraordinary relief was both substantively and procedurally erroneous. And although the Court need not consider this separate question to grant the relief requested, the ARRPs are also simply irrelevant to future proceedings in this Court, and at the very least no one will be irreparably harmed by granting relief from disclosure (let alone by a brief administrative stay).

**I.    The ARRPs are Privileged**

"Federal law recognizes a privilege for pre-decisional, non-factual, non-public communications occurring within federal agencies." *United States v. Irvin,* 127 F.R.D. 169, 172 (C.D. Cal.1989). This deliberative process privilege protects confidential exchanges of opinions and advice within the executive branch of government. *Mansourian v. Bd. of Regents of Univ. of Cal. at Davis*, No. CIVS 03-2591 FCD EFB, 2007 WL 4557104, at *4 (E.D. Cal. Dec. 21, 2007). Its purpose "is to prevent injury to the quality of agency decisions by ensuring that the frank

discussion of legal or policy matters in writing, within the agency, is not inhibited by public disclosure." *Maricopa Audubon Soc'y v. U.S. Forest Service,* 108 F.3d 1089, 1092 (9th Cir. 1997) (quoting *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 148 (1975)) (internal quotations omitted). "The deliberative process privilege is designed to allow agencies to freely explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1019 (E.D. Cal. 2010). "To fall within the deliberative process privilege, a document must be both 'predecisional' and 'deliberative.'" *Carter v. U.S. Department of Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002). The ARRPs satisfy both requirements.[4]

The ARRPs are predecisional. "A predecisional document is one prepared in order to assist an agency decisionmaker in arriving at his decision." *Assembly of State of Cal. v. U.S. Dep't of Com.*, 968 F.2d 916, 920 (9th Cir. 1992) (quotation marks omitted). That is satisfied here. For one, as explained in the attached declaration, ARRPs are "subject to change at any moment as the agency's needs, missions, and staffing evolve or as new leadership joins an agency." Declaration of Stephen M. Billy ¶ 5 (Decl.). An ARRP is never final and may change drastically as the agency's priorities and thinking changes. *Id.* ¶ 6. "Indeed, the non-final and frequently changing nature of ARRPs is one of the reasons OMB and OPM requested that the agencies submit monthly progress reports in May, June, and July." *Id.* Nothing in an ARRP irrevocably commits an agency to taking any specific step. *Id.* ¶ 5. But in addition, the ARRPs have *many* recommendations distinct from specific RIFs. *Id.* ¶ 3; *see also* TRO Opposition at 15-16 (summarizing information to be included in Phase 1 and Phase 2 ARRPs). They typically include plans for changes that would take place many years in the future, if at all. Decl. ¶ 3.

---

[4] The privilege is qualified and may be overcome if a litigant's "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure." *FTC v. Warner Communc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (per curiam). In assessing a claim under the privilege, a court must consider "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.* The Court conducted no such analysis here before ordering disclosure. And Defendants would prevail in any such analysis since the ARRPs contain significant highly sensitive information, while, on the other hand, they bear no relevance to this action globally challenging implementation of the Executive Order and Workforce Memorandum.

Defendants' Motion for a Protective Order or in the Alternative for Reconsideration and Request for an Immediate Administrative Stay
3:25-cv-3698-SI

1    They are also deliberative. "A predecisional document is a part of the deliberative process,

2    if the disclosure of the materials would expose an agency's decisionmaking process in such a way

3    as to discourage candid discussion within the agency and thereby undermine the agency's ability

4    to perform its functions." *Carter*, 307 F.3d at 1089. The foregoing discussion demonstrates why

5    that requirement is clearly satisfied here. As the Workforce Memorandum and Declaration both

6    make clear, Phase 1 and Phase 2 ARRPs contain a significant amount of information concerning

7    the agencies' future plans and strategies, not all of which will actually be acted upon, at least not

8    right away. And as discussed further in the next section, that information is highly sensitive,

9    concerning plans and strategies in a number of core areas. *See infra* p. 6.

10    The Court's opinion appears to reflect fundamental misconceptions about ARRPs. First,

11    the Court suggested that ARRPs are set in stone following a single discrete event (their "approval"

12    by OPM/OMB). *See* TRO Opinion at 35. As explained above, that is incorrect. *See supra* p. 4; *see*

13    *also* Decl. ¶ 5 ("Nothing in an ARRP, or its review or approval by OPM or OMB, binds the agency

14    to any particular course of action."). As a formal matter, ARRPs are always subject to change

15    based on, among other things, intervening events and changes in the agency's thinking. The

16    Court's opinion, relatedly, appears to rest on a mistaken understanding that the only content in

17    ARRPs concerns upcoming RIFs and other related subjects directly tied to the TRO decision,

18    essentially analogizing the ARRPs to an administrative record for imminent RIFs. *See* TRO

19    Opinion at 35 ("While the ultimate impacts of the RIFs may yet be unknown (in part due to

20    defendants' refusal to publicize the ARRPs)…"). Again, as discussed above, that is mistaken. The

21    ARRPs are extensive long- and intermediate-term agency planning documents containing the

22    agencies' detailed analysis, plans, and strategies on a range of regulatory, legislative, and

23    organizational subjects. *See supra* p. 4; *infra* p. 6.

24    **II.    Disclosure of the ARRPs would Irreparably Harm the Government**

25    Publication of confidential documents is irreversible. "[O]nce a secret is revealed, there is

26    nothing for [a court order] to protect." *Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, 306 F. App'x

27    727, 732 (3d Cir. 2009). A party erroneously required to disclose privileged materials or

28    communications" is likely to suffer irreparable harm. *See Admiral Ins. Co. v. U.S. Dist. Ct.*, 881

Defendants' Motion for a Protective Order or in the Alternative for Reconsideration and Request for an Immediate
Administrative Stay
3:25-cv-3698-SI

1  F.2d 1486, 1491 (9th Cir. 1989) (collecting cases). "[A]n order that information be produced that

2  brushes aside a litigant's claim of a privilege not to disclose, leaves only an appeal after judgment

3  as a remedy. Such a remedy is inadequate at best. Compliance with the order destroys the right

4  sought to be protected." *In re von Bulow*, 828 F.2d 94, 98 (2d Cir. 1987). If Defendants are required

5  to disclose the ARRPs on Tuesday, there can be no putting that toothpaste back in the tube. That

6  is quintessential irreparable harm.

7          The irreparable harm to the government would be particularly severe here given the

8  contents of the ARRPs, which "include highly sensitive information that would seriously

9  undermine agency operations if they were released." Decl. ¶ 4. This "information includes

10  strategies for agency negotiations with unions; plans and strategies for personnel reorganization

11  that may or may not materialize, but might seriously hurt agency recruitment and retention if

12  released; plans and strategies regarding present and future regulatory changes; plans and strategies

13  for present and future appropriations requests; plans and strategies for congressional engagement;

14  and plans and strategies for agency IT management." *Id.*

15  **III.    The Disclosure Order is Substantively and Procedural Flawed and Highly Unfair to the Government**

16          The Court should not require the Government to hand over this massive trove of

17  information and suffer this grave and irreparable harm in this highly expedited context. Based on

18  its opinion, however, the Court may be of the view that the Government did not adequately oppose

19  Plaintiffs' supposed discovery request. *See* TRO Opinion at 35 ("Nor do any defendants claim that

20  the ARRPs, once approved, may be modified or rescinded."). Respectfully, that is not the case,

21  and there is no basis for the Court's grant of this extraordinary relief.

22          Initially, the Court did not even have before it a proper motion for discovery. The caption

23  to Plaintiffs' motion did not indicate that Plaintiffs were seeking discovery. *Compare* TRO Motion

24  ("Motion for Temporary Restraining Order and Order to Show Cause"), *with* TRO Decision

25  ("Order Granting Temporary Restraining Order and Compelling Certain Discovery Production.").

26  Plaintiffs also did not follow any of the local rule requirements for resolving discovery and

27  disclosure disputes. *See* Local Rule 37-1. When counsel for Plaintiffs emailed counsel for

28  Defendants to obtain a position on their emergency motion and proposed schedule, they did not

1    indicate that the motion would seek discovery.[5] Nor did Plaintiffs attempt to serve Defendants

2    with discovery requests, and Defendants never had a chance to make formal objections to any such

3    request.

4           Putting those procedural defects aside, Plaintiffs provided no meaningful *legal* basis for

5    these materials to be released. Indeed, the entire basis for Plaintiffs' demand that the ARRPs be

6    produced in their TRO Brief was a postcard conclusory statement at the bottom of page 50 of their

7    51-page brief, in which they made no attempt to establish that the ARRPs were non-privileged and

8    otherwise subject to disclosure. In that context—a TRO briefing posture, where the government

9    had only three business days to respond to Plaintiffs' 51-page brief backed by nearly 1,400 pages

10   of exhibits—Defendants were not required to treat this conclusory and procedurally improper

11   request as effectively requiring the type of response they would have provided in formal discovery

12   objections and responses. Rather, Defendants quite appropriately pointed out that Plaintiffs had

13   provided no legal basis for this request. TRO Opposition at 48.

14          Notwithstanding all of this, the government explained that "the ARRPs are deliberative

15   agency planning documents that discuss a number of steps the agency plans to take t[o] … improve

16   the agency's efficiency, as well as to focus on statutorily required functions activities that directly

17   serve the public." ECF No. 60 at 21. Such documents, "which reflect the agency's group thinking

18   in the process of working out its policy," are definitionally deliberative materials shielded from

19   disclosure. *See NLRB. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975). And the Workforce

20   Memorandum itself and the Government's extensive discussion of it made clear that ARRPs

21   contain significant information about the agency's long term strategies and recommendations. *See*

22   *supra* p. 4; TRO Opposition at 15-16. But without addressing those concerns or purporting to

23   engage in balancing analysis, this Court concluded that Plaintiffs had shown "good cause" under

---

[5] The substantive text of that email is as follows: "We are writing to inform you that Plaintiffs in
the above-referenced case will tomorrow be filing a motion for temporary restraining order and to
show cause why a preliminary injunction should not issue. We intend to ask the Court to set a
deadline for the government's response of Monday, and will ask for a hearing as soon as possible
next week. Please let me know whether Defendants will consent to this schedule on the TRO. We
will be asking the Court for additional pages on the memorandum in support of the TRO motion,
of up to 50 pages. Please let us know if Defendants will consent."

Defendants' Motion for a Protective Order or in the Alternative for Reconsideration and Request for an Immediate
Administrative Stay
3:25-cv-3698-SI

1    Federal Rule of Civil Procedure 26(d), and then ordered the government to produce the Plans and

2    other documents by 4:00 p.m. PDT on Tuesday, May 13.

3        That analysis is plainly inadequate to dispense with the privilege. In *Karnoski v. Trump*,

4    the Ninth Circuit issued a writ of mandamus vacating discovery orders because the district court

5    did not perform a sufficiently "granular" balancing analysis before holding that the plaintiffs in

6    that case had overcome the deliberative process privilege. 926 F.3d 1180, 1206 (9th Cir. 2019)

7    (*per curiam*) ("The district court appears to have conducted a single deliberative process privilege

8    analysis covering all withheld documents, rather than considering whether the analysis should

9    apply differently to certain categories."); *see also id.* at 1195 (order covered 15,000 documents).

10   Here, the problem is not that the Court's analysis was too vague, but that it conducted no analysis

11   at all.

12       Indeed, the scope of the disclosure the Court ordered exceeds even what Plaintiffs sought

13   in their motion. *See* ECF No. 37-3 (requesting only "current versions" of the Plans). Plaintiffs first

14   asked for "waivers" of the 60-day RIF notice period at the end of the live hearing, and they never

15   asked for "agency applications for waivers" at all. Tr. at 43.

16   **IV.    The ARRPs Are Not Relevant to Future Proceedings before this Court**

17       Given the foregoing, the Court should grant a protective order or reconsider the Disclosure

18   Order. To grant either form of relief, the Court need not decide whether disclosure of the ARRPs

19   could be required or should be required in the future. The Court could simply order briefing on

20   whether the ARRPs should be withheld and the applicability of privileges.

21       In any event, Defendants respectfully submit that the ARRPs are not relevant to the

22   preliminary injunction proceedings this Court intends to conduct in the coming weeks—and

23   certainly no party would be irreparably harmed by the relief the Government seeks here. The Court

24   enjoined *all* implementation of the Workforce Executive Order and Workforce Memorandum, as

25   to *all* the 21 components against which Plaintiffs sought a TRO. TRO Decision at 40. And the

26   Court clearly held that both the Workforce Executive Order and the Workforce Memorandum were

27   *ultra vires*. TRO Opinion at 26-34. It is unclear how the contents of the ARRPs could affect the

28

1  conclusions the Court reached in issuing the TRO—since the Court held that the Workforce

2  Executive Order and Workforce Memorandum *cannot* be lawfully implemented.

3       The Court also stated that "the release of the ARRPs will significantly aid the Court's

4  review of the merits of" the claims that individual ARRPs are arbitrary and capricious. TRO

5  Opinion at 37. But Plaintiffs' arbitrary-and-capricious claims were directly tied to the Workforce

6  Executive Order and Workforce Memorandum. Plaintiffs did not make freestanding claims that

7  particular ARRPs violated the APA for reasons *independent of* these sources—for example, that

8  particular elements of the ARRPs flunked the arbitrary-and-capricious standard. And any such

9  fact-bound claim directed at individual ARRPs would of course not provide any basis for enjoining

10 implementation of the Executive Order and Memorandum, let alone enjoining its implementation

11 virtually government-wide. In short, no matter how detailed or well-supported the ARRPs may be,

12 the Court's opinion indicates that the Court believes they are tainted by an unlawful Executive

13 Order and Memorandum. True, the Court framed all of its merits conclusions in terms of

14 "likelihood of success" and Defendants obviously hope that the Court reconsiders these legal

15 conclusions (which Defendants respectfully submit are mistaken) at a later stage of the case. But

16 if the Court adheres to its legal conclusion that the Executive Order and Memorandum are

17 themselves unlawful, an analysis of specific ARRPs would not appear to in any way change those

18 conclusions.

19      Even if this Court had conducted a balancing analysis, the deliberative privilege would not

20 be overcome. Plaintiffs allege that the President has called for "large scale" changes to agencies

21 and that the separation of powers forbids him from so reforming federal agencies absent express

22 statutory authorization. Plaintiffs' claim thus does not turn on the specific Plans agencies have

23 prepared. Indeed, Plaintiffs do not challenge any Plan at all. Rather, they challenge the President's

24 authority to ask agencies to prepare Plans and OPM and OMB's ability to offer guidance on what

25 those documents should contain. Because the content of the ARRPS is legally irrelevant to the

26 claims as pled, Plaintiffs are not entitled to these ARRPs, and the Court erred in concluding

27 otherwise.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V. At a minimum, the Court Should Grant a Protective Order Restricting Disclosure of the ARRPs to the Court and Plaintiffs' Counsel

At the very least, Defendants ask that its disclosure obligation be restricted to only Plaintiffs' counsel; this smaller disclosure would obviate some of the most significant harms to Defendants of having their deliberative work-product made public. The Court should accordingly direct any ARRPs to be filed under seal and should enter a protective order directing that Plaintiffs' counsel may not disclose the ARRPs to anyone else (including their clients). Such limited relief would not eliminate the chilling effect created by disclosures of deliberative materials, nor would it justify disregarding the government's interest in maintaining the documents' confidentiality. *Cf. Perry v. Schwarzenegger*, 591 F.3d 1147, 1163-64 (9th Cir. 2009) (granting defendants' mandamus petition and overruling a district court's order compelling the defendants to produce documents whose disclosure threatened to "inhibi[t] internal campaign communications that are essential to effective association and expression," while emphasizing that "[a] protective order limiting dissemination of this information will ameliorate but cannot eliminate these threatened harms"). And it would not cure the procedural and substantive flaws associated with the Court's Disclosure Order discussed in detail above. But it would temper some of the effects of the disclosure that are most likely to hinder agency operations.

## VI. The Court Should Grant an Immediate Administrative Stay

Given the pending Tuesday, May 13 deadline, and the grave and irreversible injury to the government associated with the disclosure of the ARRPs, Defendants respectfully request that the Court rule on this motion as soon as possible and to grant an immediate administrative stay of the Disclosure Order. Given the imminence of the deadline, Defendants also intend to seek mandamus relief from the Disclosure Order in the Ninth Circuit tomorrow morning, as well as an immediate administrative stay from that Court. Defendants will promptly inform this Court of any relevant developments in the Ninth Circuit.

## CONCLUSION

For the foregoing reasons, the Court should relieve Defendants of the obligation to produce the ARRPs, and grant an immediate administrative stay while it considers this motion.

Dated: May 11, 2025

Respectfully submitted,

PATRICK D. ROBBINS (CABN 152288)
Acting United States Attorney
U.S. ATTORNEY'S OFFICE
450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

ERIC J. HAMILTON (CABN 296283)
Deputy Assistant Attorney General

DIANE KELLEHER
Branch Director

CHRISTOPHER HALL
Assistant Branch Director

s/ Andrew M. Bernie
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 353-7203
andrew.m.bernie@usdoj.gov

*Counsel for Defendants*

Defendants' Motion for a Protective Order or in the Alternative for Reconsideration and Request for an Immediate
Administrative Stay
3:25-cv-3698-SI

Add. 183
11

1   PATRICK D. ROBBINS (CABN 152288)
    Acting United States Attorney
2   450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
3   Telephone: (415) 436-7200
    Fax: (415) 436-6748
4

5   ERIC J. HAMILTON (CABN 296283)
    Deputy Assistant Attorney General
6   DIANE KELLEHER
    Branch Director
7   CHRISTOPHER HALL
    Assistant Branch Director
8   ANDREW M. BERNIE
    Trial Attorney
9   Civil Division, Federal Programs Branch
    1100 L Street, NW
10  Washington, DC 20005
    Telephone: (202) 353-7203
11  andrew.m.bernie@usdoj.gov
12

13  Counsel for Defendants
14
                    UNITED STATES DISTRICT COURT
15            FOR THE NORTHERN DISTRICT OF CALIFORNIA
                    SAN FRANCISCO DIVISION
16

17                                          Case No. 3:25-cv-03698-SI
    AMERICAN FEDERATION OF
18  GOVERNMENT EMPLOYEES, *et al*.
                                            **DECLARATION OF STEPHEN M. BILLY**
19          Plaintiffs,

20              v.

21  DONALD J. TRUMP, *et al.*,

22          Defendants.

23

24

25

26

27

28

Declaration of Stephen M. Billy
3:25-cv-03698-SI                           **Add. 184**

I, Stephen M. Billy, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.    I currently serve as a Senior Advisor for the Office of Management and Budget (OMB), Executive Office of the President.  I have occupied this position since January 24, 2025.

2.    The portion of the Court's Order requiring disclosure of all Defendant Agency Reorganization and RIF Plans (ARRPs) will irreparably harm OMB, the U.S. Office of Personnel Management (OPM), and Defendant Agencies if it is not quashed.

3.    ARRPs are distinct from actual RIFs. ARRPs have many recommendations distinct from plans for specific RIFs. They typically include plans for changes that would take place many years in the future, if those changes take place at all.

4.    ARRPs include highly sensitive information that would seriously undermine agency operations if they were released. Such information includes strategies for agency negotiations with unions; plans and strategies for personnel reorganization that may or may not materialize, but might seriously hurt agency recruitment and retention if released; plans and strategies regarding present and future regulatory changes; plans and strategies for present and future appropriations requests; plans and strategies for congressional engagement; and plans and strategies for agency IT management.

5.    In addition to containing significant amounts of sensitive information, ARRPs are deliberative in nature, subject to change at any moment as the agency's needs, missions, and staffing evolve or as new leadership joins an agency. Nothing in an ARRP, or its review or approval by OPM or OMB, binds the agency to any particular course of action.

6.    No ARRP is ever "final." ARRPs are living documents that are always subject to change as agency needs and circumstances may dictate, or simply due to an agency rethinking or reconsidering an issue. They may change drastically as a result of new leadership joining an agency, as agency officials are confirmed by the Senate to their posts. Indeed, the non-final and frequently changing nature of ARRPs is one of the reasons OMB and OPM requested that the agencies submit monthly progress reports in May, June, and July.

7.    ARRPs are internal agency planning documents that lack any immediate force or effect. They were developed thoughtfully and carefully by agencies, and invariably include the

Declaration of Stephen M. Billy
3:25-cv-03698-SI

1    agency's close consideration of its own statutory functions and authorities and its own long-term

2    workforce planning needs.

3        8.      In many cases, ARRPs include ideas for reforms aimed at improving agency

4    efficiency in delivering services to the American taxpayer—but those reforms, again, frequently

5    reflect the agency's current thinking involving potential changes that may or may not take place

6    in the intermediate or distant future, and are always subject to change for any reason.

7        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

8    and correct based on my personal knowledge.

9    Dated: May 11, 2025

10

11

12                    /s/ Stephen M. Billy
                      Stephen M. Billy
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28